1          IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2

3    MUNIAUCTION, INC., t/d/b/a
     GRANT STREET GROUP, INC.,
4          Plaintiff
        vs.                    Civil Action 01-1003
5
     THOMSON CORPORATION, t/d/b/a
6    THOMSON FINANCIAL and/or
     THOMSON FINANCIAL MUNICIPALS
7    GROUP and i-DEAL, LLC,
           Defendant.
8
     Transcript of Jury Trial Proceedings on Monday, September
9    25, 2006, United States District Court, Pittsburgh,
     Pennsylvania, before Gary L. Lancaster, District Judge.
10   APPEARANCES:
     For the Plaintiff:        Raymond P. Niro, Esq.
11                             Sally J. Wiggins, Esq.
                               Douglas M. Hall, Esq.
12
                               NIRO, SCAVONE, HALLER & NIRO
13

14   For the Defendants:       James L. Quarles, III, Esq.
                               William G. McElwain, Esq.
15                             C. Colin Rushing, Esq.
                               WILMER, CUTLER, PICKERING
16                             HALD & DORR

17                             Steven M. Reinsel, Esq.
                               LEECH, TISHMAN, FUSCALDO &
18                             LAMPL

19
     Court Reporter:           Juliann A. Kienzle, RMR, CRR

20          Fifth Floor USPO & Courthouse
            700 Grant Street
21           Pittsburgh, PA 15219
            (412) 261-6122
22

23        Proceedings recorded by mechanical stenography;
        transcript produced by computer-aided transcription.
24

25

                              2



1   (In-chambers conference; Monday, September 29, 2006.)

2          THE COURT:  We have a number of things I guess we

3   have to go over in a very short amount of time.  Now, we

4   talked about which claims were being prosecuted, we had a

5   pretrial conference and I had I think 14 claims.  You said you

6   might cut back on some.

7          MR. NIRO:  When we looked at it, it's really ten,

8   there are two independent claims, 1 and 31, then the dependant

9   claims grouped with them, so I think we're going to use all

10  14, but when we present it, it will be effectively ten because

11  we can take two at a time on the dependents, for example,

12  claims 1 and 31 are the independent, and then if you take a

13  dependant claim like 9, that pairs up with another dependent

14  claim, so we can deal with those together, so it's effectively

15  going to be ten.

16          THE COURT:  You're working hard at this, aren't

17  you?  You're really going to make this as confusing for these

18  people as you can.  You must have thought about this all

19  weekend.

20          I have 1, 2, 9, 14, 18, 20, 24, 31, 32, 36, 40, 42,

21  46 and 56.

22          Are those the claims?

23          MR. NIRO:  Yes.

24          THE COURT:  I'm not going to bifurcate the trial.

25          Had defendants planned on introducing a best mode

3

1  defense?

2          MR. QUARLES:  No.

3          THE COURT:  Defendant's motion to exclude evidence

4  of innovation award.  What is an innovation award?

5          MS. WIGGINS:  I will address the Court.  Your

6  Honor, this is an award that was granted to the City of

7  Pittsburgh when they applied for it in relation to the

8  patented invention that is the subject matter of the '099

9  patent.  Dr. Henningan would come in and lay the foundation as

10  well for the introduction of this award.  He was involved

11  personally in the application to Harvard, the interviewing

12  process that took a year, multiple interviews, a visit from

13  the folks at Harvard here to the City of Pittsburgh, and this

14  was the ultimate award that was received.

15        THE COURT:  What is it relevant to?

16        MS. WIGGINS:  It's relevant to the commercial

17  success.  I understand that the defendants are raising the

18  issue of obviousness, and under the case law, awards regarding

19  appreciation of the invention, publicity, but specifically

20  awards come in as evidence of nonobviousness.

21        MR. NIRO:  It's actually mandatory, Your Honor,

22  because any time there's an issue of obviousness, the

23  secondary, so-called secondary considerations are important to

24  the objective criteria for nonobviousness and recognition by

25  others of the significance of an invention, like the Ford

4

1  Foundation, which is what the genesis for this is, is

2  important evidence for the jury to hear on this question of

3  obviousness.  That's their whole defense.

4          MR. McELWAIN:  Your Honor, there is this secondary

5  consideration that's called praise of contemporaries in the

6  field of the art at the time.  There are two really important

7  aspects of this.  One is that the praise come from people

8  skilled in the art.  Here the praise is from the government's

9  JFK School and the art is computer science.  So, the JFK

10  School said this is a pretty cool thing because of the way

11  they're selling bonds, it's maturity-by-maturity sales instead

12  of all or nothing.  That's what the award is for.  The claims

13  aren't limited to maturity, the claims are in the field of

14  computer science, that's what their own expert says, so the

15  fact that the JFK School thinks that maturity-by-maturity

16  bonds is a good idea is not relevant because it doesn't

17  demonstrate the required nexus between the award and the

18  claimed --

19          THE COURT:  I'll take it under advisement.  Don't

20  say anything about it in your opening.

21          MR. McELWAIN:  The case is cited in our brief.

22          THE COURT:  Now, you were supposed to go over each

23  other's exhibits and let us know if anything is being objected

24  to, and, if so, what and on what basis.

25        Have you done that?

5

1        MR. QUARLES:  We have, Your Honor.  We didn't get

2  some of the indication that some of the exhibits were going to

3  be offered until one-thirty last night, but there's a list of

4  exhibits that we don't have a problem with.  One, Exhibit 1,

5  2, 3, and 6, we have no objection.

6        Exhibit 10, Your Honor, is our opinion letter, is

7  the opinion letter which we were going to put in.  I don't

8  know how --

9        MR. NIRO:  We're not using that in the opening or

10  in the first witness, so that's coming later.

11        MR. QUARLES:  All right.

12        Exhibit No. 39 we do have an objection to, Your

13  Honor.  That document we can give you a copy of.  This is a

14  document which is an i-Deal, LLC competitor overview.  We just

15  don't understand what the relevance of this is.  It may be

16  that they can explain what the relevance is, but we don't know

17  what it is at this stage.

18        THE COURT:  Are you introducing this?

19        MR. NIRO:  I don't think so.  Not in the opening.

20 I have my opening exhibits right here.

21          MR. HALL:  If we read in testimony, that will be

22 one of the exhibits that was used.

23          MS. WIGGINS:  If we read Mr. Ganeles' deposition

24 transcript.

25          MR. NIRO:  It won't be Mr. Harrington.  And it

6

1 won't be in the opening, but it's an admission from them in

2 any case.

3          THE COURT:  This was a deposition exhibit?

4          MS. WIGGINS:  Yes, sir.  If it would expedite

5 things, since it really wouldn't come in until later today, we

6 can get the relevant testimony for the Court if you would like

7 to see that in order to evaluate.

8          THE COURT:  First of all, what is it?  I see the

9 title, but what is it?

10          MR. QUARLES:  It's a competitor overview, an

11 internal document of i-Deal, LLC, one of the defendants.

12          MS. WIGGINS:  It was used with one of the

13 defendant's witnesses during a deposition.

14        THE COURT:  You're objecting on the basis of

15  relevance?

16        MR. QUARLES:  On the basis of relevance.

17        THE COURT:  What relevance does it have?

18        MR. HALL:  It was written by an internal employee

19  which it described the market in which i-Deal competes as

20  being the electronic auction market.  I asked the CEO at his

21  deposition if it was written by an employee of i-Deal

22  internally, and he said yes.  So we want to introduce it to

23  show that i-Deal competes in the electronic auction market

24  because they have contended all along that they don't do

25  auctions.

7

1        THE COURT:  On that basis, it's admissible.

2        MR. QUARLES:  Your Honor has ruled on the issue of

3  auctions.

4        The next is a series of about 27 newspaper articles

5  that they'd like to introduce and we object to this on

6  multiple grounds.  It's hearsay within hearsay within hearsay,

7  and much of what is in it is not only hearsay, but sort of

8  demonstrably wrong.  For example, there are quotes in here

9   about MuniAuction being the first person to do

10  maturity-by-maturity auctions; that's clearly wrong.  One of

11  the things in the file history indicates that that had been

12  done a year earlier.  So those are newspaper articles.  We're

13  just sort of --

14          MR. NIRO:  The Bond Buyer is their publication.

15  It's an admission from them.  This is their magazine that they

16  put out, so it's a statement by the defendant so the hearsay I

17  don't think is applicable since it's the defendant's

18  representation.

19          As to a third-party article such as the

20  Post-Gazette and others, we don't seek to offer those for the

21  truth of the matter asserted, just for the mental state of the

22  person making the statement.  It also relates to praise for

23  the invention, so I don't think the hearsay objection is

24  appropriate, given the fact that on The Bond Buyer, at least

25  that's them speaking rather than someone else.

8

1          MR. QUARLES:  First, The Bond Buyer isn't a

2   defendant in this case, it's a different part of Thomson

3  Financial or the Thomson Corporation, they're not a defendant

4  in this case.  The Bond Buyer has never been named as a

5  defendant, and even if it were, it's a newspaper, so, it can't

6  be that, for example, any article written by the Pittsburgh --

7  that's an AP story published in the Pittsburgh Tribune would

8  be admissible against the Pittsburgh Tribune, so that's one

9  issue.

10        The second issue, Mr. Niro I think said it was

11  admissible for the state of the mind of the person that wrote

12  it; what the state of the mind of the reporter could -- how

13  that could possibly be relevant to me, to this --

14        THE COURT:  I agree with that.  Those statements

15  don't come in.

16        What is the status of The Bond Buyer?  He says this

17  is your publication called The Bond Buyer.

18        MR. QUARLES:  The Bond Buyer is a trade magazine

19  which we sell subscriptions to, Thomson Corporation does.  But

20  Thomson Financial, the division that's involved here has

21  nothing to do with The Bond Buyer.  The Bond Buyer is simply a

22  newspaper, as far as we're concerned.

23        THE COURT:  Does it talk about your products?

24        MR. McELWAIN:  Most of these articles are sort of a

25  description of what MuniAuction entered into, the auction

9

1  market.  They're chatty newspaper articles about the lay of

2  the land, including many, many quotes from many people that

3  are going to be witnesses here.  So there's a huge amount of

4  internal hearsay in it.  Some of the quotes are frankly kind

5  of good for us, some of the quotes good for them, but all of

6  them real serious hearsay.  You'd have to go through every

7  article kind of paragraph by paragraph to weed out the

8  internal hearsay that seems to me to be the --

9        THE COURT:  Why don't you do this.  At some point

10  before you introduce these, why don't you go through and just

11  highlight what it is you want to come in and then we'll work

12  on that section of what you want to come in.

13        MR. NIRO:  It's very limited, Your Honor, because

14  when this product hit the marketplace in Pittsburgh, it was a

15  tremendous sensational -- actually, historic event and there

16  was a lot of publicity about it.

17        THE COURT:  Any other objections to their exhibits?

18        MR. QUARLES:  I do.  If we go to --

19          THE COURT:  While you're looking, I asked you to

20  put together a book of the issuers for the patent, the

21  glossary and the claim construction.

22          MR. NIRO:  We did that.

23          THE COURT:  You have that?

24          MR. NIRO:  Yes, sir.

25          MS. WIGGINS:  I would have to leave the room.  We

10

1  made 13 sets.

2          THE COURT:  All right.

3          Hold off.  I just want to make sure it was done.

4          MR. NIRO:  There's some disagreement on the

5  glossary.  I think there's disagreement on the claim

6  construction.  We have your terms as you defined them, Your

7  Honor, and we have the terms as defined by Judge Mitchell.

8  Then Your Honor suggested we take terms like bond, municipal

9  bond and things like that, we've taken a crack at a bunch of

10  definitions and we have actually incorporated all of their

11  definitions.  So we put them both in there.

12          THE COURT:  What is the fight about then?

13          MR. McELWAIN:  I remember a definition of Internet

14  that is just wrong.  It describes the Internet as it exists

15  today, which is not -- is an important issue in the case about

16  the growth of the Internet.  I think it describes it, for

17  example, as 100 million sites on the Internet.  It's just not

18  correct.  That's one that comes to my immediate mind.  And

19  then there had been some issues with Judge Mitchell's

20  recommendation that goes beyond your claim construction, and

21  some of that we thought was fine if that wants to get worked

22  into the claim construction.

23        MR. NIRO:  If they want to take Internet out,

24  that's okay with us.  I don't think that should be

25  controversial material.

11

1        MR. QUARLES:  We didn't think so either.  We met

2  last night and tried to do that.

3        THE COURT:  All right.  I take it you have a book

4  right there that has all these terms in it, but you object to

5  some of the terms.

6        MR. McELWAIN:  To some of terms and the way it was

7  written.

8          THE COURT:  This is what you can do.  I'll let you

9  sit down and say, alternate term definition submitted by

10  defendant, something like that.

11          MR. QUARLES:  Okay.

12          The next document, Your Honor, is a --

13          THE COURT:  How many documents are you objecting

14  to?

15          MR. QUARLES:  I think I have four more.

16          THE COURT:  Okay.

17          MR. QUARLES:  Your Honor, the next document is one

18  of our internal documents, but it's about parity pricing.  We

19  object to that on grounds of hearsay -- I'm sorry, on the lack

20  of relevance to any issue that's currently being tried in the

21  case.  How we price anything, you may remember there was an

22  antitrust claim in this case, but that's been dismissed.

23          MR. NIRO:  This may be the single-most important

24  document in the case.  This is their person saying, we

25  deliberately priced this product at a level to drive these

12

1  guys out of business, and we did it as part of our plan.

2          THE COURT:  Where does it say that?

3          MR. QUARLES:  It doesn't say that anywhere.

4          MR. NIRO:  This is kind of highlighted, but you

5  have to go to the next page, Your Honor.  He says, we've

6  achieved a dominant position as a result of our giving this

7  away.  "Giving it away," and that's one of the cornerstones of

8  what is going on in this case.  They not only infringed the

9  patent, but they developed a strategy, we believe, to run our

10  people out of business, and they were pretty good at doing it.

11  They took our market share from 100 percent down to 15

12  percent.  It goes right to the heart of some of the damage

13  claims, and, more importantly, willfulness because after

14  copying the invention, they then priced their product to hurt

15  us.

16          THE COURT:  So why is it objectionable?

17          MR. QUARLES:  I think it's not relevant.  The

18  pricing, our pricing we say is not relevant to any issue

19  that's currently in the case.

20          MR. McELWAIN:  This is the antitrust claim.

21          MR. QUARLES:  That case was dismissed.

22          MR. NIRO:  It's not the antitrust claim, Your

23  Honor.

24          THE COURT:  It's admissible.

25          MR. QUARLES:  The next, Your Honor, is a series of

13

1  four documents which purport to be indications of people from

2  Thomson Financial hitting their website, or something along

3  that line.  That document is totally unintelligible to a juror

4  without some explanation of what it is.  And, more

5  importantly, the document appears to have been manipulated.

6  It's not -- it's not an accurate document.  If you look, for

7  example, at Pages 11 and 17 of the document, you'll see that

8  the same information appears in both places, that is, it shows

9  the identical hits.

10          MR. NIRO:  This, Your Honor, is our document,

11  Mr. Harrington can testify about it.  We have a website, that

12  is, Mr. Harrington has a website for MuniAuction and as they

13  were ramping up to copy this invention, they started hitting

14  the website and hitting it almost daily, to the point of

15  thousands of website hits to find out how we were doing it,

16  why we were doing it, how we structured our brochures,

17  everything that we were doing.  Mr. Harrington can testify

18  that as part of the ordinary course of his business, he can

19  see who is spying on him, who is looking at what is on his

20  website and these pages are all TFN.  That's Thomson

21  Financial.  We can show that the president of the company was

22  doing it, that various technical people were doing it and the

23  cumulative effect of this.  And we have a graph, which is the

24  next one, that shows that this is the amount of activity

25  ramping up, hitting our website to 1,069 instances, hitting

14

1  our website right before they introduce their product, so it

2  goes to copying the number of hits on our website to get

3  information about how we do this.

4        MR. QUARLES:  Two things, Your Honor.  First, that

5  graph is -- we object to that as misleading.  If you look at

6  it, it's not a suggestion that that's an increasing amount of

7  activity over time.  What that is is a cumulative count of

8  what they call hits.  And if Your Honor will look at what they

9  call a hit, remember, this is the day of dial-up modems and so

10  when you open the first web page here, this GET, all you're

11  doing is going on a publicly available site and looking at it.

12  It then records every file that you open.  These files are not

13  even things -- you may not even have seen them, but as a

14  result of logging in, it says, okay, I'll now make it

15  available for you to see it.  So this is -- they're now

16  suggesting there are 1,069 hits.  In many cases, that's 50

17  files that were opened as a result of somebody looking at the

18  publicly available front page of the website.

19          THE COURT:  It goes to the weight of the evidence

20  not the admissibility.  I'll admit it.

21          MR. QUARLES:  Finally, Your Honor --

22          THE COURT:  We're going to have to get going.

23          Are you going to use these in your opening?

24          MR. NIRO:  Your Honor, right, these are just

25  demonstratives.  For example, what is a municipal bond?

15

1           THE COURT:  You don't object to those?

2           MR. QUARLES:  If you're going to use the Buck

3  Rogers one that you sent over last night or the sausage, the

4  sausage, I'm definitely going to object to those.

5           MR. McELWAIN:  We'll object to the very

6  argumentative ones.

7           MR. NIRO:  That's fine.

8          THE COURT:  What is the Buck Rogers?

9          MR. QUARLES:  You sent over one Buck Rogers versus

10  Reality.

11         MR. NIRO:  That goes to their defense -- Buck

12  Rogers was a comic character, but --

13         THE COURT:  It says 1929, why would I know about

14  Buck Rogers?

15         MR. NIRO:  I actually don't know.

16         THE COURT:  Take them out.

17         MR. QUARLES:  One other one is 265.

18         THE COURT:  Is that going to be used this morning?

19         MR. NIRO:  What is 265?

20         MR. QUARLES:  That's the before MuniAuction.

21         MS. WIGGINS:  That's in the beginning.

22         MR. NIRO:  How a bond was sold before MuniAuction.

23  I don't think that should be a controversial one.  Again,

24  these are just intended to put in pictures what we're going to

25  be saying, this is the way bonds were auctioned before

16

1  MuniAuction.

2        MR. QUARLES:  That's not the one I care about.

3  Yes, that's the one.

4        MS. WIGGINS:  It's 255.

5        MR. NIRO:  Essentially, people had to hand deliver

6  them, get on the telephone and deliver it or use a fax.

7  That's one of the problems here.  The clocks on these faxes

8  were set at different times, so the big disputes, my clock

9  said it was in at 10:30 but the official clock or the other

10  clock said it was 10:15.

11        THE COURT:  Why is that objectionable?

12        MR. QUARLES:  Before MuniAuction there was PARITY,

13  which did all those things.  Their own patent says that.

14        MR. NIRO:  We're going to say that in our opening

15  as well.

16        THE COURT:  They can use that.  There's nothing

17  objectionable about this stuff.

18        This is what we're going to do.  Those that you

19  have not objected to and he's going to use this morning are

20  going admitted.  What other objections that you have, let's

21  meet one o'clock and see if we can deal with that.

22        Now, I have to tell you guys this.  In terms of

23  timing, this case I put away a last week and this week for

24  trial.  Next Tuesday I'm out of here, Tuesday afternoon, I

25  won't be back until Thursday.  So we told the jury it would

17

1  take four to five days to try.  I have to leave town on

2  committee work next Tuesday afternoon and I won't be back

3  until Thursday, so I'm giving you fair warning about this now.

4       Let's get started.

5       MR. QUARLES:  One other issue.  I don't know

6  whether it's going to come up in the opening, but we raised in

7  the motion in limine and they filed a motion yesterday

8  suggesting Mr. Harrington was going to testify about his 90

9  percent number, that is, if Thomson hadn't been in the market,

10  I would have gotten 90 percent of the business.  We object to

11  that strenuously, Your Honor, and we filed a memorandum

12  yesterday on that.  There is a case solid on point with the

13  Court of Appeals called Grain Processing.

14       THE COURT:  Had you planned on saying --

15       MR. NIRO:  That doesn't come up in opening.  I

16  think that will come up late in Mr. Harrington.  All he's

17  going to testify to, I think you'll hear it in context, this

18  is the price I charge, this is the profit I made.  These are

19  facts he knows exactly, and I don't think that's --

20        MR. QUARLES:  I don't have a problem with him

21  giving you the fact of what he charges.  It's when he says I

22  would get 90 percent of the market if Thomson wasn't there,

23  Grain Processing says that has to be done by an economic

24  analysis.

25        MR. NIRO:  I'll take a look at that.  I don't think

18

1  that's even coming up until late in his testimony and I'm not

2  sure he's even going to say something like that.  If he is

3  headed there -- we'll call him first, but if he's headed there

4  before I ask those questions, I'll ask permission from the

5  Court, make a proffer on it because I don't think -- again,

6  it's a question of fact versus opinion.  We're interested in

7  getting facts, not his opinions.

8        THE COURT:  He can certainly testify how much money

9  he made and what the cost margin was and what the cost was,

10  those kinds of things he can testify to.

11        MR. NIRO:  He was negotiating with these guys, he

12  went up to talk to them about a license and that kind of

13  stuff, that's really where he's going.

14          THE COURT:  You don't want some but for I'd now be

15  a bezillionaire.

16          MR. NIRO:  He's not going to say that.

17          (Whereupon conference in chambers concluded.)

18      (Open court.)

19          THE COURT:  Members of the jury, I'm going to give

20  you some preliminary instructions that will guide you through

21  your participation in the trial.  At the end of the trial, you

22  will each be given written instructions that explain the law

23  and the issues that you have to decide.  So, what I want you

24  to do right now is sit and listen.

25          Now, I'm going to go through a number of things,

19

1  some of the terms I'm going to use are going to be rather new

2  to you.  Some of the terms I'm going to use are going to have

3  certain definitions that you might not be accustomed to.

4          Know, if I go through this and at some point it

5  goes zoom, don't worry about it.  Do not panic.  Don't alarm

6  yourself.  When this trial is over, I guarantee you you will

7  know exactly what it is you have to decide, you will know what

8  the law is that will guide that decision and you're going to

9  do a fine job.  I know you are.  Believe me, I've done this

10  before.  So just relax.  Don't worry about it.  You'll do

11  fine.

12          Jury service is, truly, one of the highest duties a

13  citizen of the United States can be called upon to perform.

14  The system of justice called for by our Constitution is the

15  best devised because it relies on citizens of the United

16  States to decide issues of fact in dispute between parties.

17  The involvement of citizens in this way takes the important

18  fact-finding function out of the hands of individual judges so

19  that the decisions about facts or questions can be made by

20  members of the community having a variety of backgrounds and

21  perspectives, rather than by legal professionals.

22          Notwithstanding the importance of jury service,

23  coming into court and participating in a trial requires

24  sacrifice by jury members who must give up other business and

25  personal pursuits, sometimes at considerable inconvenience.

20

1  I'm aware of the sacrifice involved, as are the parties and

2  their attorneys who join me in thanking each of you for being

3  here and for serving as a juror in this case.  We hope that

4  the experience will be rewarding to you despite any

5  inconvenience involved.

6        We'll take testimony Monday, Tuesday, Wednesday and

7  Thursday.  There will be no testimony on Friday.  However, if

8  the jury is ready to deliberate, you will report back and you

9  can deliberate on a verdict.  We'll take a luncheon recess at

10  about 12:00 p.m. every day and resume at 1:30 sharp.  We will

11  take one 15-minute recess during each morning and afternoon

12  session.  We'll typically adjourn for the day between 4:30 and

13  4:45, and resume the following day at 9:30 sharp.  Again, this

14  case should take four to five days to try.

15        It's very important, ladies and gentlemen, that

16  each of you be here when the proceedings are scheduled to

17  start because if anyone is late, the other jurors, the

18  parties, the lawyers, the witnesses and I have to wait until

19  you arrive.

20        It will be your duty to find from the evidence what

21  the facts are.  You and you alone are the judges of the facts.

22  You will then have to apply these facts to the law as I give

23  it to you.  You must follow that law whether you agree with it

24  or not.

25        I caution you that nothing that I may say or do

21

1  during the course of the trial is intended to indicate or

2  should be taken by you as indicating what your verdict should

3  be.

4        The evidence from which you will find the facts

5  will consist of the testimony of witnesses, documents and

6  other things received into the record as exhibits, and any

7  facts the lawyers agree or stipulate to or that I tell you to

8  find.  Certain things are not evidence and shouldn't be

9  considered as evidence.  Statements, arguments and questions

10  by lawyers are not evidence.  Objections to questions are not

11  evidence.  Lawyers have an obligation to their clients to make

12  an objection if they believe that the evidence being offered

13  is improper under the rules of evidence.  You should not be

14  influenced by an objection or by my ruling on it.  If an

15  objection is sustained, ignore the question.  If it's

16  overruled, treat the answer like any other.  If you are

17  instructed that some item of evidence is received for a

18  limited purpose only, you must follow that instruction.

19          Testimony that I have excluded or told you to

20  disregard is not evidence and must not be considered.

21          Anything you may have seen or heard outside the

22  courtroom is not evidence and must be disregarded.  You are to

23  decide the case solely on the evidence presented here in the

24  courtroom.

25          There are generally two types of evidence which you

                                    22

1  may properly use in deciding this case.  One is called direct

2  evidence, the other is called circumstantial evidence.

3          Direct evidence is where a witness testifies about

4  what is known to him of his own knowledge by virtue of his own

5  senses, that is, what he saw, what he felt, what he touched,

6  what he heard.  That's called direct evidence.

7          Circumstantial evidence is evidence that tends to

8  prove one fact by other facts.  There's a simple example of

9  circumstantial evidence that is often used in this courthouse.

10  Assume that when you came into the courthouse this morning the

11  sun was shining and it was a nice, pretty day.  As you were

12  sitting here, however, somebody walked in with an umbrella

13  that was dripping wet.  Somebody else then walked in in a

14  raincoat that was also dripping wet.  Now, you cannot look

15  outside of the courtroom to see for yourself whether or not it

16  is raining, so you have no direct evidence of that fact.  But,

17  on the culmination of those other facts I told you to assume,

18  the raincoat and the umbrella, it would be reasonable and

19  logical for you to conclude that it is now raining outside.

20  That is all there is to circumstantial evidence.  You infer on

21  the basis of reason and experience and common sense from an

22  established fact the existence or nonexistence of some other

23  fact.  Circumstantial evidence is no less value than direct

24  evidence; for, it's a general rule the law makes no

25  distinction between the two.

23

1        In this trial, you will hear expert testimony.  A

2  witness who has some special knowledge, skill, experience in a

3  particular science or occupation may give his opinion as an

4  expert as to any matter in which he is skilled.  You should

5  consider an expert's opinion and give it such weight as you

6  think it deserves.  In determining the weight to be given to

7  his opinion, you should consider the qualifications and

8  reliability of the expert, the reasons given for his opinion

9  and whether the factual assumptions that allow the opinion are

10  supported by the credible evidence in the case.

11        You're not bound by an expert's opinion simply

12  because he is an expert.  You may accept it or reject it, in

13  whole or in part, as in the case of any other witness.  Give

14  it the weight, if any, that you think it deserves.

15        In resolving any conflict that may exist in the

16  testimony of expert witnesses, you are entitled to weigh the

17  opinion of one expert against that of another.  In doing this,

18  you should consider the relative qualifications and

19  reliability of the expert witnesses, the reasons for the

20  opinions, and the facts and other matters on which it is

21  based.

22        I have said you must consider all the evidence.

23  This does not mean, however, that you must accept all the

24  evidence as true or accurate.  You, as the jurors, are the

25  sole judges of the credibility of the witnesses and the weight

24

1 their testimony deserves.  You may be guided by the appearance

2 and conduct of the witness or by the manner in which the

3 witness testifies or by the character of the testimony given

4 or by evidence contrary to the testimony given.

5        You should carefully scrutinize all the testimony

6 given, the circumstances under which each witness has

7 testified and every matter in evidence that tends to prove

8 whether a witness is worthy of belief.  Consider each

9 witness's intelligence, motive, state of mind and demeanor or

10 manner while on the witness stand.  Consider the witness's

11 ability to observe the matters as to which he has testified

12 and whether he impresses you as having an accurate

13 recollection of those matters.  Consider also any relation

14 each witness may bear to either side of the case, the manner

15 in which each witness might be affected by the verdict and to

16 the extent to which, if at all, each witness is either

17 supported or contradicted by other evidence.

18        Inconsistencies in the testimony of a witness or

19 between the testimony of different witnesses may or may not

20 cause you to discredit that witness.  Two or more persons

21 witnessing an incident or transaction may see or hear it

22 differently.  Innocent misrecollection, like failure of

23  recollection, is not an uncommon experience.  In weighing the

24  effect of a discrepancy, always consider whether it pertains

25  to a matter of importance or to an unimportant detail, and

25

1  whether the discrepancy results from innocent error or

2  intentional falsehood.

3         In summary, after making your own judgment, you

4  will give the testimony of each witness such weight, if any,

5  as you think it deserves.  You may accept or reject the

6  testimony of any witness in whole or in part.

7         This is a civil case.  MultiAuction has the burden

8  of proof, that is, the plaintiff has the burden that Thomson

9  infringed its patent by what is called the preponderance of

10  the evidence.  That means that MuniAuction has to produce

11  evidence which, considered in light of all the facts leads you

12  to believe that it is more likely true than not true that

13  Thomson infringed its patent.  To put it differently, if you

14  were to put each witness's evidence on opposite sides of the

15  scales, the plaintiff would have to make the scale tip

16  somewhat on its side.  If it fails to meet this burden, the

17  verdict must be for the defendant.

18        Thomson, the defendant, claims it should not be

19  held liable for infringes this patent because the patent is

20  invalid or unenforceable for various reasons I will explain to

21  you later.  For now, you should be aware that Thomson must

22  prove their defenses by what is called clear and convincing

23  evidence rather than a preponderance of the evidence.  Again,

24  you will get this in time, don't worry about it for now.

25        The clear and convincing evidence standard is a

26

1  higher burden of proof than the preponderance of the evidence

2  standard.  Some refer to it as requiring proof that something

3  is highly probable.  We require a defendant to meet a higher

4  standard of proof because once a patent is issued, there's a

5  presumption that it's valid, so if Thomson wants to prove that

6  it's invalid, it has to have this higher burden of proof that

7  I just told you about.

8        Rest assured you will be given detailed written

9  instructions on the appropriate burdens to apply to each part

10  of this case before you agree on a verdict.  You do not have

11  to memorize all of this now.  I want you to be generally

12  familiar with the burdens of proof because you may hear the

13  lawyers or witnesses refer to them during the trial.

14       Again, this is a patent infringement case.  In a

15  patent infringement case, a person who owns a patent accuses

16  another person of using the invention without their

17  permission.  Using an invention without permission is also

18  called infringing the patent.

19       The patent owner in this case is the plaintiff,

20  MuniAuction, Inc.  It is also sometimes known as Grant Street

21  Group.  MuniAuction and Grant Street are the same company.

22  Although some witnesses might refer to plaintiff as Grant

23  Street, in this trial, generally, we will refer to plaintiff

24  as MuniAuction.

25       There are several entities that are accused of

27

1  infringement on this case; Thomson Corporation, Thomson

2  Financial, Thomson Financial Municipals Group and i-Deal.

3  These companies are all related.  We will refer to them simply

4  as Thomson.

5       The patent at issue in this case is U.S. Patent No.

6  6,161,009.  Patents are commonly referred to only by their

7  last three digits, therefore, you will hear people talk about

8  the '099 patent in this case.  The patent's invention is a way

9  to auction municipal bonds over the Internet.  Municipal bonds

10  are financial instruments used by public entities, like school

11  districts, to raise money for projects like building a new

12  school.  One way to issue the bonds is to auction them to the

13  highest bidder.  The plaintiff, MuniAuction, contends that

14  Thomson's way to auction municipal bonds using a system that

15  it calls BIDCOM infringes MuniAuction's patented way of doing

16  the same thing.  That is, MuniAuction accuses Thomson of

17  infringing its patent and is seeking money damages to recover

18  for the alleged infringement.  MuniAuction has several

19  theories of how damages should be awarded through profits,

20  fair royalties and recovery for price erosion.  Again, you'll

21  be given very specific instruction on these theories.  For

22  now, just be prepared to hear testimony about the different

23  types of damages.

24          Thomson denies that its product infringes

25  MuniAuction patent.  Thomson also claims the '099 patent is

28

1  invalid.  The defendant can defend the infringement case on

2  the basis that the patent is invalid in several ways.  The

3  bottom line is that the patent should not have been issued in

4  the first place by the patent office.

5       Again, I'm going to explain these different

6  defenses to you in detail at the end of the case.  Just be

7  aware that Thomson will be presenting evidence to prove either

8  that they did not infringe the patent and/or the '099 patent

9  is defective in some way and cannot be the basis of an

10  infringement lawsuit.

11       Also, before we start the trial, I'm going to give

12  you some background information about the patent system and

13  patent infringement cases.  I understand that many, if not

14  all, of you may not be familiar with these things and,

15  hopefully, this will make you more comfortable with the

16  subject matter that you'll be dealing with in the coming

17  weeks.  First, I'm going to show you a video that will explain

18  the patent system, then I will discuss some issues that will

19  be especially important for you in this case.  Finally, I'm

20  going to give you a notebook and I'll explain what is in that

21  notebook, but there will be several things in there that you

22  will refer to throughout the course of the trial.

23      This video is about 20 minutes long.  It's not made

24  by the defendants, it's not made by the plaintiffs, it's made

25  by the federal government as part of our effort to help jurors

29

1  like you understand the patent system and the fact that these

2  issues have to be resolved, so it's very neutral, it's not an

3  advocacy for either side.  You'll be able to watch on the

4  screen in front of you in the juror box.  My staff will also

5  give you a copy of a sample patent that is referred to in this

6  video so you can follow along.

7      (Whereupon, the video was played.)

8      THE COURT:  Now, members of the jury, as you've

9  just heard, patents are issued by the U.S. Patent Trademark

10  Office, which is a part of the federal government.  Once a

11  person gets a patent, he has the right to prevent others from

12  making these, using, offering for sale the invention covered

13  by the patent during the term of the patent.  The term of the

14  '099 is 20 years from the date in which the application was

15  filed.

16      Again, there are three main parts to a patent that

17  you're going to hear about:  Identifying information, the

18  specification and the claims.  The claims are the numbered

19  paragraphs listed at the end of the patent.  The claims of the

20  patent are the main focus of a patent infringement case

21  because the claims define the patent owner's rights under the

22  patent.  The patent claims are compared to the defendant's

23  product to determine whether or not there is infringement.

24  The patent claims are also compared to what was already known

25  in the field, what he has referred to as the prior art to

                                    30


1  determine whether or not the invention is something new and

2  really inventive or was obvious.

3        Now, again, you are going to get a booklet at the

4  end of this trial -- not at the end of the trial, at the end

5  of opening statements that are going to have a lot of

6  information in there, some technical terms and glossaries and

7  the claim construction, that is, what do these words in the

8  claim mean because oftentimes on these patent infringement

9  cases, the parties to the invention often will have some

10  disagreement as to what each word or phrase in the claim

11  means.  Therefore, before the trial, I'm the one who decides

12  what these disputed words will mean and you will have that in

13  the booklets and those words will be the ones that you will

14  use to decide the issues in the case.

15        Now, a few words on your duty as jurors.  First, I

16  instruct you that during the trial, you're not to discuss the

17  case with anyone or to permit anyone to discuss it with you.

18  Until you retire to the jury room at the end of the case you

19  simply are not to talk about the case with anyone including

20  each other.  Second, do not read or listen to anything

21  regarding this case in any way.  If you would become aware of

22  an article in the newspaper or a story on television or the

23  radio regarding this case, ignore it, do not let anyone else

24  tell you.  If anyone else is trying to discuss it with you,

25  let me know.  Third, do not try to do any research or make any

31

1  investigation about this case or these types of cases on your

2  own.  Finally, do not form any opinion until all the evidence

3  is in.  Keep an open mind until you start your deliberations

4  at the end of the trial.

5        Additionally, you're not permitted to ask questions

6  of the witnesses or their attorneys, therefore, please do not

7  interrupt the lawyers during their examination of the

8  witnesses or otherwise.  However, if you're unable to hear a

9  witness or one of the lawyers, please raise your hand and I'll

10  see to it that is corrected.

11      The trial is now going to begin.  First each side

12  will make what is called an opening statement.  An opening

13  statement is neither evidence nor argument.  It is simply an

14  outline of what that party intends to show.  It is offered to

15  help you follow the evidence.

16      Next, the plaintiff, MuniAuction, will present its

17  witnesses and then the defendant, Thomson, may cross-examine

18  them.  Then Thomson will present its witnesses and plaintiff

19  may cross-examine them.

20      Now, I've instructed the attorneys in order to help

21  you follow the evidence but before each witness will testify,

22  the attorney will give a very short and general explanation of

23  who the witness is, and what he is going to say, but remember

24  what the lawyers say is not evidence.  The witness's testimony

25  is the evidence.  We're using this procedure simply to make it

32

1 easier for you to understand and follow the witness's

2 testimony.

3          After all the testimony is heard, the attorneys

4 will make their closing statements to you to summarize and

5 interpret the evidence.  I will read you the instructions on

6 the law.  And, again, you'll have a written set of

7 instructions with you in the jury room, you will then retire

8 to deliberate.

9          A written transcript of the trial may or may not be

10 available to you during your deliberations.  Therefore, please

11 pay close attention to the testimony that is admitted during

12 the course of the trial.  The verdict will be based on the

13 collective recollection of the testimony.

14          Finally, if you like to take notes during the

15 trial, you may do so.  We're giving you notebooks so you can

16 take notes if you like.  There's a little flap on the side of

17 your chair, like there was in elementary school, that will

18 come up and you can use that as a desk.  If you decide to take

19 notes, be careful not to get so involved in note taking that

20 you become distracted from the trial.  Additionally, there's

21 always a tendency to attach undue importance to matters that

22  one has written down, some testimony that is considered

23  unimportant at the time presented and not written down may

24  take on greater importance later in the trial in light of all

25  the evidence presented, therefore, you are instructed that

33

1  your notes are a tool to aid you in your individual memory.

2  You should not compare your notes with other jurors in

3  determining the testimony, in evaluating the importance of the

4  evidence.  Your notes are not evidence and by no means a

5  complete outline of the trial or list of the highlights.

6  Above all, your memory should be your greatest asset when it

7  comes to deliberation in rendering a decision.

8          You may not take your notes outside of the

9  courtroom.  Before you leave the courtroom for any reason,

10  these notebooks will be left in the jury room.  When you leave

11  at night, your notebooks will be secured and not read by

12  anyone.  At the end of the trial your notes will be collected

13  and destroyed.  No one, not the attorneys, my staff, newspaper

14  reporters, nor would I be permitted to read your notes.

15          Ladies and gentlemen, stand up and stretch your

16  legs for a minute.

17      (Continue onto next page with no loss of context.)

18

19

20

21

22

23

24

25


34


1      THE COURT:  Okay.  Counsel.

2      MR. NIRO:  Thank you, Your Honor.

3      Good morning, ladies and gentlemen, my name is Ray

4  Niro.  I am going to speak on behalf of the Plaintiff,

5  MuniAuction, in this case.

6      I will introduce some of the people you will see on

7  my side of the case.  Sally Wiggins, who is over here, is a

8  lawyer who works with me.  We have Doug Hall, who is another

9  lawyer that you will see from time to time trying to make this

10   case more efficient by giving us the documents and things that

11   we will be presenting to the witnesses and to you.  So if you

12   see him wandering around, he is trying to help us.

13          I would also like to introduce two of the named

14   inventors, two of the inventors of the patent involved in this

15   lawsuit, Myles Harrington and Dan Veres.  They will be here

16   throughout the trial.  Myles is going to be testifying and Dan

17   as well.  They will tell you about their invention and how

18   they got it and the patent process and explain that entire

19   process to you, their experience with it.

20          Myles and Dan also are the founders of MuniAuction,

21   the Plaintiff in this case.  So they are both the inventors

22   and founders of the company that's the Plaintiff.

23          In a nutshell, this case is about invention,

24   success, and somebody that decided to take something rather

25   than pay for it.  I think that is our view of what the

35

1   evidence in this case is going to present.

2          The invention here is an electronic auctioning

3   system for the sale of municipal bonds.  We are going to hear

4    a lot about auctioning and a lot about the Internet and a lot

5    about an electronic system for not only calculating interest,

6    but helping people bid for the bonds and then sell those

7    bonds.

8         As Judge Lancaster said, you will get a book that

9    will have definitions of some of the terms that the Court has

10   already interpreted that are in the patent to help you

11   understand the definitions.  It's sort of a dictionary that

12   you can consult and use as we go through this process with

13   experts and others that will be testifying.

14        A municipal bond is a little like a mortgage that

15   you might have on your home.  It is a loan.  The only

16   difference, of course, is that the person that's borrowing the

17   money might be the City of Pittsburgh or a hospital district

18   or an institution of some kind.  The person lending the money

19   might be a very big institution lending the money who then

20   sells those bonds to people like us.

21        We have a little chart that shows how a municipal

22   bond works.  Basically a municipal bond, in a nutshell, in

23   this process is an effort to finance something like a hospital

24   or a school or something that the City of Pittsburgh or in

25   this case I think the example is the University of Pittsburgh

1  Medical Center might need an addition for their hospital.  How

2  do they get the money?  They get the money by borrowing it

3  from people like us who through another institution will bid

4  on what those bonds are.

5       The rates of calculating what the interest is

6  becomes a little more complex.  You have a mortgage, you pay

7  an interest rate, generally it's fixed.  But in this instance

8  you have different maturity dates, and these different

9  maturity dates make the calculation a little more complicated.

10  You might pay 4 percent interest one year and 4 1/2 percent

11  interest a different year and 5 percent or 6 percent.  So that

12  varies in the process.  And the people bidding on these bonds

13  have to take that into account in coming up with how much they

14  are willing to lend at what price.

15       Now, when I think of auctions, and I think most of

16  us probably think of auctions this way, there's an auctioneer

17  in the room and there's something maybe like a Pittsburgh

18  Steeler helmet that somebody is bidding on.  And the people in

19  the room are actively seeking to buy that, whatever it is, a

20   Steeler helmet, a Super Bowl ring, whatever it happens to be.

21      In that process there is an auctioneer who controls

22   the process.  People that bid, there are rules, there is a

23   time limit, and at the end of that process somebody wins the

24   secret bid, generally there's a charity that gets the money,

25   and the process is ended.

37

1      Bonds are auctioned a little differently.  The

2   rules are a little different and the process is a little more

3   complicated.  Again, the interest that's calculated becomes

4   somewhat complex and we have an equation I think somewhere in

5   this mix of materials that gives you an idea of exactly how

6   complicated that calculation will be.

7      You will hear in the course of this trial

8   information about something called true interest cost, T-I-C.

9   That calculation in the context of the patent that is at issue

10   in this case is done for all the people that are bidding so

11   that they all know what the interest rate is, the true

12   interest cost.  It is a complex calculation, and Myles

13   Harrington will explain to you how that calculation is done

14   using the computer systems and the software that he and his

15  team of people created.

16      The patent in this case, as Judge Lancaster told

17  you and as you saw in the video, is for a process and

18  apparatus for conducting auctions over electronic networks.

19  Right on the front of the patent itself -- and this is a

20  one-of-a-kind, this is the original, this is the one that you

21  saw an example of coming from the Patent Office.  You only get

22  one of these with the red ribbon on the side.  It says right

23  on the front here, the director of the United States Patent

24  and Trademark Office has received an application for a patent

25  for a new and useful invention.  New and useful invention.

38

1  The title and description of the invention are enclosed.  The

2  requirements of law have been complied with and it has been

3  determined that a patent on the invention shall be granted

4  under the law.

5      Then in the next paragraph it describes what the

6  grant is.  The inventor has contributed something to the

7  public.  In turn, the inventor or his company has the right

8  for a period of time, a limited period of time, to exclude

9   others from making, using, or selling that invention without

10   his or her permission.  It's a reward, a constitutional right,

11   and as the video on the Patent Office indicates, it provides

12   that right to exclude in exchange for the giving to the public

13   of the idea.

14        You know, the system really goes all the way back

15   to the statute of Venice.  I was looking this up the other

16   day.  In the 1400s the Venetians were travellers and they

17   would bring recipes back to their culture from around the

18   world.  What they found was happening is the chefs would keep

19   the recipes as a secret and when they died, they were lost.

20        So the Venetian government came up with a patent

21   system.  In exchange for giving the chef exclusive rights to

22   his or her recipe for the life -- for their life, they wrote

23   it down and upon their death the public benefited by getting

24   access to those recipes.  That concept carried forward

25   hundreds of years later as the concept for our patent system.

39

1   You disclose something to the public, you get an exclusive

2   right for a period of time to use it exclusively.

3        The inventors here -- Sally, you can put the first

4    page up -- the first cover page of the patent has a lot of

5    information on it, some of which I think you heard about in

6    the video and the sample that you saw of a patent.  But up top

7    is the number, 6,161,099.  That means that there are about

8    six million patents that preceded this.  We are now up into

9    the seven million range.

10         There is the title of the patent.  Then the names

11   of the inventors, Myles Harrington, Dan Veres, the two

12   gentlemen I introduced a moment ago, and Bob Panoff.  You will

13   hear about him in the course of this case and what his

14   contribution was to this invention.

15         The assignee, MuniAuction, Inc., Pittsburgh, PA.

16   And there is a filing date and related material.

17         Then as you look down, there is something called

18   references cited.  This is part of that examination process

19   where the patent examiner was investigating what existed

20   before.

21         If you turn the page, Sally, you will see that

22   there are other publications that are described here.  These

23   are all things that the patent examiner considered that were

24   earlier than -- or purportedly earlier than the invention.

25    And the examiners are identified, Eric Stamber and

40

1  Forest Thompson, a primary and an assistant examiner; then a

2  law firm, Nixon and Vanderhye, PC, was involved in assisting

3  Mr. Harrington and Mr. Veres, Mr. Panoff, in getting this

4  patent.  They wrote the patent application and assisted in

5  that process, just as was described in the video.

6        Examiners -- and you will hear this -- are skilled

7  in the technology.  They know about these kinds of inventions

8  and they study that and they are skilled in the patent law.

9  So that process that they go through is one where they apply

10  an educated experience in deciding whether or not you get this

11  patent in the first place.  You don't just file something and

12  they give it to you.  You have to establish your right to get

13  it.

14        Now, if you look further, you will see -- and we

15  can run through this quickly -- the evidence in this case is

16  going to show that the patent, like the sample patent you saw,

17  has drawings.  This one has a lot of drawings, flowcharts,

18  illustrates how this idea came to pass and what the invention

19  was.  Then there is a description, in this case there are

20  drawings numbering 15, 15 different drawings.  It is a little

21  more detailed than the chair that you saw a sample of.

22          But in the description there are descriptions of

23  the embodiments and then at the very end you will see

24  something called claims.  In the video I think it explained

25  that claims are like the deeds, the deed to your property.  It

41

1  defines the invention right, what's being covered by this

2  patent and what is not.

3          Now, how did this all come about?  You will hear

4  evidence that if you go back to the early 1990s, Myles

5  Harrington and Dan Veres were friends working here in

6  Pittsburgh for a company called Grant Street Advisors.  What

7  they did is they helped municipalities like Pittsburgh or

8  hospital districts or whatever get their bond issues ready so

9  that when they auctioned them off, they were being advised and

10  helped on how best to get the best interest rate, how best to

11  auction them off.  They also helped people that were bidding.

12  So they were consultants of a sort.  The name of their company

13  here was Grant Street Advisors, named I think after Grant

14  Street, one of the streets here in Pittsburgh.

15        They say that necessity is the mother of invention.

16  Indeed it is.  When you think about it -- and, again, I think

17  the video said that as well -- invention comes from

18  recognizing a problem and solving it.  That's exactly what

19  they did.

20        Someone once said that invention is like a lost

21  purse along the highway.  Hundreds pass it by until somebody

22  finds it and returns it to the owner.  It's that ability to

23  recognize a problem and solve it that oftentimes leads to

24  invention.

25        So what were the problems that these guys saw as

                                   42


1  advisors to people that were in the marketplace?  We have a

2  little thing that shows some of the problems.  But, in

3  essence, if you can imagine this process being done with

4  people at remote locations with fax machines, for example, and

5  one guy's got his fax machine with the time set at the wrong

6  place -- I do that all the time, I am either too late or too

7  early -- submitting a bid that has to close at 10:30 in the

8  morning and now you have a dispute.  My clock said it was

9   10:32.  Your clock said it was 10:28.  Was that on time or not

10  on time?  A dispute.  Those kinds of issues were things they

11  were dealing with.

12          There were illegibility issues, someone would write

13  down a number, 4 1/2 percent, people would say, I didn't mean

14  4 1/2 percent, I meant 1/4 percent.  You looked at one half, I

15  meant one quarter.  Disputes, difficulties because of the

16  manual way in which these kinds of things were being done.

17          You had bids that didn't conform to the

18  specification, had the wrong numbers in them.  People were

19  disqualified when they didn't want to be disqualified.  There

20  were inaccuracies, legibility problems, one after another.

21          And Myles Harrington will explain to you firsthand

22  the kind of problems he saw and how he and Dan tried to solve

23  them.  In the patent itself you will see with Myles as he goes

24  through it, he lists all these problems and he says, these are

25  the problems that we had to overcome.

43

1          How did they overcome them?  You will hear evidence

2   from Myles that they had a brainstorming session.  They sat

3   down in a group of two or three or four of them and they said,

4   how can we solve these problems.  And they came up with a

5   solution.  Let's use the Internet.  Let's use the Internet.

6   Let's use a web browser.  You will have definitions of these

7   terms.  Let's figure out a way we can communicate instantly

8   with people across the country.  They're sitting at their

9   computers.  They have got a central computer here, we'll do

10  the interest calculations, we'll have a clock.

11          It would be like playing the football game

12  yesterday with the Bengals having one time clock and the

13  Steelers having another time clock and they say, I don't know,

14  I have ten minutes left in the game and the other guy said,

15  no, you don't, you have two minutes left.

16          THE COURT:  It might not be smart to bring that up.

17          MR. NIRO:  I am sorry I brought that subject up.

18  But the Steelers will get them the next time.

19          You have observers, they wanted to have observers

20  for the auction.  The person that is selling wanted to see

21  who's bidding and with what are they bidding.  In some cases

22  these are closed bids so you don't see it until the end.  But

23  you wanted to have that as well.

24          They wanted to have an automatic calculation of the

25   interest so that one guy isn't calculating his interest one

44

1   way and another guy is calculating his interest a different

2   way.

3        All of this came together with bidders across the

4   country -- and, Sally, I think 256 is that -- and they came up

5   with a combination of features.  Invention is oftentimes like

6   music.  You have the same eight notes, but people write songs

7   as differently as John Lennon, Let It Be, and Paul McCartney

8   of the Beatles, or Louie Armstrong, What a Wonderful World, or

9   Gershwin, Rhapsody in Blue.  If you look at notes, it is the

10  same eight notes creating the music, but what combination.

11  What these guys did and what the evidence will show is they

12  created a hit record, a new song, a new way to do it, an

13  electronic auctioning system.  And it was born and grew up

14  right here in Pittsburgh.

15       These guys became famous overnight in their

16  particular world of Internet auctioning.  The first electronic

17  Internet auction occurred right here in Pittsburgh.  It was

18  called the Pittsburgh experiment.  It was deemed to be

19  revolutionary.  In the first year MuniAuction auctioned over

20  $1 billion in bonds electronically.  Today they have auctioned

21  $36 billion in bonds electronically.

22          You know, I grew up in Pittsburgh and am the son of

23  a bricklayer.  My dad used to take me to work with him in the

24  summers and I had the distinction of being a laborer.  I mixed

25  the mortar and carried the bricks, and my brother is here and

                                    45


1  he knows firsthand because he was laying the bricks beside my

2  dad and I was carrying the mortar.  He used to talk about

3  goals.  My dad told me the story about the three bricklayers

4  and the visitor.  The visitor came to the first bricklayer and

5  said, what are you doing?  He said, I am laying bricks.  Went

6  to the second bricklayer and said, what are you doing?  He

7  said, I'm building a wall.  He went to the third bricklayer

8  and said, what are you doing?  He said, I'm building a

9  cathedral.

10          What is your goal?  Do you want to lay bricks or do

11  you want to build a cathedral?  These guys decided to build a

12  cathedral.  I think the evidence will show they were

13  successful at doing that.

14          They started a new business called MuniAuction.  It

15    was a huge success.  They got the recognition for that success

16    from around the country.

17          What they didn't know, what the evidence is going

18    to show you, is that behind the scenes there was a giant about

19    to take the idea, what they had done.  That giant is known as

20    Thomson.  The evidence will show you a company founded by Lord

21    Thomson of Fleet, the eighth or ninth richest person in the

22    world --

23          MR. QUARLES:  If Your Honor please, I --

24          THE COURT:  What is the legal basis of your

25    objection?

46

1          MR. QUARLES:  My legal basis is that this is

2    supposed to be an opening statement about the evidence that is

3    to be presented and not a closing argument.

4          THE COURT:  Counsel, why don't you explain to the

5    jury what evidence you intend to prove.

6          MR. NIRO:  I intend to produce evidence of the

7    ownership of Thomson and their founder, Lord Thomson of Fleet,

8  and Mr. Harrington will present that evidence, Your Honor.

9      Now, Thomson had something called old PARITY. You

10  are going to hear about that. It was an old system. They

11  combined it with something called BIDCOM. It was clumsy and

12  it didn't work and it was no good. You will hear evidence

13  about that. It is going to be resurrected now as a defense in

14  this case and say, gee, we had this idea all along.

15      I would like to show you some of the things it

16  didn't have. That's Exhibit 277, Sally. It didn't calculate

17  the interest at a central place. There was no web browser.

18  There was no central database. There was no common clock.

19  There was no automatic calculation of interest. And one by

20  one they added them all back until they arrived at, and the

21  evidence will show you this, exactly what MuniAuction had

22  invented. That became the new PARITY. This all happened

23  after MuniAuction did the first Pittsburgh auction in November

24  of 1997.

25      Ten months later Thomson introduced its copy. It

47

1  hatched what the evidence will show was a fairly difficult and

2  nasty plan. They decided they're going to give it away, not

3    charge for it, and the result of that, and you will see a

4    memorandum from one of their people who will testify here,

5    Mr. Landes, the result of that was that they, in Mr. Landes'

6    words, dominated the market.  They took it over.

7            In that process MuniAuction, as Mr. Harrington will

8    tell you, went from 55 employees to 25 and from the only

9    source for electronic auctions to a pretty minor player

10   relative to Thomson.  In a sense, the evidence will show you

11   that their dream of building the cathedral got crushed.

12           Before it happened, Mr. Harrington will show you

13   that he saw something very unusual happening.  He had a

14   website through his company and they were hitting the website,

15   that is Thomson, day in and day out, cumulatively over 1,000

16   times.  Sometimes under anonymous names, oftentimes under and

17   frequently under their symbol, and I think it's T-F-N, Thomson

18   Financial.

19           In that process they accumulated information they

20   needed to come up with their plan to make the same thing.

21   Myles decided to confront them.  He went to New York and he

22   talked to them and he said, look, what's up, you guys are

23   hitting my website at an incredible rate, at a frequent rate,

24  so much so that I think you're up to something.

25        They said to him, well, thanks for coming to visit

48

1  us, but get lost.

2        At that point in time the evidence will show you

3  that they decided to take it rather than pay.  And Mr. Landes

4  in his memo admits that and admits they dominate the market

5  today.

6        You will hear a lot of evidence about patent

7  claims.  I want to show you the charts that we will present in

8  the course of this case.  It is sort of like a report card or

9  like a checkmark.  We are going to break the claims down into

10  pieces, then we are going to have an expert, Mr. O'Neill, who

11  is an expert in this field, show you point by point, checkmark

12  by checkmark, how each and everything in these claims is in

13  the Thomson system.

14        But in that process there will not only be the

15  evidence that is presented from our expert, Mr. O'Neill, but

16  the admissions from these Defendants point by point that they

17  infringed.  And we think when the evidence is in you are going

18  to see that every checkmark, every box is checked based upon

19  Mr. O'Neill's testimony and based upon the testimony of their

20  own witnesses.  And, of course, Judge Lancaster will instruct

21  you as to what these words all mean.

22          The evidence is also going to show that it's

23  Thomson that controls these auctions.  It is the auctioneer.

24  It provides what someone needs to do the electronic auction.

25  They supervise it, they control it.  And that's important in

49

1  the process of this case because that exercising control is

2  what creates the basis for the infringement.

3          You don't have to copy somebody, by the way, in

4  order to infringe.  Innocent infringement is still

5  infringement.  But if you copy, that goes to the question of

6  willfulness, and we are going to ask in this case that this

7  jury determine that the infringement was deliberate, it wasn't

8  accidental.  You can still infringe without doing it on

9  purpose; but when you copy, that's willful infringement.

10          The Defendants will present, I predict, we predict,

11  a parade of defenses.  This was old, this was easy, this was

12  obvious, anybody could do it, I could be John Lennon and Paul

13   McCartney and write the song, Let It Be, in hindsight. Anyone

14   could do it, and you didn't tell the Patent Office everything

15   you knew about.

16          When you get your hand caught in the cookie jar

17   sometimes the best defense is to say, I didn't do it, I'm

18   sorry, I don't know. You won't hear a sorry here. In fact,

19   Myles will show you that when he went to them a second time

20   and offered them a license under his patent, they told him, no

21   way, we're not interested, get lost.

22          Again, invention is like new music. New songs,

23   everybody has the same eight notes, but it's how you put it

24   together that makes a new song. As different as Gershwin to

25   Beethoven to the rock and roll or whatever you hear today.

50

1          Thomson was a huge success. They sold $360 billion

2   of bonds using this electronic auctioning system. Over 13,000

3   auctions across the United States. The interest paid by the

4   companies and the municipalities is in excess of $17 billion.

5   Big numbers. Savings to these municipalities you will hear

6   because of this invention is in excess of $3 billion.

7          MuniAuction was charging $10,000 an auction for the

8  use of their invention to people that used it.  When Thomson

9  started giving their product away, their price dropped to

10  2,000.

11          Again, when Myles went to New York a second time to

12  offer them a license, they said, no way.

13          In the end you will be asked to decide four things:

14          No. 1, was there infringement?  Have we been able

15  to prove by a preponderance of the evidence, on the scales

16  tipping it slightly our way, that there's infringement?

17          No. 2, if there is infringement, what's the damage?

18          No. 3, if there is infringement, was it willful?

19          No. 4, have the Defendants in this case proven by

20  clear and convincing evidence, that's tipping it a lot, that

21  this patent shouldn't have been issued by the Patent Office,

22  that it got it all wrong?

23          In the end we will ask you to award damages to make

24  Thomson pay for what it did, for the taking, for the success,

25  and for the theft of this invention.

                                    51

1          Thank you.

2          THE COURT:  Members of the jury, stand up and

3    stretch your legs for one minute.

4          Let me see counsel at sidebar.

5        (On record at sidebar as follows).

6          THE COURT:  I guess I should have mentioned this

7    before, I tend to run a much more formal courtroom.  I expect

8    you to refer to the parties and witnesses by their surname,

9    not Bob and Joe and Harry.

10          The second thing, I will allow you to introduce the

11    Harvard report.

12          MR. NIRO:  When can I do that, during the

13    testimony?

14          THE COURT:  During the testimony.

15          How long do you plan on going?

16          MR. QUARLES:  I think I will be 35 minutes, 40

17    minutes, about as long as Mr. Niro.

18          THE COURT:  Let's give them ten minutes.

19        (Back on record in open court).

20          THE COURT:  Members of the jury, we will take a

21    ten-minute recess.

22        (Recess taken).

23        (Please go to next page with no loss of context).

24

25

52

1  (11:10 a.m.)

2         MR. QUARLES:  May I, Your Honor.

3         THE COURT:  Yes.

4         MR. QUARLES:  Good morning, ladies and gentlemen of

5  the jury.  Together with my partner Mr. McElwain I represent

6  the defendants Thomson Financial and i-Deal Corporation.

7         My name is Jim Quarles.  I was born in West

8  Virginia.  My dad worked on the railroad, and I trust that

9  what you are going to have learned over the course of this

10  week is that's not what this case is about.

11         What this case is about is the witnesses who are

12  going to testify, and what they're going to tell you.  I would

13  like to introduce some of those witnesses to you now.

14         Seated over in the far corner, and if you would

15  stand up, is Cheryl Horowitz.  She is someone who has been

16  working with a product known as PARITY and BIDCOM.  She worked

17  most with BIDCOM for more than 19 years.

18          Seated next to her is Allen Williams.  Mr. Williams

19   is the president of i-Deal Corporation, and seated to just

20   here with the blond hair is Mr. David Landes.  Mr. Landes

21   you'll hear a lot of testimony about.  He's the man who

22   invented the product known as PARITY.

23          So what I'm going to do now, now is my chance, as

24   Paul Harvey used to say on the radio, to tell you the rest of

25   the story, what is it we're going to prove to you.

53

1          Now, you saw the video and you heard Judge

2   Lancaster, and you have to be asking yourself how is it that

3   I'm here to decide a patent case involving municipal bonds.  I

4   probably don't know very much about either.

5          Well, the answer is simple.  We chose you, and as

6   the video suggested, you have been part of our system to

7   decide this case, to decide the issues of infringement and

8   validity.  You're perfectly well equipped to do it because

9   you're going to bring to this case the common sense you bring

10   to all of the decisions you make in your life.

11          This case is complicated on one level, but on

12   another level it's really simple.  If you just bring the

13  common sense that you use to make yours decisions every day,

14  you're not going to have any trouble deciding this case.

15      So what is the evidence you are going to hear from

16  the witness box and from the documents that will be introduced

17  into evidence? We all watch a lot of TV. It's always a

18  courtroom drama, a lot of dispute, one single piece of

19  evidence comes in, and that makes it all clear.

20      Well, it won't be quite like that here. There's

21  not going to be a single piece of DNA that will settle

22  everything for you; but, in fact, there is one piece of

23  evidence that will help you make sense of this case.

24      Mr. Niro used PTX255 in his opening. Do you have

25  that there? It's the world before MuniAuction. That really

54

1  may be what this case is mostly about. What's going to help

2  you decide what the world was before MuniAuction is what is

3  shown on that or is that not correct.

4      I'm going to suggest to you there is one piece of

5  evidence that will be very, very important to you, and it's on

6  this little diskette. Why? Because on this diskette is a

7  program written by David Landes who will testify in this

8  courtroom that does everything the claims in this patent

9  required except it didn't do it on the Internet.  It used a

10  dial-up modem.

11        Mr. Niro talked about how every song is made up of

12  the same eight notes, and he said Gershwin isn't Jon Lennon.

13  We could probably agree on that.  He just said it's different

14  songs, those eight notes could be different songs.

15        That's not what this case is about.  The song was

16  already written.  The songs on this diskette, and you'll see

17  it.  The only question was am I to play it on a.m. or am I

18  going to play it on the f.m.  Am I going to play it up on a

19  dial-up modem, or am I going to use the Internet for the

20  tiniest part of it.

21        That's going to be important to you because as the

22  video said, it's not the first person who files a patent who's

23  entitled to it.  It's the first person who comes up with a

24  new, novel, and non-obvious invention.

25        This little diskette is going to tell you it was as

55

1  obvious as the nose on your face that you could use this in

file:///A|/MUNIACUTION-THOMSON9-25-06.txt

2  any medium you wanted.

3       Now, you're going to hear from Mr. Landes exactly

4  how this system worked two years before the patent was even

5  applied for.

6       Now, there's one other thing, just so that we get

7  through it.  Mr. Niro put up that impressively

8  difficult-looking calculation about municipal bonds and how

9  you calculate the interest.  That's really about a very simple

10  concept.  It's called the time value of money.

11       Now, those of you who are my age may remember

12  Popeye who had a friend Wimpy.  Wimpy would say for a

13  hamburger today, I would gladly pay you Tuesday.  Actually, I

14  think Wimpy was trying to get out of paying that forever; but

15  what that recognized was it's better to be able to pay

16  something later than it is to pay it now.

17       So when the bidders are bidding on municipal bonds,

18  they're calculating how much they will pay today for the right

19  to get the hamburger Tuesday.  How much will I give you today

20  in order to get my money -- how much will I pay you today in

21  return for some money that will be paid down the road.

22       Now, there was a lot of talk about Thomson.  It was

23   a big company.  None of that has anything to do with this

24   case, except this.  Thomson has been in the municipal bond

25   business for years and years and years.  Thomson has a

                                    56


1   publication known as the Bond Buyer, which is essentially the

2   Wall Street Journal of municipal bonds.  It collects all of

3   the information about bonds and their trading.  They offer

4   people who are in the municipal bond business a series of

5   services so that they can learn about upcoming bond sales, how

6   they can compute their bids and everything you need to do to

7   resell those bonds.

8          Now, there's one more term I'm going to ask you to

9   think about.  It's the term BIDCOM.  You're going to hear a

10  lot about BIDCOM over the course of this trial.  BIDCOM has

11  been around since 1988, and it does just what its name says.

12  It computes bid.  It's a bid computation service; and what it

13  does is allow bidders to figure out how much they're going to

14  pay for a bid.

15          Now, don't worry about it.  You don't have to

16  figure out that formula.  You don't have to learn how it

17  works, because PARITY itself had its own way of calculating

18  before this patent was ever applied for.

19       So BIDCOM is in many ways a red herring that runs

20  through this case.  BIDCOM is simply a different way of

21  calculating the money, calculating your bid.

22       I was trying to think of a way we could really

23  personalize the idea of calculating a bid and the time value

24  of money.  Maybe the best way to think of it is we've all seen

25  the lottery signs, and they say lottery, million dollars, if

57

1  you win.

2       Then you win it and you say, I would like my

3  million dollars, and they say, well, actually we're going to

4  give you $50,000 a year for 20 years.  You say wait.  That's

5  not exactly the same thing.  Okay.  We'll write you a check,

6  and actually the check will be for about $480,000.  That's the

7  time value of money.

8       Now, PARITY, BIDCOM, and all sorts of calculators

9  have made that calculation for years, and let's see if we can

10  just for a moment call up how PARITY did it as it existed on

11  this disk in 1995.

12       If you dialed in, just dialed up the Thomson server

13   or you dialed up Mr. Landes' server at 21St Century

14   Municipals, you would see a screen just like this.  Okay.  You

15   can then select an issue.  There are only two shown there, and

16   you then move to the bid screen.

17       Now, Mr. Landes and Mr. Bradner will explain all

18   this to you.  Once you fill in the bid screen, you push a

19   button, and PARITY will calculate the true interest cost of

20   the bid.  Will you do that.

21       Now, that's what PARITY did two years before

22   anybody applied for this patent.  To be sure, we've now

23   replaced this specific method of calculation with BIDCOM, so

24   now you can use BIDCOM.

25       One of the reasons Thomson bought PARITY was to

58

1   combine the two, but PARITY was a full system before Thomson

2   ever bought it.  You'll hear evidence about how Thomson makes

3   money.  You heard a lot of numbers there, $360 billion.

4   $3 billion in interest.  The evidence will show in the five

5   years we've been selling BIDCOM, we've made $3.5 million total

6   from selling.

7          How do we sell it?  Well, we have a different

8    business model than Mr. Harrington does.  You heard Mr. Niro

9    describe it as we hatched a plan.  Nobody in the history of

10   PARITY ever charged an issuer for it.  We charged bidders.

11   The people we do business with are the people who have the

12   money that the issuers are trying to raise.

13          So what we do is we charge $25 every time they

14   compute a bid using BIDCOM, and $500 if their bid is selected

15   and they win.

16          Now, let's take a look at a timeline that I

17   prepared for you.  It will be on your monitor as well, but

18   it's useful to put in focus what we've been talking about.

19   BIDCOM was created in 1988.  In 1992, Mr. Landes formed 21st

20   Century Municipal and started using PARITY.

21          His first -- the first bid submission using PARITY

22   was in 1993.  In 1994, it was modified so that it could use

23   BIDCOM if you wanted to use BIDCOM as a different way of

24   calculating them, but it almost had its own calculation

25   system.

59

1          In February 1995, the version of PARITY that Scott

2   Bradner tested and that Mr. Landes will talk about and which

3   is on the podium in front of you was downloaded onto the disk.

4          Mr. Landes will testify, he will show you how the

5   program worked.  He will show you manuals, and he will testify

6   that the problem he was trying to solve was an automated way

7   to deliver bids instead of using a fax, that he did it, and

8   that by 1995, he had done it well enough that 500 issuers had

9   used his service to sell more than $5 billion worth of bonds.

10          Remember the video talked about prior art.  We are

11   the prior art.  Now, the next item on the timeline is in 1985,

12   and at this point Thomson and 21St Century Municipals said

13   that we ought to have a marketing agreement, so they did.

14          They had a marketing agreement where they jointly

15   marketed PARITY and BIDCOM.  Ultimately, Thomson bought PARITY

16   from 21st Century Municipals in 1997 for $60,000.  That's how

17   much we paid to acquire this product.  Mr. Landes will testify

18   that he became an employee of Thomson and that he is still an

19   employee there today.

20          The evidence will demonstrate that it only at this

21   point in 1995 after all of these sales had taken place,

22   Mr. Harrington leaves his job as an employee of Wheat, First,

23  Butcher starts Grant Street and starts to think about the idea

24  as to how bonds ought to be sold.

25      The evidence will demonstrate that he thought he

                              60

1  had an idea about how bonds should be sold, and it wasn't

2  really so much about the Internet.  He thought it would be

3  better if the auction was conducted like remember the Steelers

4  helmet that Mr. Niro put up and the Steelers ring where

5  everybody could say $5, $10, $15, $20, he thought that would

6  get people a better bid, a better price.

7      Of course, we didn't do that then.  We don't do

8  that now.  We've never done that because the bidders don't

9  like it.  The bidders say we want to do this as a sealed bid.

10  We'll send in one bid.  Nobody gets to look at it.  Best bid

11  wins.

12      Mr. Harrington had another idea which was let's do

13  this by maturity by maturity.  Let's break up the bond issues

14  and try to sell it to ten different bidders at once.  It turns

15  out he didn't have that idea either.  In 1995, the State of

16  New Hampshire had conducted an auction maturity by maturity,

17   and it didn't go well.  It was a problem because the bids got

18   out of order, and they were badly -- the bids had the wrong

19   number associated with the bid for 1997, and bidders said I'm

20   not interested in that either.

21          So the patent, however, doesn't require that.  The

22   patent is not a patent that is limited to any specific way of

23   auctioning.  That's why this diskette is so important.

24          Now, I want to talk to you for just a minute about

25   this plan.  Mr. Niro talked about us being a big company,

61

1   talked about some Lord over in England, as if that was

2   relevant to this case.  That's because they say we give the

3   product away.  Well, we don't give the product away.  That's

4   just not true.  We charge bidders.  They charge issuers.

5          I assume most of you have seen cable television and

6   understand that there are two types of networks on cable

7   television.  There's ABC, CBS, NBC.  The ones that used to

8   come over the antenna, they charged advertisers.  There's no

9   free lunch anywhere.  You get to watch the show for free

10   because an advertiser has paid for it.

11          That's what we do.  Issuers get our service for

12  free because bidders have paid for it.  You may also have HBO

13  and watch the Soprano's or one of those shows, and that's a

14  totally different market.  They charge you, but you don't get

15  to see it -- there's no advertising.  You don't have to watch

16  advertising.  That's what they do.  They say well, we'll

17  charge the issuer and not charge the bidder.  We're not giving

18  it away for free, nor did we do what Mr. Niro suggested.

19       The evidence is going to show you we didn't take it

20  rather than pay.  We said quite politely, as we said to

21  Mr. Harrington forever, we don't want maturity by maturity.

22  We don't want open auctions.  We just want to run auctions in

23  the way we've run auctions forever.  We just want to have our

24  ability to operate our business in the way we were operating

25  the business before you were, and the only thing you've added

62

1  is this claim that you're doing it on the Internet.  The only

2  thing that has changed in the period that we've been operating

3  PARITY is the use of the Internet.

4       Now, Mr. Bradner will testify -- Mr. Bradner is

5  seated in the back -- he's the director of computer security

6   at Harvard University.  He actually was around when the

7   Internet took off.  He will testify that Mr. Harrington's

8   decision to make this patent so broad that it covers a PARITY

9   bid submission makes the patent invalid because it would have

10  been obvious to use some portion of the web in 1996.

11          This is what PARITY looked like in 1995.  It should

12  be on your screen.  You'll see that there's a bidder, bidder's

13  computers on the left, then there's a server in the middle,

14  and then there's an issuer's computer on the other side.

15          What has always happened and happened today is that

16  the bidders' side is on telephone lines.  The bidders who are

17  Wall Street type institutions dial in and get access to the

18  server, compute their bid, and if they want to use PARITY to

19  submit it, they push a button, and PARITY puts it onto that

20  server.

21          In 1995, what would have happened is that the

22  issuer would have dialed in using commercially available

23  software and found out what the bid was, what the bids were

24  when they were received, and the winning bid is displayed on

25  the issuer's screen.  That's what happened in 1995.

63

1        Here's the change.  Would you put that up.  Now,

2   what happens is exactly the same on the left.  The bidder uses

3   his computer, makes his bid, sends it to the server, and

4   instead of using a conventional piece of software like a

5   dial-up modem, the issuer, if he wants to, can look on the

6   web, uses the web, goes back to the same server, gets the

7   identical information they could always get.

8        Mr. Bradner will walk you through the arguments

9   that Mr. Harrington made to get this patent.  Mr. Bradner will

10  show you where Mr. Harrington said that at the time he came up

11  with his idea, PARITY had not been integrated for a program

12  for calculating a true interest cost.  You will be able to see

13  with your own eyes that that is simply not true.

14        This diskette does just that, and Mr. Bradner will

15  show you that from the stand.  Mr. Landes who wrote the

16  software will explain that it always had the ability to

17  calculate a true interest cost.  The PARITY manuals that

18  you'll be able to hold in your hand in the jury room will show

19  that.

20        The second argument was -- it was made at the very

21  end of the prosecution -- it was that putting this on the web

22  was a novel idea.  Mr. Bradner will walk you through the

23  history of the Internet starting in 1969 when the first four

24  computers were connected to what was called Arpanet in D.C.

25          We don't think about this anymore, but the reason

64

1  the Internet started was so the government could communicate

2  in the event of a nuclear attack.

3          In 1987, there was a change so that networks could

4  communicate with each other.  By 1989, there were over a

5  hundred thousand computers connected over the Internet.  By

6  1991, the World Wide Web protocols had been created, and 1993,

7  the browser, mosaic browser, that thing that allowed us to use

8  a mouse and move around, that was commercially available.

9          So the question comes would it be obvious for

10  somebody to do a process like an auction over the Internet.

11  Well, everybody was.

12          By Labor Day, 1995, Amazon.com was running a

13  business where you just went in and bought a book over the

14  web.

15          By 1995, there was a book that you could buy in a

16  bookstore about how to set up and maintain a World Wide

17  Website.  That's how much people were using the World Wide Web

18  by 1995.

19         By May of 1995, on sale, an Internet auction

20  service had their first auction.  Oddly enough, one of the

21  first auctions they had was for computer memorabilia in Boston

22  where Mr. Bradner is from.  He'll tell you about people

23  talking about how there was an online auction in May of 1995.

24         In June of 1995, the wine merchants of Napa Valley

25  had a charitable organizations, and, again, one of

65

1  Mr. Bradner's friends was involved in setting up an auction.

2  So they had an Internet auction in June of 1995 of Napa Valley

3  wines.

4         Well, is that all?  No.  In September of 1995, Ebay

5  was started.  Most of us probably know what Ebay is.  It's the

6  place where you just go on and you bid on a product that

7  somebody got for sale, and it's up for sale for 24 hours or 48

8  hours, and the high bid gets it.  That started in September

9  1995.

10         Well, you say, but does that tell somebody about

11  municipal bonds?  Is anybody thinking about municipal bonds?

12  In fact, they were.  Two years before this patent was applied

13  for and is La Roche speaks to the Bond Market Association and

14  says you know, everything is going on the Internet.  One of

15  these days we could all be out of a job.  It could be like

16  Ebay.  People might be just selling municipal bonds on the

17  market.

18        Well, is that all?  No.  Gerard Miller, who will

19  testify by deposition, gave a speech to Government Financial

20  Office Association saying everything is going to the Internet.

21  All of that is two years before this patent was applied for.

22        Now, were there patents out there about the

23  Internet?  Patents that were prior art and that should have

24  been disclosed to the patent officer?  There were.  Did

25  Mr. Harrington know about them?  He did.

66

1        If we could call up DXTR001.  You see that's an

2  email from a woman named Sara Thomas.  She was the librarian

3  in Mr. Harrington's company.  She is sending him a patent to a

4  Mr. Brown, and what is that patent about?  It's about

5  electronic auctions.  Electronic auctions where?  On the

6   Internet.

7          Can we put up figure one of that patent, please?

8   You see in the lower bottom, there's a bidder's computer and

9   the word "browser" underneath it.  That's because this was a

10  patent about doing electronic auctions on the Internet using a

11  browser.  Mr. Harrington's librarian sent it to him.

12          Now, you heard on the video about the duty of the

13  examiner about the obligation to bring information you know to

14  the patent office because folks like us don't get to

15  participate in the proceedings.  Nobody called up what's

16  PARITY like, what do you know about the Internet.  What do you

17  know, so if you know about something, it's only fair you tell

18  the patent officer.  You have a duty to do it.

19          Well, when you look at the patent, you're going to

20  find out Mr. Harrington never submitted that patent to the

21  patent examiner.  That document doesn't show on the face of

22  the patent as ever having been considered by the examiner.

23  The examiner never knew about it.

24          Is that just one thing that happened?  No.  Can we

25  call up the second email from Mr. Harrington's librarian.

1   This is another patent.  This is a patent to Mr. Brown.  Do we

2   have Brown or Fisher up?

3        THE CLERK:  Brown.

4        MR. QUARLES:  This is another patent directed to

5   auctions on the Internet, both talk about conducting auctions

6   over the Internet, and they even show a web browser as being

7   on the bidder's computer.  This one didn't get to the patent

8   office either.

9        The patent office never got the chance that you're

10  getting.  It's why the video says it's so important that

11  people who are accused of infringing, people who have an

12  infringement lawsuit brought against them, that they have the

13  ability to talk to you about whether a patent was valid or

14  not, because the examiner never got to see this one.

15       So our position, as you might have gathered by now,

16  is the patent is invalid.  Our position, and the evidence will

17  show, is the examiner didn't know about PARITY on the diskette

18  and calculated the true interest cost, that the examiner

19  didn't know about the two patents Mr. Harrington had and

20  didn't give to anybody.  So we say this patent is invalid.  We

21  will also say, and we will also prove to you, that we don't

22  infringe it.

23          Now, obviously Mr. Harrington's patent was filed

24  after he knew about PARITY.  We'll show you a letter he got in

25  August of 1996 from Dan Veres -- it was to Dan Veres from Dave

                                68

1  Landes telling him all about PARITY, telling him what PARITY

2  did.  You see that in front of you, August 13th, 1996, two

3  years before he files his patent application.

4          Now, remember, Mr. Niro talked about how we went

5  and looked on their site, on their website.  You have to take

6  that with a grain of salt.  You're going to have to figure

7  out -- first of all, you don't think Macey's walks over to

8  Gimbel's to see what is going on in their store.  Somebody at

9  Home Depot doesn't go over to Lowe's to see what's going on in

10  their store, and you found out the most of what somebody did

11  is look at the front of the web page, which is exactly what

12  Mr. Harrington did to other competitors' websites.

13          Well, he didn't have to go to our web page.  We

14  sent him a letter two years earlier telling him exactly how

15  PARITY worked and seeing if he was interested in using it.  So

16  the fact that his patent looks a lot like our product,

17  probably not an accident, but there are two reasons we will

18  tell you we don't infringe.

19        The first reason is we don't use a system like

20  MuniAuction does in which a single computer gathers all the

21  bids and awards to the highest bidder using a computer.

22        You'll find out that all we do is make PARITY

23  available as a substitute for the facts.  If you want to use

24  PARITY to transmit your bid, you can, but you can also

25  transmit it by fax, phone, have a messenger come.

69

1        The second reason we don't infringe is we don't

2  really do any of the steps.  This is a method claim.  This is

3  a claim about doing things.  We don't issue municipal bonds,

4  never have, never will.  We don't bid on municipal bonds.

5  Never have, never will.

6        Bidders bid on bonds, and they have a completely

7  different interest than issuers.  Issuers want to get the

8  highest price, bidders want to get the lowest price.  We don't

9  play any role in bringing those people together.

10        I'm not going to talk to you about damages now, but

11  the big numbers you may hear, keep in mind when somebody talks

12  about a billion dollar bond issue, that money goes from the

13  bidder to the issuer.  We don't get any of that.  Nobody gets

14  any of that.  We get $25 for every person that's calculating

15  the bid, and $500 if that's the winning bid.

16      But when you do hear the damage figures, when you

17  hear the damage evidence, keep this in mind.  Old PARITY and

18  BIDCOM, old PARITY did everything that the claim requires.

19  The only differences -- remember that little Internet file.

20  Ask yourself, you think issuers have paid thousands and

21  thousands of dollars to get that information over the Internet

22  instead of getting it by fax, email, somebody calling you up?

23  That's what I want you to keep in mind when you hear the

24  damages testimony.

25      When all the evidence is done, I'll have the

                                    70


1  ability to come back and speak to you one more time.  When I

2  do and all of the evidence is done, I'm going to ask you to

3  speak the truth and say that this patent is not valid and is

4  not infringed.

5          In the meantime, I very much look forward to

6    presenting i-Deal's and Thomson's case to you.

7          Thank you.

8          THE COURT:  Members of the jury, stand up and

9    stretch your legs, please.

10          (Brief pause.)

11          THE COURT:  Mr. Niro, call your first witness.

12          MR. NIRO:  Tank you, Your Honor.  We call Mr. Myles

13   Harrington, Your Honor.

14          THE CLERK:  Could you please step forward and spell

15   your first and last name for the court reporter.

16          THE WITNESS:  Myles, M Y L E S, Harrington,

17    H A R R I N G T O N.

18          MYLES HARRINGTON, PLAINTIFF WITNESS, WAS SWORN.

19          MR. NIRO:  Your Honor, may I briefly address the

20   jury on the expected testimony of this witness?

21          THE COURT:  You can address me on the expected

22   testimony.

23          MR. NIRO:  Your Honor, this witness is a

24   co-inventor of the patent and suit.  He is the founder,

25   co-finder of MuniAuction, grew up in Pittsburgh, went to

71

1  graduate school at Carnegie Mellon.  He will explain how he

2  and Mr. Veres came up with the idea of the patent invention,

3  how they went through the patent proffers and claimed their

4  patent what their invention is about he will explain that to

5  the jury, how he started the business and the success he

6  enjoyed in that business, how Thomson he believes copied his

7  ideas, what his profits were and expectations were and overall

8  view of what happened here.  How the idea was created, how it

9  was taken, how his company got hurt.

10        THE COURT:  Proceed.

11              DIRECT EXAMINATION

12  BY MR. NIRO:

13  Q.  Would you please state your full name, please.

14  A.  Myles Harrington.

15  Q.  How old are you, Mr. Harrington?

16  A.  47.

17  Q.  Are you married?

18  A.  Yes.

19  Q.  Any children?

20  A.  Two.  Ages four months and 24 months.

21  Q.  Where did you grow up?

22  A.  Pittsburgh.

23  Q.  You are the last of nine children, is that correct?

24  A.  I am.

25        THE COURT:  Lean closer.

72

1  Q.  Did you go to college, sir?

2  A.  I did.  I went to Georgetown University.

3  Q.  What degree did you receive at Georgetown?

4  A.  Bachelor of science in business administration.

5  Q.  Did you do any graduate work and if so, where?

6  A.  Carnegie Mellon, I have a master's of science in

7  industrial administration.

8  Q.  Now, the plaintiff in this case is MuniAuction, Inc.  Are

9  you employed by that company?

10  A.  I am.

11  Q.  In what capacity?

12  A.  President and co-founder.

13  Q.  Okay.  Who is the other co-founder.

14  A.  His name is Dan Veres.

15  Q.  He is here in the courtroom?

16  A.  He is.

17  Q.  When did you and Mr. Veres go found MuniAuction?

18  A.  We started the company in 1997.

19  Q.  Is that company a Pennsylvania corporation?

20  A.  It is.

21  Q.  Does MuniAuction or is MuniAuction known by any other

22  name?

23  A.  We're now called Grant Street Group.

24  Q.  Is that name in some way after Grant Street here in

25  Pittsburgh?

73

1  A.  We're located very close to Grant Street and most of our

2  clients when we first started were located on Grant Street.

3  Q.  Where is the company's office here in Pittsburgh?

4  A.  It's in the Allegheny County Building near the corner of

5  Forbes and Grant Street.

6  Q.  All right.  Now, if you would, tell the jury what a

7  municipal bond is and for reference purposes, I'm going to put

8  up plaintiff's Exhibit 250.  Let me see if I can do that.

9        Would you tell us by reference to this chart

10  Exhibit 250 what a municipal bond is?

11  A.  Well, it's similar to a mortgage in that there's a

12  borrower and a lender and an interest rate that the borrower

13  pays.  Another way to describe it, would be an IOU.  The

14  difference in this instance being the borrower is often a

15  school district or a hospital or a municipality like the City

16  of Pittsburgh that borrows money for road improvements or

17  bridge improvements or a hospital that borrows money to

18  develop a new wing, that type of thing.

19          The lender in this case is an institution such as

20  Mellon Bank Trust Department or Federated Investors, that type

21  of entity, and they give money to the borrower, and then in

22  return, the borrower repays over a period of time, often 15,

23  20, 30 years to repay the obligation.  We call the borrower an

24  issuer and we call the investor a bidder.

25  Q.  Let me see if I can stop you there.  What is shown here is

74

1  a hospital that needs money and then some people, bidders,

2  that buy bonds.  What is that process called?

3  A.  That's called the bond issuance process.

4  Q.  All right.  Now, for frame of reference, the person that's

5   bidding is called what?

6   A.  A bidder.

7   Q.  All right.  They're the ones lending the money?

8   A.  They are.

9   Q.  And the person that's receiving the money is called what?

10  A.  An issuer or a borrower.

11  Q.  Those issuers are, if I understand you correctly,

12  municipalities or school districts or hospitals or things of

13  that sort?

14  A.  Yes.

15  Q.  And the municipal bond itself is what in this process?

16  A.  The municipal bond is, in effect, an IOU.  It's a security

17  in which the issuer of the security is, for example, this

18  public entity or nonprofit and in which the investor or lender

19  is a large financial institution initially in most cases.

20  Q.  All right.  Now, how many employees does MuniAuction have?

21  A.  Presently?

22  Q.  Yes.

23  A.  Presently, we have 30 full-time employees.

24  Q.  And at its peak, how many did it have?

25  A.  We had approximately 55.

1  Q.  Tell us briefly, if you would, how you started

2  MuniAuction, how you started that company, how you and

3  Mr. Veres did?

4  A.  Mr. Veres and I had been in the -- I had been in the

5  investment banking and bond underwriting business since 1984,

6  and in 1989, Mr. Veres and I met each other, and we were

7  working for the same firm.

8  Q.  What was the name of that company?

9  A.  Russell, Ray and Zappala.

10  Q.  That's the Russell, that's Andy Russell, the football

11  player for the Steelers?

12  A.  Yes.

13  Q.  Former football player.  What did you do with that

14  company?

15  A.  We left there and went to work with another investment

16  banking firm, Wheat, First, Butcher, Singer in the early '90s.

17  We did financial advisory work, bond underwriting, investment

18  for Wheat, First, Butcher, Singer, and then we formed our own

19  company called Grant Street Advisory in 1995.

20  Q.  Who were the principles of that company?

21  A.  Dan Veres and I were co-founders of that company as well.

22  Q.  What did that company do?

23  A.  We advised nursing homes, school districts, and hospitals

24  and the City of Pittsburgh and a number of local municipal

25  entities on how they should go about raising money in the bond

76

1  market, and then we would run for them the auction process

2  that they would use to sell their bonds in a competitive

3  auction format.

4  Q.  Now, when you have a mortgage, you make payments to the

5  bank, I assume, every month, most of us do, over a period of

6  time.  Do municipal bonds work that way?

7  A.  They're a little bit different and a bit more complex,

8  frankly, than a typical mortgage in that where your mortgage

9  has principal payments every year, a municipal bond also has

10  principal payments every year; but on a mortgage, the interest

11  payments are fixed throughout the term, that the rate on the

12  interest payments is fixed throughout the entire term of the

13  mortgage; whereas, in the case of a municipal bond, there is a

14  different interest rate associated with every single principle

15  maturity in the bond.

16  Q.  I would like to show you for a moment Exhibit 251A.  Tell

17  us, if you would, what the highlighted interest rates show?

18  A.  It's an example of how a bidder who might be bidding for

19  the bond would enter a different interest rate for each and

20  every principle maturity that comes due on the bond.

21        So, for example, you see in 2007 there is a bond

22  principle payment due of a million, eight hundred twenty-five.

23  Q.  Where is that?

24  A.  That's, for example, on July 15th of 2007.  Can you see

25  it?

77

1  Q.  Yes.  Then where is the interest shown?

2  A.  The interest rate is shown right here (indicating), and

3  then the semiannual payments that are made on $1,825,000 is

4  shown right here (indicating), the interest payments.

5  Q.  It appears it's not going to register.

6  A.  I thought touching the screen made it show up.

7  Q.  It doesn't on mine, but -- okay, maybe it does.  I'm

8  sorry.  All right.  Why are there different interest rates

9  shown in this example?

10  A.  By virtue of the large volume of bonds that are issued or

11  the very large size of the bonds that are issued, you need to

12  try to appeal to a large audience of prospective investors.

13          There are some investors that are interested in

14  bonds that mature in one year, some are interested in bonds

15  that mature in two, and some three, et cetera, and each of

16  them has a different objective in terms of the return or rate

17  of return that they would like to realize on their investment.

18          So, for example, this investor here wanted a rate

19  of four and a half, this one at 4.6, this one 4.7, et cetera.

20  So it shows that when you sell a bond issue, there are

21  multiple components to a bid is really what I think, and the

22  yellow highlighted inputs here indicate the inputs that a

23  bidder for this hypothetical bond issue would have to supply.

24  Q.  So the bidder might say I'll pay 4.5 percent in 2007 and

25  4.6 percent or some different rate at a different point in

78

1  time?

2  A.  Exactly.

3  Q.  Is that typically the way the bids are put together for

4   the sale of a municipal bond?

5   A.  It is.

6   Q.  And there's a column over here that says present value.

7   What does that mean?

8   A.  The present value that is shown there is a computation of

9   the annual debt service payments -- I should say the

10  semiannual debt service payments, which I'll just mark there.

11  There's the semiannual payment, there's one and one on down

12  here (indicating).  Each of these are a semiannual debt

13  service payment.

14        You try to figure out what the present value is of

15  those payments using present value factors shown here, and

16  when you multiply the semiannual debt service payments here

17  times the present value factors here, it gives you in

18  aggregate a total present value of nine million nine.  There

19  is that complicated formula that you've shown.  I'm probably

20  scribbling all over this thing.

21  Q.  You're very close to the mic.

22  A.  Sorry.  So the point being that the formula that's used to

23  compute the present value factors that you showed earlier,

24  each one of them is computed using that formula, and then you

25  run that formula hundreds of times in order to figure out what

1   is the right number that goes in here, in this column right

2   here that I scribbled all over.

3   Q.  That process is called what, to calculate cost or what?

4   A.  That calculation is called to get to the net proceeds

5   numbers.  It's called a true interest cost calculation.

6   Q.  You said the borrower is called an issuer, and that's the

7   hospital or the city or whatever, and the person lending the

8   money is called the bidder.

9           What typically do bidders do once they buy these

10  bonds?  Do they keep them, sell them, do what with them?

11  A.  Usually they reoffer them to other investors.  So, for

12  example, let's say that Mellon Bank was the winning bidder.

13  Mellon Bank would then turn around and reoffer or resell those

14  securities to Federated Investors, which is a local mutual

15  funds company would be one example.

16          (Please proceed to next page with no loss of

17  context.)

18

19

20

21

22

23

24

25

80

1  Q.  So if I want to buy the bonds for an investment or

2  whatever and you wanted to buy the bond, you would buy them

3  from some institution that had bid on them early year?

4  A.  Yes.  Normally, you'd go to your broker, for example, like

5  Parker Hunter, or a firm like that.

6  Q.  Let's talk about the auction process for a moment and

7  during the opening statement, I think we put up a charitable

8  auction for a Steeler, autographed Steeler football helmet.

9  Who is the auctioneer in this type of setup?

10  A.  Well, the auctioneer is right here.

11  Q.  That's the person at the podium?

12  A.  Yes.

13  Q.  And the bidders are whom?

14  A.  This collection of people right here.

15  Q.  And the issuer in this instance would be some charity or

16  somebody that would get the proceeds of the bid?

17  A.  Yes.  That would be an example.

18  Q.  Now, is this the type of thing that's done in a municipal

19  bond auction, that is, you have an auctioneer and a group of

20  people bidding on whatever it is that's being sold, or is it

21  different?

22  A.  It's quite a bit different.

23  Q.  Would you explain to the jury how the auctioning of a

24  municipal bond, say, is different than the auctioning of an

25  autographed Steeler helmet that you're selling for charity?

81

1  A.  Well, in prior -- prior to MuniAuction, the traditional

2  means of submitting bids in municipal bond auctions was first

3  and foremost a fax machine, and then secondarily, walk-in bids

4  or call-in bids, and then third, sometimes people would use

5  the U.S. Mail, that type of thing to send their bid to the

6  issuer of the bonds.

7  Q.  By the way, how are municipal bonds auctioned in this

8 electronic system that MuniAuction now uses?

9 A. Well, it's no longer necessary, for example, to use a fax

10 machine or for the issuer to receive the bid using a fax

11 machine. Now, they go to their computer terminal and they

12 just get access to the auction that's taking place, they can

13 see the bids when the bids come in. And the bidders can also

14 get access without using a fax machine, they just go to the

15 computers and input their bids into MuniAuction and everyone

16 that's a participant in that process can see what has happened

17 and see it virtually instantly.

18 Q. And they're using the Internet in this process?

19 A. They are.

20 Q. Would you tell the Court and the jury what the Internet

21 is?

22 A. Well, the Internet, I think, simply described is an

23 electronic network over which a large number of parties can

24 communicate with each other using a computer and a common

25 medium. In this case, the common medium would be the

82

1 Internet.

2 Q. Now, you mentioned some of the ways in which bonds were

3   auctioned before this electronic system that we're going to be

4   talking about.  I'd like to put before you Plaintiff's Exhibit

5   255, which is another demonstrative exhibit that just shows a

6   technique that was used to auction municipal bonds before the

7   electronic systems came to pass.  Can you briefly describe how

8   that was done, and, if you can, reference to the telephone or

9   the person hand delivering or the facsimile, tell us some of

10  the problems that were created or that you observed as a

11  result of these types of manual systems?

12  A.  Well, start at the bottom because by far and away the most

13  popular means of submitting a bid prior to MuniAuction was to

14  use a fax machine so that the bidder would compute their bid

15  on their computer and then frequently they would either print

16  it out or else they would transcribe onto a piece of paper

17  that was given to them by the issuer the bid that they were

18  submitting for each maturity of the bond issue, as well as the

19  total purchase price that they were willing to pay.  They

20  would transcribe that onto a piece of paper, they would walk

21  over and stick it into a fax machine and send it to a number

22  that had been given them by the issuer, and then the issuer

23  would stand by the fax, wait for these bids to come in, and

24  then they'd look at them one after another and compare them to

25  each other and try to determine who the winner was.

83

1  Q.  Any problems in terms of the fax machines having clocks

2  that were set at times that were not accurate?

3  A.  Well, in almost every competitive auction that Dan and I

4  were involved in prior --

5  Q.  Dan is Mr. Veres?

6  A.  Mr. Veres, the co-founder, and I were involved in almost

7  every single auction.  The bids would come in with a variety

8  of mistakes, some of them very significant mistakes, and one

9  of the things that issuers and bidders all took quite

10  seriously was the time stamp that was shown on the fax.  So

11  that, for example, if the time stamp shown on the fax were one

12  second after the published deadline for submission of bids,

13  technically, it was an invalid bid.  So, Dan and I had had the

14  experience working with City of Pittsburgh and Pittsburgh

15  Water and Sewer Authority and a number of other local issuers,

16  like Presbyterian Association on Aging where the bids would

17  come in and the time stamp on the bid was a minute, two

18  minutes, three minutes late, and also the clocks that were

19 being used on the fax machines by the bidders weren't set

20 properly.  They might be on daylight savings time and we might

21 be on standard time, that type of thing.

22 Q.  Did that create any problems in terms of sorting out who

23 was the winning bidder?

24 A.  Well, in fact, it made it impossible without the

25 involvement of lawyers and telephone calls and some shouting

84

1 back and forth.  Often the issue of the bidder is, well, my

2 clock is right, your clock is wrong.  I had my bid in on time,

3 somebody else's bid must have been in front of me and

4 prevented mine from coming in by the deadline.  So the faxes

5 would get backed up on the fax machine, that type of thing.

6 Q.  So what if the municipality, for example, just had a

7 single fax machine and there were multiple bids come in at the

8 last minute, did that create any problems?

9 A.  It practically guaranteed there would not be timely

10 submission of all the bids because, unlike faxes today, most

11 issuers did not have faxes where the faxes would lineup and

12 get time stamped in a queue before they got printed out.  In

13  the old days, the only time you'd get a time stamp on a fax

14  was at the point in time at which it was actually printed by

15  fax machine.

16  Q.  So I might submit my bid on a timely basis, but because

17  twelve people were in front of me, my bid didn't get in?

18  A.  Right.

19  Q.  What about this person hand delivering, were there

20  actually people that would hand deliver bids to the

21  municipality?

22  A.  There were.  And, for example, in Tennessee was a place

23  where people used to deliver bids hand delivery and other

24  places actually like Georgia, it was very common to actually

25  have to take your bid right at the courthouse steps and hand

85

1  it to somebody, or try to find a room where you would deliver

2  the bid, and often people were late showing up, they couldn't

3  find the room, they got caught in traffic, that type of thing.

4  Q.  I have to confess in the sixth grade I was the only

5  student that did not get a writing certificate, so my writing

6  skills were very poor.  Were there legibility problems of any

7  kind in transmitting these bids where somebody like me that

8  didn't write neat enough would say something or write

9  something and then that would create a problem?

10  A.  Often.  I don't notice it so much on the newer faxes, but

11  on the older faxes, frequently you would get like print lines

12  and the pages would be fuzzy, it would be difficult to read

13  things, and because the bidders were in such a mad rush to get

14  their bid transcribed onto a piece of paper and get it out on

15  the fax machine before the deadline, they were often writing

16  in a way that once you received it, you could not make out

17  whether it was a 4 percent or 4.05 percent, that type of

18  thing.  And the problem with calling bids, which is shown on

19  here as well, telephone bids, is that the person you were

20  calling was not an employee of your company, it was somebody

21  that was designated to receive bids over the phone.  So the

22  bidder would call in the bid and somebody that didn't know it

23  was transcribing the bid onto a piece of paper, and if they

24  should have happened to make a mistake, there -- it's not a

25  situation where the bidder can say, well, whoever you had take

86

1  my bid got the wrong number.  So, because they were bidding

2  millions of dollars at a time, it was a pretty significant

3  problem if there was a transcription error, whether it came in

4  by fax or whether it was a third party that was actually

5  writing it down.

6  Q.  So, if this telephone shown at the top, if that's some

7  person other than the bidder, and they put down $1,755,000

8  instead of the correct number, then the incorrect number would

9  be sent?

10  A.  Yes.  It would be received by the issuer representative

11  and it would be contractual.  There would be no like after the

12  fact, I didn't mean that, so, it could cost the bidder

13  millions.

14  Q.  And if the issuer wrote it down wrong at their end, then

15  what would happen?

16  A.  I'm sorry.  That was -- I'm sorry, I misunderstood your

17  question.  That was the question I was answering.  If the

18  issuer misunderstood it, then there would be a dispute or if

19  you couldn't read it or they didn't read it the way the bidder

20  meant it, there was often lawyers involved, telephone calls

21  going back and forth, that type of thing.

22  Q.  I want to show you Exhibit 256 which says, After

23  MuniAuction, at a central location in Pittsburgh, and the

24  bidders around the United States.

25          In the old way of doing it, could you reach the

87

1  entire United States through the bidding process, or was that

2  difficult to do?

3  A.  Well, for example, in the case of physical delivery, if

4  you didn't have a representative near the location where the

5  bids were being received, you had to hire somebody or you had

6  to find somebody who was willing to actually carry your bid in

7  for you.  So, let's say you were in Seattle and you were

8  bidding on an issue in Georgia, say, Atlanta, you'd have to

9  find somebody in Seattle who would be willing to actually

10  carry your bid in for you.  That might not be so easy because

11  you might not know somebody you could entrust with a

12  multimillion dollar bid in Atlanta if you were located in

13  Seattle.

14  Q.  Now, just briefly, in the MuniAuction system as it exists

15  today, you have some centralized computer located where?

16  A.  Well, our central server where all the bids are received

17  and processed is in the Strip District here in Pittsburgh at a

18  facility run by SunGard.  We have a number of racks, what are

19  called racks that have computers in them that handle these

20  bids.

21  Q.  Who keeps time?  Who is the scorekeeper?

22  A.  The time of the bid, time stamp on all the bids is

23  recorded and inside of the computer.  What our computer does

24  is it does what is called ping the atomic clock at the

25  National Naval Observatory, so to make sure that our clock is

88

1  absolutely, indisputably correct, what happens is that our

2  computer sends out a signal that actually captures the time on

3  this atomic clock at the National Naval Observatory and when a

4  bidder bids, that's the time that is stamped on the bid so

5  that in this case there can't be any disputes, everybody is

6  using the exact same clock.  The bidders, the issuer, all

7  parties see the exact same time, unlike the situation with a

8  fax machine where one fax machine was recording one time and

9  another fax machine another time and they weren't consistent

10  with each other.

11  Q.  What about the computation of the interest using your

12  system.  Let's say the guy in Seattle or in San Francisco or

13  Los Angeles or Denver, can they independently calculate the

14  interest, or is that done at the central location in

15  Pittsburgh?

16  A.  With our software, all of the bid calculations such as

17  true interest cost, for example, are performed right on our

18  computer located here in the Strip District, so that every

19  bidder, unlike the situation prior to us, is using not only

20  the same clock, but they're using the exact same calculator.

21  So there's no chance that one calculator generates one true

22  interest cost and another calculator generates another true

23  interest cost.  Just like the official clock, there's an

24  official calculator for performing the true interest costs.

25  Q.  What if somebody let's say in Dallas makes a mistake in

89

1  the bid submission, how does your system handle that?  And by

2  mistake I mean they do a calculation that's not permitted

3  under the rules.

4  A.  Well, it's common, as I mentioned earlier, for bids when

5  they come in to not only be unreadable but sometimes they

6  didn't conform to the terms specified by the issuer.  For

7  example, the issuer may say you're not allowed to enter a

8  number greater than such and such, and sometimes we would get

9  bids that would violate those parameters.  So the way we would

10  handle it is whenever the bidder entered something that

11  violated the issuers' specifications, what they would get back

12  is a message that says, you've made a mistake, but it wouldn't

13  just say you made a mistake, it would say you violated this

14  specific rule of the auction and you need to correct it in

15  order to be able to submit your bid.  That's one example of an

16  error message.  There were dozens of different types of error

17  messages that our system would give to the bidder.

18          THE COURT:  Mr. Niro, this is good time to take our

19  lunch recess.

20          Please come back at one-twenty.  We'll try to start

21  promptly at one-thirty.

22          Let me see counsel in my chambers at one-fifteen.

23  I'd like to hear the status of the notebooks.

24  (Whereupon, there was a brief recess in the proceedings.)

25      (Conference in chambers.)

90

1       THE COURT:  Where are we on this booklet?

2          MS. WIGGINS:  I had provided one for feedback.

3          MR. NIRO:  We have copies.  We've given it to them

4  again.  We're good to go with it.

5          THE COURT:  What do you have?

6          MR. QUARLES:  We have a glossary of technical and

7  financial terms that appears directly behind that.

8          THE COURT:  What am I looking at?

9          MR. NIRO:  That is essentially Your Honor's claim

10  construction.

11          THE COURT:  I recognize it.

12          MR. QUARLES:  They then say we didn't think it was

13  a useful thing to be talking about what another judge had

14  done.

15          MR. NIRO:  That was part of the claim construction,

16  Your Honor, if you recall.

17          MR. QUARLES:  The objection was to the intro.

18          MR. NIRO:  We can take that out.

19          MR. QUARLES:  Then we had proposed this list of

20  additional terms.  I don't think there's a substantive

21  difference on any part of it that has to do with your claim

22  construction.  The rest is our attempt to be as accurate as we

23  can be.

24          MR. NIRO:  I think the difficulty, Your Honor, in a

25  nutshell, was we want to help the jury, give them a glossary

91

1  of the terms, but we don't want to reinterpret what you

2  decided, and that's the fine line that we're trying to get

3  through here.  I don't think there's any dispute about your

4  order.

5          THE COURT:  Here is the patent itself, then there

6  are some -- this is what I did.

7          MR. NIRO:  Correct.

8          THE COURT:  And then other things which I adopted

9  as opinion of the Court, these are just some other words you

10  want them to have a glossary of some terms that might come up.

11          MR. QUARLES:  And then we had a glossary of some

12  additional terms as well.

13          MR. NIRO:  These are the areas, we just don't

14  think -- we're willing to adopt what they want, we can say

15  what we want, but I just wonder if we really need all that

16  kind of stuff.

17          THE COURT:  You have defendant's proposed glossary,

18  so you have some things in addition to what they had, not

19  claim construction, other words you want them to look at?

20        MR. QUARLES:  That's correct.

21        THE COURT:  What is this defendant's proposed list

22  of claim constructions?

23        MR. McELWAIN:  That probably is word for word

24  identical to theirs.

25        MS. WIGGINS:  That's duplicative.

                                92


1        THE COURT:  You only need one.

2        MS. WIGGINS:  I included it because I didn't want

3  to seem like I was picking us over them.

4        THE COURT:  The ones that I did should say that I

5  did it.  They shouldn't say MuniAuction's claim construction,

6  they're Judge Lancaster's.

7        Is that where we are?  Just take this one reference

8  to Judge Mitchell out and then we're off and running.

9        How much longer do you have with this fellow?

10        MR. NIRO:  Couple hours.

11        THE COURT:  What else is he going to say?

12        MR. NIRO:  He's going to actually do a

13  demonstration, Your Honor, of the MuniAuction system doing an

14  auction.  We're going to truncate that, but we may need

15  Mr. Veres to come up and use the Court's computer with the

16  Court's permission.  We asked Mike about that, he said that's

17  okay, so long as you approve.

18        What we'll do is we have an auction that has

19  already taken place, we'll run through that pretty quickly,

20  then he'll discuss his invention, how he came through his

21  invention, the patent process, how he got the patent, then a

22  little bit about their business and how they got there.

23        THE COURT:  The one thing that you showed on this

24  demonstration with the Steeler helmet, everybody raising their

25  hand with bids, on your system, do all the bidders know what

93

1  the other bids are as well?

2        MR. NIRO:  It depends.  You can do it both ways.

3  You can have what they call an open auction where everybody

4  knows, and you can have a closed auction which is a sealed bid

5  auction, both are covered, and we do it both ways.

6        THE COURT:  The issuer is the one who makes that

7 determination?

8        MR. NIRO:  Right.  Even on the closed bid, the

9 person who is bidding has an opportunity to look at their bid

10 and rebid, depending upon market fluctuation, they're not

11 seeing what the other guy is bidding, but they can adjust

12 interest rates, go down a tic, they can change that.

13        THE COURT:  Yours is all sealed bids?

14        MR. QUARLES:  Ours is totally sealed bids and

15 theirs was totally open bids, until the last year or so.

16        MR. NIRO:  We're not comparing product to product,

17 we have to compare what the patent says to what they're doing,

18 and the patent doesn't distinguish between closed or open.

19        MR. QUARLES:  I understand.  Then the relevance of

20 putting your product up there --

21        MR. NIRO:  It's just to give the jury an idea what

22 an auction is like.  We're willing to really truncate that.  I

23 think it might be helpful for them to see what really happens

24 in a bid.  We can do a closed one.

25        Is the one we're doing open or closed?

94

1          MS. WIGGINS:  Open.  There's a closed one on there

2  which is actually being opened right now.

3          MR. NIRO:  We don't want to do a live one.  We want

4  to run one that already took place as a demo.

5          MS. WIGGINS:  I believe it's closed.

6          MR. HALL:  It's opened.

7          MR. NIRO:  If that's going to confuse people, we

8  can do a closed, or not do it at all.  Maybe it's easier not

9  to do it.

10          THE COURT:  I wouldn't do it.  Would be afraid it

11  would break.

12          MR. NIRO:  We'll save some time, we won't do it.

13          And then the only other thing I guess is this Bond

14  Buyer.  I believe counsel said in opening that The Bond Buyer,

15  Thomson owns The Bond Buyer and we're the Wall Street Journal

16  of the industry.  It seems they're adopting what The Bond

17  Buyer says, that's their statement, that's not hearsay it

18  seems to me.

19          THE COURT:  I want you to point it out what you

20  want to get admitted, then I can focus in on something.  I

21  can't decide that stuff in a vacuum.

22          Exhibits, have you talked, had a chance to talk

23  about objections to their exhibits?

24        MR. QUARLES:  Can I ask one question?  The

25  demonstratives are not going into evidence, right?

                            95

1        THE COURT:  I don't think they were introduced as

2  exhibits, I think you just used them in the opening.

3        MR. NIRO:  We're not proposing that the

4  demonstratives go back with the jury at the end of the case,

5  they're really to give a visual look at what we're talking

6  about, so I'm not proposing we send them back; theirs or ours,

7  I think that ought to cut both ways.

8        MR. QUARLES:  There were some additional exhibits.

9  I just got a letter -- those are for tomorrow.

10        MS. WIGGINS:  Those are for tomorrow.  I'm trying

11  to give you notice of what we're going to use tomorrow.

12        MR. QUARLES:  I don't know whether we got through

13  the entire list of exhibits this morning.

14        MR. NIRO:  I thought we did.

15        MR. McELWAIN:  The entire list of ones you had

16  given us.

17        MR. NIRO:  Everything we're using today we gave you

18  last night, and all the objections have been resolved, so I

19  think we're okay.

20        MR. QUARLES:  I just need to look at the last three

21  because I think we may have had to leave before that.

22        THE COURT:  I haven't ruled on the issue of this

23  news release.

24        MR. NIRO:  You have not.

25        THE COURT:  So that's still out there.

96

1        MR. NIRO:  The news articles.

2        THE COURT:  The Bond Buyer -- I want to see them

3  highlighted exactly what you want in.

4        MS. WIGGINS:  Just for clarification so I can guide

5  Mr. Niro, do you not want us to use them until you've had an

6  opportunity to look at them, or is that more for admissibility

7  purposes?

8        THE COURT:  If I knew what they were, I could rule

9  now.  I'm accepting their representation that this is

10  essentially a newsletter that you guys publish.

11        MR. QUARLES:  It's a newspaper.

12          THE COURT:  A newspaper that you publish.

13          MR. McELWAIN:  The point is a lot of these are from

14  Pittsburgh Post-Gazette and other newspapers.

15          MR. QUARLES:  Can I step out and get that list.

16          THE COURT:  I want you to tell me what you're going

17  to introduce.

18          MR. NIRO:  It's fairly narrow.  It's a series of

19  comments by The Bond Buyer on the PARITY system that we heard

20  so much about, whether it was workable or not, that's their

21  own system, the problems they were having with it, the delays

22  and their introduction of a new version of PARITY.  So it's

23  not really focused so much on what we were doing as what this

24  PARITY system was and how it was performing in the

25  marketplace.

97

1          THE COURT:  Did you plan on introducing this

2  through this witness?

3          MR. NIRO:  Yes.  Just show him some of the things

4  and ask him if this is consistent with what was happening.

5          MR. HALL:  Here are some additional ones, too.

6        MR. QUARLES:  Which one is that?

7        MR. NIRO:  Dated July 8, 1988.  I've highlighted

8  the areas, Your Honor.  This one is March 4.

9        THE COURT:  Who is Robert Whalen?

10        MR. NIRO:  He's one of their authors, one of their

11  people.

12        MR. QUARLES:  I don't know that.

13        MR. NIRO:  These are all The Bond Buyer.  This is

14  not Post-Gazette.

15        THE COURT:  Do you have a copy of what they have

16  highlighted?

17        MR. QUARLES:  No.

18        THE COURT:  Do this.  You go through all of yours

19  and get a highlighted copy of what it is.  Give it to them and

20  then give another one to me and one of your second chairs can

21  go through that.  While we're taking in this testimony, I'll

22  be looking at it, too.  Then maybe at four o'clock --

23        You say you'll still be testifying?

24        MR. NIRO:  Well, I think we'll be done before then.

25        THE COURT:  At three o'clock when we take a three

98

1 o'clock break, we'll come back in here and we'll have

2 something to look at by then.  So they get a copy of what

3 you've highlighted and I get a copy.

4     (End of in-chambers discussion.)

5 BY MR. NIRO:

6 Q.  Mr. Harrington, you were talking about some of the

7 problems that existed with the old manual auctioning systems.

8 I'd like to just show you an actual example of an old bid

9 submission technique.  This one is for the City of Pittsburgh

10 for $167 million in bonds.  Are you involved in that one, that

11 auction?

12 A.  Yes, Dan Veres and I served as the city's financial

13 advisor on that finance.

14 Q.  Let's see if I can zero in on it.

15       Then, I'm going to show you some charts,

16 Plaintiff's Exhibits 257A through G that will explain or

17 illustrate some of the things that were going on.

18       This one for 173 million, this bid that was

19 submitted, there's a blank here.  Is that a problem?

20 A.  It is.  The bidders were asked to indicate whether or not

21 they had read all of the information that the city had

22  disclosed with respect to this bond issue, and it's a way to

23  make sure that when they submit their bid, they're fully

24  informed.  So the city has to indicate on the bid form whether

25  or not they had actually read all of the information that the

99

1  city had supplied, and in this case, this bidder failed to

2  supply that information.

3  Q.  Would that disqualify the bid then?

4  A.  It wouldn't disqualify the bid, but it certainly would

5  give the bidder an out in the event that they wanted to pull

6  out after having submitted the bid, and it would make the

7  issuer in this case quite uncomfortable because the bidder

8  could claim they weren't fully informed.

9  Q.  Now, the next one, 257F shows a bid that came in at 10:33

10  a.m.  Was that a problem?

11  A.  Well, in this particular auction, the deadline for bid

12  submission was 10:30 a.m. and the time stamp here indicates

13  that that bid came in three minutes late.  And I recall that

14  there was a dispute between I think it was Goldman Sachs,

15  that's what the GS stands for, and the City of Pittsburgh as

16  to whether or not indeed that was a timely bid because the

17  issuers fax was showing a different time than Goldman Sachs

18  fax.

19  Q.  So, this time was something that was on not a centralized

20  clock but on Goldman Sachs' fax machine?

21  A.  Fax machine, right.

22  Q.  Here's another one, 57G.  Someone has written in 100.190

23  percent.  Was that a problem, and, if so, what was it?

24  A.  Well, in one of the bond issues that the city did, in

25  fact, they stipulated that no bid for any given maturity could

                                    100


1  be greater than 100.  And in this case, the bid of 100.19

2  exceeds 100, and, therefore, it's an invalid bid.  The irony

3  in this case was that it turned out to be the best bid

4  measured from a true interest cost point of view, but

5  disqualified because the bidder in this case ignored one of

6  the city's stipulations in terms of the form of the bid.

7  Q.  Now, here's one 257E for $174,763,529.  Somebody has just

8  handwritten this number in and crossed some numbers out.  Is

9  that typical of what might happen, $174 million in bid and

10  somebody is handwriting it in?

11 A.  I think it's -- what it illustrates especially is the rush

12 that the bidder is in to get their bid in.  It's not uncommon

13 that they would -- when transcribing their bid they would make

14 a mistake, then have to change it, re-enter a number, and what

15 you'd get is something that looks like what you see here.

16 Q.  Now, did you experience these problems firsthand as an

17 advisor for the City of Pittsburgh and others?

18 A.  On almost every single bond issue that we handled there's

19 as a competitive sale we experienced these types of problems.

20 Q.  Did you decide to do anything about it, and, if so, what?

21 A.  Well, at one point we sat down, Dan Veres, myself and some

22 of our staff sat down and we had a brainstorming session.

23 And --

24 Q.  What is that, what is a brain storming session?

25 A.  It's when a group of people just get together and have a

101

1 sit down together and have a free exchange of ideas about a

2 theme.  And any idea is legitimate and you don't criticize

3 each other, you just have a free exchange of ideas and you

4 write them down and you think about them a little bit and see

5 whether or not they don't lead to some other ideas, that type

6  of thing.

7  Q.  When did this happen?

8  A.  It happened in April of 1996.

9  Q.  About ten years ago?

10  A.  Yes.

11  Q.  A little over ten years ago.

12      What came out of this brainstorming session?

13  A.  Well, it immediately -- not immediately, but over the

14  course of the session, we began to focus on these problems

15  that you just highlighted with some of the exhibits here and

16  we were focused on how could we use the Internet to solve some

17  of the problems that we had encountered in handling bids that

18  were coming in in competitive sales.  And there was an

19  exchange of ideas about how would we deal with errors, how

20  would we deal with a problem of bids not coming in on time,

21  how would we deal with the problem of not being able to read

22  the bids that we were getting, how would we deal with the

23  problem that the calculations that the bidders were doing

24  weren't consistent across firms that in fact were using the

25  same software even.

102

1  Q.  We discussed the specifics of the ideas that came out of

2  this meeting that you had with Dan Veres.  First of all, was

3  anyone else there besides you and Mr. Veres?

4  A.  There were a couple of our younger staff there and a

5  friend of mine was there from New York.

6  Q.  What came out of it in terms of the basic principles of

7  the invention that's at issue in this case?

8  A.  Well, what we decided was that we were going to follow-up

9  that meeting with an effort to actually investigate whether or

10  not we could actually make a system like the type that we had

11  just discussed that would address the problems that we had

12  encountered as bidders and using the Internet and using web

13  browsers and using the technology that was then available to

14  us in a way that not only could we use it, but also the bidder

15  could use it, the issuer could use it and it would not require

16  the use of any special software that would have to be loaded

17  on to a computer and that type of thing.

18  Q.  Mr. Harrington, I'm going to show you another

19  illustration.  This is Plaintiff's Exhibit 258.  Tell us, if

20  you would, what that illustrates?

21  A.  This shows the system that we had conceived of in detail

22 in that on the far left, you have bidders' computers.

23 Q. So you have a series of bidders' computers on the left.

24 And then what is this stuff going from the bidders' computer

25 to this next object?

103

1 A. Well, that object is what is called a server and it's a

2 computer that essentially is shared by the users in this

3 process.

4 Q. Then there's something in the middle called MuniAuction's

5 servers?

6 A. There's actually three of them in the middle. The first

7 one is a web server.

8 Q. That's the green one?

9 A. Yes.

10 Q. Then what is the one in the middle?

11 A. The one in the middle is what we call a database server.

12 Q. The third one?

13 A. I have that wrong. The first one is the application

14 server, the second one is the database server and the third

15 one is what we call a web server.

16  Q.  Now, up top here you say automatically computing TIC.

17  What is TIC?

18  A.  True interest cost.

19  Q.  Where is that calculation done?

20  A.  That calculation is performed on the application server.

21  Q.  That's the green one?

22  A.  That's the first one.

23  Q.  That's located in Pittsburgh now?

24  A.  It is.  That's the one I mentioned that's in the Strip

25  District here in Pittsburgh.

104

1  Q.  Then the next thing is verifying bid parameters.  Why did

2  you want to do that?

3  A.  Well, the bidders often, as I mentioned earlier, would

4  violate the parameters that were established by the issuer, so

5  what we would do is make sure that the bid conformed when it

6  was submitted to the specifications established by the issuer.

7  Q.  Now, up top you show a centralized clock.  Why would you

8  want a centralized clock?

9  A.  To address the problem we were having with conflicting

10  time stamps between bidders' bids and what the issuer

11  understood the time at which the bid was submitted.

12  Q.  If I'm running a marathon there is one clock that would

13  decide the time everybody was measured by?

14  A.  When anybody crosses the finish line, you see the official

15  time at which they cross the finish line.

16  Q.  Then you have to the far right issuer computer and then

17  Internet and web browser.  Explain what that is for.

18  A.  Well, as I mentioned earlier, one of the problems with the

19  technology at the time that we conceived of this was that

20  there was no mechanism for all of the participants in this

21  process to communicate with each other freely and openly.  And

22  the closest thing to it was software, shrink wrap software on

23  a disk that had to be loaded onto a computer to do a

24  calculation, and then some other device, like a fax machine or

25  the telephone had to be used to deliver the bid, that type of

105

1  thing.  So the combination of the Internet and the web browser

2  enabled us to tie people together seamlessly so that we could

3  eliminate the problems that we have encountered.

4  Q.  Why did you want a single computer or server to

5  automatically compute the true interest costs rather than have

6  them done at different places at different times?

7  A.  Well, at the time, there were several software programs

8  which were in use by bidders, and even bidders who were using

9  the same software weren't getting the same answer.  In other

10  words, the calculations that they were running weren't

11  generating consistent answers in terms of a true interest

12  cost, and the only way we could think to deal with that

13  problem was to get everybody to use the same calculator and

14  enable them to use it without bumping into each other.  In

15  other words, you didn't want to have to wait if somebody was

16  using a calculator until they were finished so you could use

17  it.  So there had to be a calculator everybody could use

18  simultaneously to do their calculations and that the issuer as

19  well had to be willing to rely upon as the official

20  calculator, and the issuer had to be satisfied with the

21  calculations that that was performing as well.

22  Q.  Now, you showed some of the errors that were occurring in

23  the manual system, nonelectronic system and some of them had

24  to do with bid submission errors.  How, if at all, did you go

25  about curing that problem and this idea that you and Mr. Veres

106

1 had?

2 A. Well, what this central computer would do is it wouldn't

3 just perform an interest cost calculation and assign a time

4 stamp to the bid, but it would also have entered into it all

5 of the specifications or terms or requirements established by

6 the issuer. For example, I mentioned earlier that sometimes

7 issuers would say, we don't want any bid for any maturity to

8 exceed such and such a number. So, we would input all that

9 information into our system in advance and when a bidder would

10 come along and let's say violate that restriction, they would

11 get a message back right over the computer instantly that

12 would say, sorry, your bid is not valid because for maturity

13 such and such, you entered a bid which exceeds the maximum

14 permitted for this issue, that type of thing.

15 Q. So if somebody put in 101.9 in that handwritten situation?

16 A. Yes.

17 Q. The computer would automatically go back and say, that

18 doesn't meet the criteria, you've got to rebid?

19 A. And it would even tell them that -- it would even give

20 them a little bit more information, such as, in fact, your bid

21 should not be greater than 100. So it wouldn't just tell them

22 it was wrong, it would give them all the information they

23 needed to fix it on the spot.

24 Q. Is that what verifying bid parameters is about?

25 A. Yes.

107

1 Q. Then Internet, what was the state of the Internet in 1969

2 as you recall? What -- 1996, I'm dating myself, April, '96?

3 A. Well, it was in a very, very early stage of development.

4 The world wide web as we know it today and the Internet as we

5 know it today was in a very, very early stage of development.

6 So, for example, in our industry, which is sort of the area of

7 the technology that I'm most familiar with, there was almost

8 nothing being done using the Internet or web browsers or any

9 of this technology.

10 Q. How many websites are there now today on the Internet?

11 A. It's my understanding there's over 70 million websites

12 today and at that time, there might have been 1/100 or 1/1000,

13 maybe even less. There was certainly less than a million and

14 it was certainly less than a quarter of a million websites in

15 existence at the time that we sat down to think about this.

16 Q. Now, did you want to commercialize these ideas?

17 A. Well, we did. In fact, what we did at the time was that

18 at the end of the meeting, Dan and I agreed that I would spend

19 some time over the next few months seeing whether or not we

20 could take the concepts and put them into practice. So, I had

21 meetings with a number of people, friends of mine, Carnegie

22 Mellon students and professors and asked them about the

23 mechanics of taking the concept and putting it into practice,

24 and what that would involve. And, in fact, it took me almost

25 I think eight months or seven months from the time that we

108

1 concluded that meeting to the time that we actually felt we

2 were able to make it.

3 Q. I want to go back to the interest cost calculation for a

4 moment and show you Plaintiff's Exhibit 397. What is that

5 crazy looking equation about?

6 A. That's the formula for a true interest cost calculation

7 that includes the process of iterating to try to figure out

8 what it is. So, for example --

9 Q. Is that something you could do without a computer?

10  A.  It would be almost impossible, at least to do it in any

11  timely fashion, it would be almost impossible.

12  Q.  You're saying iterating, what does that mean?

13  A.  It means you have to guess.  So, for example, when we

14  compute the true interest cost associated with a bid, it's not

15  A plus B equals C, it's actually you know B and you know A --

16  excuse me.  You know C and you know A, but you don't know B,

17  so you have to fit back into it, and you don't get it the

18  first time.  So, for example, to figure out what TIC is in

19  this example, we'd stick in a number which is a guess, like 4

20  percent, we'd run it through the formula and see whether or

21  not it actually gave us B, which is the first number in the

22  equation.  And if it didn't give us B, then we knew we had to

23  try again.  And each time we tried, we'd actually have some

24  idea whether we were closer to the real number because

25  eventually, it has to equal -- it has to get you to B in the

109

1  formula.

2  Q.  Okay.  Did you go outside the company in any way to get

3  help in how to come up with the algorithm or whatever to do

4  this kind of calculation?

5  A.  I went to a friend of mine, Dr. Panoff, Dr. Bob Panoff.

6  Q.  Where is he located?

7  A.  He works for the SHODOR Foundation.  He's a nuclear

8  physicist and a computational physicist who was running a

9  private foundation and was a personal friend of mine.

10  Q.  Mr. Panoff is identified as the third co-inventor on the

11  patent; is that right?

12  A.  That's correct.

13  Q.  That's the Robert M. Panoff here?

14  A.  Yes.

15  Q.  Tell us, if you would, what Mr. Panoff did in this

16  process?

17  A.  He helped us to figure out how we could take all of the

18  elements of our concept and actually put them into practice to

19  actually create the invention itself and put it into practice.

20  And he did that by virtue of I think -- personally, I think

21  the fact that he's a genius and that he's a computational

22  physicist and that he was able to figure out how to create a

23  central calculator, get everybody to use it, avoid having them

24  bump into each other, for example, while they were using it,

25  and perform all these other functions like error checking and

1  a central clock that's linked to an atomic clock at the

2  National Naval Observatory, those kinds of things which were,

3  frankly, outside of my area and Dan Veres' area of expertise.

4  Q.  So he was involved in this center area here, the

5  computational --

6  A.  He was.  He understood servers, he knew what a web server

7  was and an application server and database server, none of

8  which were things that Mr. Veres or I had any experience with.

9  Q.  Did you hire him to do this work?

10  A.  We didn't.  He wouldn't allow us to hire him.  In fact, he

11  was running this nonprofit foundation and that was consuming

12  all of his time, so, he agreed to do it free of charge for us.

13  Q.  Did you ultimately pay him in some way?

14  A.  We didn't pay him directly, but as a show of our

15  appreciation, we made charitable contributions to his

16  educational foundation.

17  Q.  What is his foundation called again?

18  A.  It's called SHODOR.

19  Q.  That stands for what?

20  A.  It stands for short and dorky.

21  Q.  Is does that describe him?

22  A.  That's the way he describes himself.  Actually, one of his

23  students described him as short and dorky.  When he was

24  looking for a name for his foundation, he chose that.

25  Q.  After you worked with Dr. Panoff, he developed the

111

1  software, what did you do next in terms of commercializing

2  this whole concept?

3  A.  Well, the next thing we did was we tested it, extensively,

4  and advised him on how to modify it, enhance it.  We got it

5  into a form where we could do two things.  One thing was we

6  wanted to present it publicly at a meeting of the Government

7  Finance Officers's Association, which is an association that

8  represents the industry, and also we contacted a lawyer about

9  filing a patent application.

10  Q.  Before we get to that, did you go out to any perspective

11  customers?

12  A.  No, we didn't.

13  Q.  When did you first get into a position of conducting a

14  public auction using the electronic auctioning system?

15  A.  I think we were capable of hosting one as early as June

16  1st, 1996, but our first client was the City of Pittsburgh and

17  we handled a $70 million auction for the City of Pittsburgh in

18  November of 1997.

19  Q.  Now, prior to that auction, that electronic auction, had

20  anyone else ever, to your knowledge, used an electronic

21  Internet-based web browser-based auctioning system to auction

22  municipal bonds?

23  A.  No.

24  Q.  This was the first time here in Pittsburgh?

25  A.  Yes, it was.

                                112


1  Q.  Now, did you decide to get a patent on your ideas?

2  A.  We did.  We consulted a lawyer and asked for advice as to

3  whether or not it was patentable and what the process was.

4  Q.  Ballpark, what time frame are we talking about did you

5  start looking at the idea of getting a patent?

6  A.  I think we first started to look in January or February,

7  maybe March, sometime in the first quarter of 1997 we started

8  to look for a patent lawyer we could afford, and, actually, we

9  found one.

10 Q. That was somebody here in Pittsburgh?

11 A. Yes, he's now actually Carnegie Mellon University, but at

12 the time he was a patent attorney at the Webb Law Firm here in

13 Pittsburgh.

14 Q. I'm going to show you Plaintiff's Exhibit 3, which is the

15 fairly thick prosecution history for a provisional

16 application. Can you tell us, is this a copy of your

17 provisional application, this document?

18 A. Yes, it looks like it.

19 Q. I won't get into all the details because it's a multipaged

20 document, but it has a section called background of the

21 invention and then some descriptions of various materials, and

22 then at the end of this, it had some very fairly lengthy

23 materials. Do you recognize any of that? I'm having some

24 difficulty zeroing in. That's a little better. Do you

25 recognize any of this stuff?

113

1 THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

114

1    A.  That looks like the code actually that we had written to

2    run the MuniAuction system.

3    Q.  When you say "the code," this goes on for some 60 to 70

4    pages.  What is code?  What are you talking about?

5    A.  It's software code.  It's the special language that's used

6    to make a technology like ours work.

7    Q.  Who wrote this code?

8    A.  We hired a college student and also was being advised by

9    Dr. Panoff to write the initial code for us.

10   Q.  So other portions of this code talk about different steps

11   in this process.  Was this source code or code made a part of

12   your patent application?

13   A.  It was.

14   Q.  And attached to it?

15   A.  Yes, including -- I don't see it here, but including the

16   true interest cost calculation.

17   Q.  Why did you include as part of this patent application the

18   source code that had been developed for this particular

19  product?

20  A.  Our patent lawyer advised us --

21          MR. QUARLES:  Objection, Your Honor.

22  Q.  You don't have to testify as to what your patent attorney

23  advised you.  I didn't intend for you to do that.

24          MR. NIRO:  Withdraw that, if that's the objection.

25  A.  Sorry.

                              115


1  Q.  Tell us without --

2          THE COURT:  What happened next?

3  Q.  Tell us what happened without disclosing the advice of

4  your attorney.

5  A.  Well, we included it because we wanted to disclose

6  everything that we knew, everything that we had discovered,

7  everything that we had conceived of that might be relevant to

8  the issuance of the patent, we wanted to disclose it; and as I

9  understand the process, even from video, the idea is to make

10  it known to the public what you've done so they can use it as

11  long as they pay you for it.

12  Q.  All right.  This application, the provisional was filed

13  May 29, 1997.  Before that day, had there been any sales of

14  this system that you conceptualized?

15  A.  No.

16  Q.  Had there been any offers for sale?

17  A.  No.

18  Q.  What was the earliest day of any commercial activity?  Was

19  it before or after May 27?

20  A.  The first time?

21  Q.  1997.

22  A.  The first time we showed it was after that date, the first

23  time we demonstrated it in public.

24  Q.  Any public views before that date?

25  A.  No, there were not.

                                116


1  Q.  Now, you were eventually awarded a United States patent, a

2  copy of which is sitting over here.  I'm going to show you

3  this.  This is Plaintiff's Exhibit 1.

4          Can you tell us whether or not this, in fact, is

5  your United States Patent 6,161,099?

6  A.  Yes, that's it.

7  Q.  I am going to see if I can go through some of this patent

8   with you, at least the portions that we can see here.

9           I'm going to again try to focus in on this slowly.

10   It says, the title is, Process and Apparatus For Conducting

11   Auctions Over Electronic Networks and identifies three

12   inventors.  Those are you, Mr. Verses, Mr. Panoff, is that

13   correct?

14   A.  That's correct.

15   Q.  Assignee is who?

16   A.  MuniAuction, Inc.

17   Q.  The patent is issued December 12, 2000, correct?

18   A.  That's correct.

19   Q.  Now, one of the things that I want you to look at here is

20   something called field of search?  Do you see that, field of

21   search?

22   A.  Yes.

23   Q.  What does that mean?

24   A.  It's my understanding --

25           MR. QUARLES:  Objection, Your Honor.

                                117


1           THE COURT:  Well, what do you think it means?  He

2   knows what it means.

3      MR. QUARLES:  Okay.

4   A.  I think it means that is the field in which the examiner

5   himself searched to find out whether or not any patent had

6   been issued or any information in his possession or in the

7   possession of a patent office or any source he had access to

8   about our invention or anything that might relate to our

9   invention.

10   Q.  It identifies where the examiner was searching?

11   A.  That's correct.

12   Q.  Then it has underneath U.S. Patent Documents references

13   cited, and it identifies a whole series of U.S. patents.  Do

14   you know what those are, these references cited?

15   A.  Yeah.  They are not only patents that we or our attorneys

16   supplied to the patent office for the patent examiner's

17   consideration but also the patents the examiner himself

18   through his own independent search had also identified as

19   possibly relevant.

20   Q.  I am going to move to the next page, and I see that there

21   are some patents from a class and subclass called 705/37

22   Fraser, Lupien, Ausubel, and Walker.  What do you understand

23   705/37 to mean?

24  A.  Well, that's the class and subclass in which our own

25  patent falls, and I understand it to be the patent examiner's

118

1  efforts to identify everything of relevance with respect to

2  the issuance of our patent that had also been patented.

3  Q.  By the way --

4         THE COURT:  Before we get too far afield, you're

5  not contending you are an expert in patent law?

6         THE WITNESS:  Certainly not.

7         THE COURT:  You are just telling the jury what you

8  think from your own experience of it?

9         THE WITNESS:  That's true.

10        THE COURT:  We'll accept that on that basis.

11  Q.  On the page it identifies the assignee as MuniAuction,

12  Inc.  Has the company's name changed?

13  A.  We changed it to Grant Street Group at a later point in

14  time.

15  Q.  And when did you do that?

16  A.  I believe it was in 2000 or 2000 -- I believe it was in

17  2000 we changed our name.

18  Q.  Did the ownership of the patent change or just the name of

19  the company?

20  A.  The name of the company changed.

21  Q.  I have the certificate here from the Commonwealth of

22  Pennsylvania.  That is Exhibit 224.  Is this the certificate

23  acknowledging the name change from MuniAuction to Grant Street

24  Group, Inc.?

25  A.  It is.

119

1  Q.  Just very briefly then back to the patent.  I want to take

2  you to the other publications because there are some things in

3  here, I'll have you look at other publications and then

4  there's a list.

5        Identified in that list is Dave Landes August 16

6  letter.  Is that, do you know, the same Dave Landes who was

7  referred to earlier and introduced?

8  A.  It is the same.

9  Q.  And then Rick Thomas August 27th letter?

10  A.  It is.  He and Mr. Landes had a business relationship, and

11  it was information that he had sent about a product he was

12  serving jointly with Mr. Landes.

13   Q.  Called what?

14   A.  That was called Muni Bid.

15   Q.  On the second page under other publications, look at a

16   couple of these.  I see one called PARITY brochure and another

17   called PARITY and municipal bond security letter and then

18   residence debts PARITY, online bidding.

19          Do you know whether or not that's the same PARITY

20   that was referred to here earlier today by Thomson's counsel?

21   A.  It's is.

22   Q.  There is a PARITY bid form and PARITY form of agreement.

23   Do you know whether or not that's the same or different PARITY

24   that was referred to earlier today?

25   A.  It's the same PARITY.

120

1    Q.  And there was some reference to BIDCOM.  Is BIDCOM

2    referenced in the materials that were considered by the patent

3    examiner?

4    A.  Repeatedly.

5    Q.  Where?  Can you identify some of them?

6    A.  It's in all caps.

7    Q.  Over here, BIDCOM PARITY bidding system (indicating)?

8   A.  Yeah.

9   Q.  So if this record is correct, some of the materials that

10   were considered by the patent examiner were the PARITY and

11   BIDCOM systems that were referred to in the opening statement?

12          MR. QUARLES:  Objection, Your Honor.  Leading and

13   incorrect.

14          THE COURT:  Okay.  Why don't you rephrase it.

15          MR. NIRO:  I can rephrase it.

16   Q.  Can you tell us whether or not these other publications

17   relate to a product of which you are aware, and if so, what is

18   it?

19          THE COURT:  If you know.

20   Q.  If you know.

21   A.  They're all -- it's all information that we gathered and

22   supplied to the patent examiner which relate to PARITY and

23   BIDCOM as it existed at the time we made those submissions.

24   Q.  When you say --

25          THE COURT:  When you say "we," who are you talking

121

1   about?

2          THE WITNESS:  I'm sorry.  "We" would be Dan Veres

3   and myself as the inventors.

4          THE COURT:  Personally submitted these?

5          THE WITNESS:  Yes, that is true, we submitted them

6   through our attorney.

7   Q.  You found them and submitted them to your attorney, and

8   your attorney submitted them to the patent office?

9   A.  That is correct.

10  Q.  Now, in the video about the patent office, there was

11  something referenced there called prior art.  Do you recall

12  that in the video that the Court showed?

13  A.  Yes.

14  Q.  Are these things that you have been looking at as other

15  publications including the PARITY publications and the BIDCOM

16  publications prior art as you understand it?

17  A.  They are prior art as I understand it.

18          THE COURT:  Is that in dispute?

19          MR. QUARLES:  The question is surely as to whether

20  some of these documents were available.  Some of these

21  documents are not technically prior art.

22          THE COURT:  But this is where prior art should go?

23          MR. QUARLES:  Yes.

24  Q.  Now, just briefly and quickly I want to go back to this

25  field of search class and subclass 705/37.  Do you know based

122

1  upon your own personal experience, not as a patent attorney,

2  but as someone who got a patent, what that class and subclass

3  relates to?

4  A.  It relates to bidding matching systems and auction

5  systems, Subclass 37.

6  Q.  Now, I want to show you portions of what's called the

7  prosecution history of your patent.  Do you recall in the

8  video, I think the commentator noted it's a written record of

9  proceedings before the patent office?

10  A.  Yes.

11  Q.  Are you familiar with that proceeding as it relates to

12  your patent?

13  A.  I was involved in it.

14  Q.  Did you personally attend interviews with the patent

15  examiner in the course of the examination process?

16  A.  Two of them.

17  Q.  And you attended with or without your attorneys?

18  A.  In both cases, with our attorneys.

19  Q.  And did you in this process of getting your patent

20  actually meet and confer with your attorneys in this process

21  like was shown on the video?

22  A.  Yes, I did.

23  Q.  Let me show you some portions of the prosecution history,

24  and I'm going to try to go through these quickly.

25          First, let's see if we can back up.  This is the

123

1  cover page of Plaintiff's Exhibit 2.  Can you tell us what

2  this is?  Do you need it zeroed in on, zoomed in?

3  A.  It appears to be a reference -- it appears to reference a

4  patent in class 705/37.

5  Q.  Do you have it up in front of you the books, PTX No. 2.  I

6  am having some difficulties zooming.  Sally just got it.

7          I want to direct your attention to the portion that

8  says Class 705, Subclass 37.  Can you tell us what class and

9  subclass your patent was assigned to in terms of the

10  technology classification?

11  A.  Class 705, Subclass 37.

12  Q.  The second page is something called search notes of the

13  patent examiner.  Can you tell us whether or not these notes

14  indicate the examiner, in fact, searched in the Class 705,

15  Subclass 37?

16        MR. QUARLES:  Your Honor, I object on the grounds

17  that the witness is now being asked to speculate about what an

18  examiner did, how long he spent on it.  Perhaps if we could

19  approach the bench.

20        THE COURT:  Yes.

21        (Sidebar discussion held as follows:)

22        THE COURT:  Do you have an expert that is going to

23  testify about this stuff.

24        MR. NIRO:  No, Your Honor.  I think the parties

25  have agreed we're not going to have an expert testifying, and

                              124


1  all I'm trying to confirm is the written record of the

2  proceedings before the patent office that there was a search

3  done, and in a particular class and subclass, and ultimately

4  that the very items of prior art that they say were not

5  disclosed to patents are, in fact, in this particular class

6  and subclass.  That's it.

7          THE COURT:  Is any of this stuff in dispute?

8          MR. QUARLES:  Yes, Your Honor.  We definitely

9  dispute the inference that is being asked to be drawn here.

10  The examiner must have seen it and ignored it.  There is a

11  case in which the federal circuit says you can't draw that

12  inference.

13          What is in front of the patent examiner is what's

14  on the patent.

15          MR. McELWAIN:  The examiners have a duty to list

16  what is considered, which is on the final patent.  You can't

17  draw the inference.

18          MR. NIRO:  If they're prepared to stipulate that

19  the examiner searched these classes and subclasses that's

20  indicated in the search notes; and two, the two items of prior

21  art that they represented to this jury were not considered by

22  the examiner are, in fact, that class and subclass, we don't

23  have a problem.

24          MR. QUARLES:  I can't stipulate, and he can't

25  testify as to what the examiner did with respect to the

125

1  search, how long he spent, whether he found those patents or

2   not.

3          MR. NIRO:  We're not asking him that.

4          THE COURT:  Okay.  The documents which you want to

5   talk about, you showed this in your opening?

6          MR. QUARLES:  Yes, sir.  The patents that he had

7   that he did not give to the patent office.

8          THE COURT:  Are you contending that he did, in

9   fact, give to the patent office?

10         MR. NIRO:  No.  We're going to deal with that in a

11  moment.  In fact, what he had was not the patent -- abstract

12  of the patents, not the drawings that he showed to the jury.

13  We're going to say this prior art was, in fact, before the

14  patent examiner because it was right in the areas that he

15  searched, that's all.

16         THE COURT:  I'm not following you.  How do we know

17  that?  How do we know he saw these typical patents you talked

18  about?

19         MR. NIRO:  We know he searched, and they were in

20  the file.  We don't know he saw them.

21         MR. QUARLES:  They were in his file?

22         MR. NIRO:  In that classification.

23      THE COURT:  Were the patents in the prosecution

24  file?

25      MR. NIRO:  They were in the search.

                              126

1       MR. QUARLES:  No.

2       MR. NIRO:  They were in the search area, not in the

3  prosecution file.  They were in the search area that was

4  searched.  In other words, there are 20 patents, let's say,

5  and that's the class and subclass.

6       THE COURT:  Objection sustained.

7       MR. QUARLES:  Thank you, Your Honor.

8       (Sidebar discussion was concluded.)

9       THE COURT:  We decided Charlie Batch should start

10  the next football game for the Pittsburgh Steelers.  That was

11  what that was all about.

12  BY MR. QUARLES:

13  Q.  Let's see if we can talk about some of the things that

14  went on during the prosecution process.

15          There was a notice of references cited, and I want

16  to put that before you as part of the record of proceedings

17  before the patent examiner and simply have you confirm that

18  there were four items of prior art cited by the examiner from

19  Class 705, Subclass 37.

20  A.  That's correct.

21  Q.  Are you familiar with this Walker patent?

22  A.  Generally.

23  Q.  Do you know whether or not the Walker patent references

24  the Internet?

25  A.  It does.

127

1  Q.  And web browsers?

2  A.  It does.

3  Q.  And that was considered by the patent examiner?

4  A.  It was.

5  Q.  Now, you mentioned interviews with the patent examiner.

6  I'm going to show you an interview summary and ask you to tell

7  us whether this official document from the patent office

8  indicates that you, Mr. Dan Veres, were present at an

9  interview with the patent examiner on January 11, 2000?

10  A.  That's correct.

11  Q.  Who else was there?

12  A.  Two of our attorneys, our local counsel, whose name is

13  shown there to the right of Dan Veres.  His name is Keith

14  Ruffus and also our counsel, our patent counsel in Northern

15  Virginia right across the street from the patent office.  His

16  name is Rob Faris.

17  Q.  Who is these people Forest Thompson and Eric Stamber?

18  A.  They were examiners.  Mr. Stamber was a senior, and

19  Mr. Thompson a less senior examiner.

20  Q.  Now, there was something filed at the patent examiner

21  called amendment -- I'll put that up?  On January 24, 2000,

22  and I want to take you to the portion that says applicants

23  appreciate the time -- see if we can zoom in on

24  it -- applicants appreciate the time devoted by Examiner

25  Thomson and Stamber to the 1-11-99 interview.

128

1        Did you attend that interview?

2  A.  I attended the interview on 1-11-2000.  I think that's a

3  typo.

4  Q.  Not '99.  It was 2000?

5  A.  Yes.

6  Q.  Then there's a statement made concerning something that

7   you told the patent examiner during this interview.  It says,

8   During the interview, Inventor Myles Harrington provided some

9   further brief explanation concerning the prior art PARITY

10   system described at Page 3 and following of applicant's

11   specification in describing certain documents applicant

12   submitted with their I29, 1990 disclosure statement.

13        It goes on and says, As Inventor Harrington

14   explained during the interview, defining BIDCOM PARITY would

15   not yield to invention, at least such combination would not,

16   for example, operate or communicate at least one message

17   associated with said submitted bid to said issuer's computer

18   over said at least one electronic member and displays on said

19   issuer's computer display information, and it goes on.

20        Do you recall having a conversation with the patent

21   examiner in which you discussed the PARITY BIDCOM system?

22   A.  I do.

23   Q.  And what did you tell the patent examiner about that

24   system?

25   A.  We drew the patent examiner's attention to the information

129

1   we had received from Mr. Landes of PARITY, Mr. Rick Thomas of

2   Muni Bid and also information we had obtained with respect to

3   the BIDCOM system from some marketing materials, and we

4   distinguished MuniAuction from those packages.

5   Q.  Was any effort made to conceal information about PARITY or

6   BIDCOM from the patent examiner during this examination

7   process?

8   A.  Absolutely not.

9   Q.  On the final page of this document there is something

10  called information disclosure statement.  There is reference

11  made to a series of things.

12        I would just like you to focus on those.  One is

13  David Landes' 8-16-99 letter, Rick Thomas' 8-28-1966 letter,

14  sample form of Muni Bid, a brochure introduction to Muni Bid

15  and BIDCOM competitive bidding system and some initials on the

16  side.  Do you know whose initials those are on the official

17  record?

18  A.  I believe Forest Thomas, the examiner.

19  Q.  What did these items of alleged prior art relate to, do

20  you know?

21  A.  The first one is a letter from Mr. David Landes to Dan

22  Veres describing the service that he was offering called

23  PARITY.

24       The second one was a related letter from his

25  business partner in the Muni Bid venture which described a

                              130

1  service that was being offered by or at least marketed by

2  Mr. Thomas, and the other things there, the sample form of

3  Muni Bid notice of sale, that was information, I believe, that

4  was attached to the letter from Rick Thomas which described

5  their system in some detail, and also the introduction to the

6  Muni Bid as well came from Mr. Thomas.

7       Mr. Landes' letter also had attachments as well

8  that described his system and services in some detail.

9  Q.   Who brought this information to the attention of the

10  patent examiner?

11  A.  Dan Veres and myself, MuniAuction did.

12  Q. Where did you get this information from PARITY and BIDCOM?

13  A.  We obtained the information about PARITY and Muni Bid from

14  Mr. Landes and Mr. Rick Thomas directly, and the information

15  from BIDCOM, my recollection is we got that at a conference

16  that we attended that was some marketing materials that were

17  being circulated by BIDCOM.

18  Q.  I want to show you some things that were actually in the

19  patent file for your patent.  One is a letter dated August 28,

20  1996 from a Mr. Rick Thomas to Mr. Dan Veres.  The date on

21  this is August 28, 1996, and it says Dave Landes with PARITY

22  suggested I send you the enclosed information regarding Muni

23  Bid and PARITY.

24       Did you receive information concerning PARITY and

25  Muni Bid from Mr. Landes?

131

1  A.  We did.

2  Q.  And did you or did you not disclose that to the patent

3  office examiner?

4  A.  We did.

5  Q.  I'm going to show you another document.  This is August

6  16, 1996 to Mr. Veres.  This one is signed by Dave Landes,

7  president.

8       Did you in fact, receive, you or Mr. Veres receive

9  materials from Mr. Landes describing this PARITY BIDCOM system

10  as it existed at that time?

11  A.  We did.

12  Q.  What did you do with it?

13  A.  I believe we just filed it at that point.

14  Q.  You gave it to the patent examiner?

15  A.  I'm sorry?  When we got it, when we filed the patent

16  application, we did give it to the examiner in one of the

17  information disclosures that followed the application.

18  Q.  Now, do you recall earlier this morning the little disk

19  that was held up, this is PARITY BIDCOM?

20       Did either Mr. Landes or Mr. Thomas or anyone from

21  PARITY BIDCOM give you a disk of any kind when they submitted

22  the materials they had concerning PARITY BIDCOM?

23  A.  No, they did not.

24  Q.  Did you withhold anything that you were given by

25  Mr. Landes or the people at PARITY BIDCOM from the patent

132

1  examiner, or did you give the patent examiner everything they

2  gave you?

3  A.  It was our practice to give anything and everything that

4  might be relevant to our application to our attorneys who

5  would then forward them to the examiner.

6   Q.  All right.  Now, with the PARITY BIDCOM information in

7   front of them, do you know whether or not the patent examiner

8   reached a decision on whether you were entitled to a patent

9   based upon what you had invented?

10   A.  We do.

11          MR. QUARLES:  Objection, Your Honor.

12          THE COURT:  What's the legal basis of your

13   objection?

14          MR. QUARLES:  He is asking for expert testimony.

15          THE COURT:  Well, no.  We clearly established he is

16   not testifying as an expert.  He is talking about his own

17   patent.  He can answer.  You can answer that question, sir.

18   A.  He did.

19   Q.  All right.  There is something called a notice of

20   allowability.  Do you know what that is?

21   A.  It's the -- my understanding of it is it's the step right

22   before the patent office issues a patent.  They tell you

23   they're about to issue a patent.

24   Q.  Did the examiner explain the reasons why he was issuing

25   this patent to you?

133

1  A.  Yes, he did.

2  Q.  I'm going to show you a page from the prosecution history.

3  See if we can read it.  It says, first of all, it says

4  statement of reasons for allowance.  Can you read that or do

5  you want me to read it?

6  A.  The instant invention relates to a novel and unobvious

7  system directed to an electronic auction process or auction

8  fixed income securities.  The system and process requiring,

9  among other things, automatically computing at least one

10  interest cost value based at least in part on said inputted

11  data, said automatically computed interest cost values,

12  specify a rate representing borrowing cost associated with

13  said at least one fixed income security in similarly

14  terminology in both of the interclaims.  Applicants amendment

15  makes the invention unique and distinct over prior art.

16  Q.  Okay.  That prior art that he is referring to, did it or

17  did it not include PARITY and BIDCOM?

18  A.  It did.

19  Q.  The examiner says he concluded the invention was novel and

20  unobvious.  Did the examiner say that orally or in writing or

21  both?

22  A.  I believe -- I don't remember him using specifically those

23  terms in the interview, but certainly in my I think it says

24  from the video cover of the patent.

25  Q.  At that point in early 2000, you had the examiner saying

134

1  that the application was allowed and ready to issue.  Did you

2  allow it to issue?

3  A.  No.  We asked the examiner to hold up.

4  Q.  Why did you do that?

5  A.  Because we had discovered what -- we had discovered prior

6  art that we had not previously seen.

7  Q.  Prior art relating to what?

8  A.  The PARITY system or at least the PARITY concept.

9  Q.  And did you keep that prior art to yourself or did you

10  tell the patent office about it?

11  A.  We gave it to our attorneys who then forwarded it to the

12  patent office.

13  Q.  Let me show you something called a preliminary amendment

14  and applicant's interview summary record.

15          This is dated August 18, 2000, and this is after

16  you already had an allowed application.  Did you or did you

17  not attend an interview, a second interview with the patent

18  examiner?

19  A.  I did attend it.

20  Q.  What was the purpose of that second interview?

21  A.  To discuss the additional prior art and the reasons why we

22  had asked the examiner not to issue our patent until he had

23  considered the additional prior art.

24  Q.  In the beginning of this statement, it says, Applicants

25  thank the Examiner Thompson and Stamber for their time during

135

1  the 8-16-00 personal interview.  At the interview, applicants

2  explained that after receiving the 2700 notice of allowance,

3  they obtained the trademark registration filed for PARITY and

4  design filed on 3-27-92 by 21st Century Municipals and

5  discovered a specimen then containing detailed information

6  about the PARITY system.  See specimen entitled PARITY a

7  realtime, no-risk bidding network from 21st Century Municipals

8  and associated statement of use.

9       Was that statement, in fact, made to the patent

10  examiner that there was some additional material you had

11  concerning PARITY and BIDCOM that you wanted to get before the

12  examiner?

13  A.  That's what you said.

14  Q.  It goes on to say, applicants have withdrawn their allowed

15  application from issue to give the examiner the opportunity to

16  consider all of this information and reach his own

17  conclusions.  Why did you do that?

18  A.  We wanted to make sure that we did not neglect to supply

19  the examiner with anything that he might consider to be

20  relevant to issuing our patent.

21  Q.  Did you give the patent examiner everything that PARITY

22  and BIDCOM gave you describing their system?

23  A.  We did.

24  Q.  And after this additional material was provided, what

25  conclusion did the examiner reach?

136

1  A.  He concluded that our invention was patentable.

2  Q.  Did he state the reasons?

3  A.  He did formally in writing.

4  Q.  I'm going to show you Page 3 of the filed history

5  statement of reasons for allowance.

6        Would you read to the jury what the examiner said

7    were the reasons for the allowance of your patent application?

8    A.  The instant invention relating to a novel and unobvious

9    system directed to an electronic auction process or auction

10    fixed income of financial instruments.

11        This system and process incorporating a web browser

12    and requiring, among other things, automatically computing at

13    least one interest cost value based at least in part on said

14    inputted data, said automatically computed interest costs

15    value specifying rate representing borrowing costs associated

16    with said at least one fixed income security in a similar

17    terminology in both of the independent claims, applicant's

18    amendment makes the invention unique and distinct over prior

19    art.

20    Q.  All right.  The examiner concluded the invention was

21    unique, distinct, novel, and unobvious, is that correct?

22    A.  That's correct.

23    Q.  And the prior art that was considered, at least on the

24    face of this patent, was the PARITY BIDCOM system, correct?

25    A.  That's correct.

137

1  Q.  Just to break it down, the examiner said the combination

2  of a web browser, calculating interest of cost, based on

3  inputted data and automatically computing interest costs value

4  specifying a rate representing borrowing costs, those five

5  things in combination were patentable, is that correct, or

6  not?

7  A.  That's correct.

8  Q.  Did your invention as described by the patent examiner

9  have any unexpected consequences as you at least viewed?

10  A.  I think when we commercialized it, we were quite surprised

11  by how quickly it was accepted and adopted by the marketplace.

12  Q.  Now, did these pieces, the pieces of the invention, did

13  they exist in one form or another separate and distinct from

14  the combination before your invention?

15  A.  Many of them did, yeah.

16  Q.  There was an Internet, for example?

17  A.  Correct.

18  Q.  And there were web browsers?

19  A.  Correct.

20  Q.  And people that could calculate interest cost in some way?

21  A.  They could.

22  Q.  Did anyone put the combination together like you did?

23  A.  Not prior to us, no.

24  Q.  Now, the defendant in this case, I think I heard it during

25  the opening statement, said you didn't give the patent office

138

1  everything that was important to determine whether or not you

2  were entitled to a patent.  Is that so?

3  A.  That's not true.

4  Q.  Do you remember your testimony about Class 705, Subclass

5  37?

6  A.  Yes.

7  Q.  Do you know whether that class and subclass has prior art

8  in it that was cited by the examiner?

9  A.  Well, Walker, for example, and at least four others from

10  that class were cited on the cover of the patent.

11  Q.  All right.  There was some reference made to some items of

12  prior art Fisher and Brown, and I want to see if I can take

13  you to that, and then a Sara Thomas I think was mentioned.

14        I want to take you to Sara Thomas and who she is

15  and show you initially Defendant's Exhibit No. TR, DX-TR.  Do

16  you recognize this document that I just put up here

17  (indicating)?

18  A.  Yes, I do.

19  Q.  What is it?

20  A.  It's an email from Sara Thomas to Dan and I regarding some

21  research that she had done on patents.

22  Q.  First of all, who is Sara Thomas?

23  A.  Sara Thomas was a contract employee that we had hired to

24  help us get our files organized.

25  Q.  Did she send you something related to a Fisher Patent

139

1  5,835,896?

2  A.  She did.

3  Q.  Did what she send you contain any drawings of the type

4  that were put before the jury in this case during the opening

5  statement where it said Internet or web browser?

6  A.  No.

7  Q.  Was that true with respect to the other patents, the

8  Fisher patent, of which you were given a copy by her, do you

9  know whether or not there were any drawings or anything like

10  that that came along with that?

11   A.  No, there were no drawings, not in the email she sent me,

12   no.

13   Q.  Okay.  So the drawings that were up here a little while

14   ago weren't something you were given, correct?

15   A.  That's correct.

16   Q.  What did you do with the materials that Sara Thomas gave

17   you?

18   A.  The same thing we did with everything else that we

19   received.  Anything that might have been prior art would be

20   forwarded to our attorney, our local attorney, who would

21   forward it to our patent counsel in Northern Virginia.

22   Q.  Did you personally hold anything back in any way, shape,

23   or form from the patent office or the patent examiner that

24   might conceivably be prior art?

25   A.  No.  It was very clear to us that everything that we -- we

                                    140


1   didn't make the independent determinations as to whether or

2   not something was or something was not -- when I say "we," Dan

3   Veres and I did not make independent verifications this is

4   prior art and that's not.

5        We simply forwarded it to our lawyers to let them

6   make the decision as to what was and was not relevant to the

7   examiner.

8   Q.  Now, the two actual patents that I think were shown during

9   the opening are -- I'll try to zoom in.  One of them is U.S.

10  Patent 5,794,219 entitled Method of Conducting an Online

11  Auction with Bid Pooling to Steven J. Brown.

12        Can you tell in looking at this where that patent

13  is classified on its face?

14  A.  It's a little out of focus, but it's 705/37.

15  Q.  I'll see if I can zero in on it.  It is completely --

16  A.  There it is, 705/37.

17  Q.  What about the other one, the Fisher patent that was

18  referred to?

19  A.  It was also in the same class and subclass 705, Subclass

20  37.

21  Q.  And that one is called methods and system for processing

22  and transmitting electronic auction information?

23  A.  Correct.

24  Q.  Is that the same class and subclass that your patent is?

25        MR. QUARLES:  Objection, Your Honor.  That is

141

1  exactly --

2        MR. NIRO:  I can withdraw that.

3  Q.  Have you had a chance to look at these two patents?

4  A.  Generally.  I had a quick glance to them.  I haven't

5  studied them, but I'm generally familiar with both of them.

6  Q.  Are you familiar enough with them to say whether or not

7  they disclose your invention in combination?

8  A.  They don't.

9        MR. QUARLES:  Objection, Your Honor.

10        THE COURT:  Sustained.

11  Q.  All right.  Let me see if we can move to a different area.

12  I'm going to show you something called a continuing

13  prosecution application, CPA, and this is part of the

14  prosecution history.  Do you know what that is?

15  A.  We filed -- it's an application with MuniAuction filed

16  with the patent office for another patent that relates back to

17  our original patent application that was filed back in the

18  spring of 1997.

19  Q.  All right.  This says that you had to pay an additional

20  $924?

21  A.  Correct.

22  Q.  And was that to withdraw your application from issue to

23  cite additional prior art?

24  A.  That, I'm not sure of.  I can't see it.

25  (Please proceed to next page with no loss of context.)


142


1      MR. NIRO:  This is part of Plaintiff's Exhibit 2,

2  Your Honor.

3  BY MR. NIRO:

4   Q.  There's something attached to that, and I just want to

5  put it up here if we can.  Let's see if we can zoom in a bit.

6  Do you recognize what additional material was provided to the

7  patent examiner after the application had been allowed?

8   A.  There's a list here of things that we gave to the

9  examiner after it had been allowed, but before it had been

10  issued, then asked them to consider them as prior art.

11   Q.  Do any of those materials relate to PARITY BIDCOM?

12   A.  Yes.

13   Q.  How many of them, do you know?

14   A.  Well, most of the articles actually address PARITY, so

15   I would say that the majority of things on there, and most of

16   the things on there relate to PARITY, BIDCOM, and MuniAuction

17   or just PARITY and BIDCOM.  For example, the trademark was

18   just PARITY, trademark application.

19   Q.  All right, I want to very quickly take you through your

20   patent, which I understand the jury will get in a book, but

21   just to quickly go through it, does your patent have drawings?

22   A.  A number of them, yes.

23   Q.  Without getting into elaborate detail, what, for

24   example, does Figure 1 show?

25   A.  It's a very simplistic representation of a network of

143

1   computers.

2   Q.  And what about Figure 3A, what is that?

3   A.  It's a flowchart that shows how the Web pages are tied

4   together from the home page through to bid preparation and

5   submission.

6   Q.  And what about Figure 3B?

7   A.  It's a more detailed presentation of the bid submission

8   and preparation and calculation process.

9   Q.   Figure 3C?

10   A.   That's where we set up an auction, modify it, put in

11   the parameters or specifications given to us by the issuer.

12   Q.   And what's Figure 4?

13   A.   It's a registration page where users have to first fill

14   out a form in order to get access to the website.

15   Q.   And Figure 5?

16   A.   It's what's called a selections page where they have an

17   option to, for example, go to a trial auction and practice

18   bidding or they can view information about the bond issuer,

19   for example, view POS or other documents or actually access

20   the auction itself.

21   Q.   Without going through each and every one of these, can

22   you tell us what the remaining figures of your patent relate

23   to?

24   A.   They show, for example, the actual bids being submitted

25   on the bid page; they show error messages that are generated,

144


1   for example, when somebody makes a mistake; they show things

2   like observation -- an observation page where, for example, an

3  issuer could -- or an issuer could see the results of the

4  sale, that type of thing.

5    Q.  All right.  There's something called verification.

6  What is that?  That's Figure 9.

7    A.  That's where the bidder actually indicates that they

8  are qualified to bid and that the ID and password they are

9  using is the ID and password for the person whose name is

10  shown on the page.

11    Q.  Does your patent contain a description of your

12  invention?

13    A.  Yes, it does.

14    Q.  In one of the sections, I want to just go to that very

15  quickly, in Column 3 of your patent you refer to something

16  called PARITY.  What system is that?

17    A.  That's the same system that Mr. Landes created.

18    Q.  All right.  That's discussed in your patent?

19    A.  Yes.

20    Q.  It says:  It is a drawback of the PARITY bid submission

21  system that to use electronic bid submissions the bidders must

22  previously obtain and install the appropriate software,

23  resulting in essentially a closed computer network.  An

24  additional drawback with the PARITY system is that no feedback

25  is provided to bidders.  The system incorporates all the

145

1  drawbacks inherent in the other bid submission systems.

2        What does that mean?

3   A.  Well, the PARITY system --

4        MR. QUARLES:  Judge, he was just asked, what does

5  that mean.  Isn't it clear that it means what it says?

6        MR. NIRO:  I think, Your Honor --

7        MR. QUARLES:  Therefore, I say the document speaks

8  for itself.

9        THE COURT:  Why don't you have him read that part

10  that you want the jury to focus on.

11        MR. QUARLES:  He just did read it.

12        THE COURT:  Good.  Did you hear it?  Read it again,

13  I want to hear it.

14  BY MR. NIRO:

15   Q.  Would you read it.

16   A.  It's a drawback of the PARITY bid submission system

17  that to use electronic bid submission the bidders must

18  previously obtain and install all the appropriate software,

19  resulting in essentially a closed computer network.  An

20  additional drawback with the PARITY system is that no feedback

21  is provided to the bidders.  The system incorporates all of

22  the drawbacks inherent in these other bid submission systems.

23   Q.  Now, in this column you talk about:  It is a drawback

24  of bids submitted by mail, and it is a drawback of the fax

25  auction methods, and it is a drawback of in-person bidding

146

1  methods, and it is a drawback of prior art bidding methods.

2       Then you go on and give eight examples, I think, of

3  problems that existed.  Are any of those problems the ones we

4  discussed earlier?

5   A.  Yes, they were.

6   Q.  So the Patent Office was told about the problems and

7  then your solution to the problems?

8   A.  That's correct.

9   Q.  By the way, does your patent cover both open and closed

10  bids?

11       MR. QUARLES:  Objection, Your Honor.

12       THE COURT:  Objection overruled.

13        MR. QUARLES:  He has just asked for a legal

14  question, whether it covers -- whether his patent covers open

15  and closed auctions.

16        THE COURT:  Well, does your machine have the

17  capability of covering both open and closed auctions?

18        THE WITNESS:  It does.

19        THE COURT:  He can answer that question.

20  BY MR. NIRO:

21    Q.  Would you tell us what an open auction is and what a

22  closed action is so the jury understands it?

23    A.  In an open auction, bidders have the opportunity to see

24  how they are performing relative to other bidders in the

25  auction.  So, for example, let's say you submit a bid of

                              147


1  5 percent and somebody else submits a bid of 5.5 percent, then

2  in an open auction you would have some idea how you are going

3  relative to other bidders and whether or not you need to

4  improve your bid or not improve it.

5        Alternatively, in a closed or sealed bid auction,

6  you wouldn't have any idea what anybody else was submitting

7  and you wouldn't then be in a position to react to anybody

8   else's bid.  All you would see is your bid.

9    Q.   Now, when you and Dan Veres and Bob Panoff created your

10  idea, was Thomson Financial involved in muni bond options?

11   A.   No, they were not.

12   Q.   What kind of business were they doing as you understood

13  it in the marketplace at that time?

14   A.   In response to the BIDCOM software, it was a software

15  package that a bidder could load onto their computer, upload

16  onto their computer, and they could use it to do calculations

17  associated with their bid.  But in order to do so, they had to

18  download information from another computer in another location

19  into their software, their BIDCOM software, then they could do

20  the calculation that they needed to do.  Then they would have

21  to transcribe their bid and fax the bid to the issuer in the

22  case of a competitive bond sale.

23   Q.   Focus on BIDCOM for a minute.  Did it use the Internet?

24   A.   No, it didn't.

25   Q.   Did it have a wed browser?

148

1   A.   No.

2    Q.  Did it calculate a true interest cost for multiple

3    bidders at the same time?

4    A.  No.

5    Q.  Did it do the calculation on a central server connected

6    to the Internet?

7    A.  No, it didn't.

8    Q.  Did it have a centralized clock?

9    A.  No.

10    Q.  Did it allow for an observer to see what was going on

11    in the bidding process?

12    A.  No, it didn't.

13    Q.  Did it solve any of the problems that you've described

14    and discussed here to this jury?

15    A.  No.

16         MR. QUARLES:  Your Honor, I object to the constant

17    leading.

18         THE COURT:  I will allow it.  These aren't matters

19    in dispute, are they?

20         MR. QUARLES:  Yes, Your Honor, BIDCOM is a totally

21    different product from PARITY.  PARITY is what was on the

22    disk.

23         THE COURT:  All right.  I will allow it.  You can

24  allow him to answer the questions.

25      MR. NIRO:  I will.

                            149


1       THE COURT:  Ladies and gentlemen, generally going

2   through this material the attorneys are trying to speed things

3   along and they ask what we call leading questions.  That is,

4   they tell the information and they can respond yes or no to

5   it.  Ordinarily I allow leading questions when I think it is

6   matters that are not in dispute, but sometimes when it is

7   areas that there is dispute as to what was going on, we have

8   the witness testify and not the lawyers.  So that's what this

9   leading question thing is all about.  Okay.

10  BY MR. NIRO:

11    Q.  Now, as to PARITY, the second one counsel just

12  mentioned, when did Thomson acquire the PARITY system, do you

13  know?

14    A.  It is my understanding they acquired it in December of

15  1997.

16    Q.  From whom did they buy that?

17    A.  From Dave Landes.

18    Q.  Did Thomson buy that PARITY system before or after you

19  did your first Internet auction here in Pittsburgh?

20    A.  After.

21    Q.  Describe this old PARITY system as you understood it.

22    A.  It was -- my understanding is that the --

23         MR. QUARLES:  Objection, Your Honor.

24         THE WITNESS:  -- bidder --

25         THE COURT:  Hold on, hold on.  What is the legal

150

1  basis of the objection?

2         MR. QUARLES:  The objection would be relevance,

3  what his understanding of it was in 1997 is not relevant

4  certainly to any issue here.

5         THE COURT:  I will allow the question.  Go ahead.

6         THE WITNESS:  The PARITY system, as it was

7  described in the marketing literature we got from Dave Landes,

8  indicated that, among other things, you would take software on

9  a disk and you would load it into the bidder's computer -- and

10  it would actually take three disks, not just one, but three

11  different disks that you would have to load one after another

12  into the bidder's computer.  Then using other software made by

13  other companies, BIDCOM was one example, he gave -- there were

14  two others, Bond Bidder, MicroMuni, those were separate

15  programs by separate companies that would be used to do

16  calculations.

17       So you do your calculation on software that -- like

18  a BIDCOM or MicroMuni or one of these others, and then you

19  would either -- the idea was you were supposed to be able to

20  transport the calculation from the software you had loaded

21  from these other companies onto the PARITY software and then

22  you would connect to a modem and you would be able to send the

23  bid from the bidder's computer through the modem to a modem in

24  a place called 21st Century Municipals, which was affiliated

25  with Dave Landes' company.  Then it would get stored there,

151

1  the bid would then get stored there on a computer.  Every

2  bidder would then send in their bid to that computer; and then

3  when it was all over, you could fax the bids to the issuer.

4       So it struck us as a terribly inefficient process

5  and one that really didn't address the problems we were trying

6  to solve.

7          THE COURT:  Ten-minute recess, please.

8          (Recess taken).

9          (On record in conference room).

10         THE COURT:  Okay.  I take it you have come to

11   agreement on most of this, is that it?

12         MR. NIRO:  We are just down to two documents,

13   Your Honor, we are not going to use anything else but these

14   two, with Mr. Harrington.

15         THE COURT:  Which two -- I have this one.

16         MR. NIRO:  March 4, correct.  Just the highlighted

17   area, Your Honor.  Then the second is that last page.

18         THE COURT:  The last page.

19         MR. NIRO:  The highlighted portion.

20         THE COURT:  All right.  Why are these two now --

21   you have withdrawn the other ones, correct?

22         MR. NIRO:  Yes, for purposes of Mr. Harrington,

23   that's correct.

24         THE COURT:  So what's objectionable about these?

25         MR. QUARLES:  The objectionable thing about these,

152

1   Your Honor, is that they are hearsay.  They come -- they are

2   both written by Mr. Robert Whalen, who is employed by The Bond

3   Buyer, which has absolute editorial freedom from my one

4   client, Thomson Financial.  I-Deal has no interest at all in

5   The Bond Buyer.  The other Defendant in the case has no

6   interest in The Bond Buyer.  So this is, by my understanding,

7   rank hearsay, surely as to i-Deal and I think also as to

8   Thomson.

9          THE COURT:  Yes.

10          MR. QUARLES:  Because Thomson gives -- The Bond

11   Buyer has complete editorial freedom.

12          THE COURT:  I agree simply because they may own

13   this paper does not convert it into an admission.

14          Why wouldn't something like, though, appearing in

15   the Wall Street Journal of whatever this is, why wouldn't

16   these be secondary sources showing that there was a great deal

17   of enthusiasm, this is a new and innovative process?  Don't I

18   have to take into account what some secondary sources say

19   about these things?

20          MR. MCELWAIN:  Could I address that?  Briefly, the

21   key is that a claim for the secondary -- it needs to come from

22   people skilled in the arts, which is, by their expert's

23  submission, this is computer science we are talking about, not

24  bond -- that may seem counterintuitive given all we have heard

25  about today is computer science --

153


1          THE COURT:  One of the biggest steps the municipal

2  market has recently taken into cyberspace was the selling of

3  debt through the Internet.  Although first met with

4  skepticism, the concept caught on in a series of successful

5  MuniAuction deals.

6          MR. MCELWAIN:  If you think of the key issue --

7          THE COURT:  That comes in.  I am not going to let

8  you tell them this is their newspaper.

9          MR. NIRO:  No, I won't do that.

10          THE COURT:  Well, you already did.

11          MR. NIRO:  He did that in his opening.

12          MS. WIGGINS:  He said that in his opening.

13          THE COURT:  Let me see the other one here.  Who is

14  Dalcomp?

15          MR. NIRO:  Dalcomp is them.

16          MR. QUARLES:  No, Dalcomp was a prior company.

17          MR. NIRO:  That they bought.

18          MR. QUARLES:  Which was ultimately bought by

19  Thomson.  What happened was Dalcomp owned BIDCOMP --

20          THE COURT:  Okay, I will let this come in, I think

21  on the same basis.

22          You are entitled to let the jury know that these

23  people in the industry, or as set forth in the marketplace --

24  Wall Street Journal of technology, this was greeted with a

25  great deal of enthusiasm, it was a unique and viable new

                              154

1  product.

2          MR. QUARLES:  Your Honor, if I can.

3          THE COURT:  It is admissible on that basis.

4          MR. QUARLES:  Just to make sure I accurately

5  communicated it.  It is the -- the objection is that it is --

6  this is by people who are talking about the bond industry.

7          THE COURT:  Yes.

8          MR. QUARLES:  The patent is about an electronic

9  process.  A person skilled in the art is not a bond buyer or a

10  bond bidder.

11          THE COURT:  Okay.  That's fine.  Thank you.  Those

12   two can come in.

13          How much longer do you have with this fellow?

14          MR. NIRO:  I would say about a half hour,

15   Your Honor, we are done.

16          THE COURT:  Okay.  Now, what I allow generally is I

17   allow direct, cross, limited redirect, and limited recross and

18   that's it.  No redirect redirect.  None of that.  We end for

19   all the principal witnesses.

20          Now, if you get down to some cumulative witnesses,

21   some nickel-dimers, I may just allow a direct and cross.  But

22   on these main persons I will allow direct, cross, redirect,

23   recross.

24          All right.  We will go to 4:30, 4:45.

25          MR. NIRO:  Your Honor, just by way of preview for

155

1   tomorrow, after Mr. Harrington we have a very short witness,

2   about ten minutes, Mr. Henningan.  Then we will call Cheryl

3   Horowitz adverse, and she will be maybe half hour to 40

4   minutes.  So the remaining witness is going to be pretty fast.

5   We have our expert and then Mr. Gleason and Mr. Landes.

6          THE COURT:  You still want to have this Daubert

7   hearing on Gleason?

8        MR. QUARLES:  Very briefly, just to make sure that

9   Your Honor understands the arguments we are making and we have

10  made it clear what the arguments are.

11       THE COURT:  All right.  Maybe we will do it at

12  1 o'clock tomorrow.

13       MR. NIRO:  I don't think he is going to be on until

14  Wednesday morning would be my guess.  So we can do it

15  tomorrow.

16       THE COURT:  We will do it at 1 o'clock tomorrow if

17  he can get down here.

18       MR. NIRO:  We will check on that.

19       MS. WIGGINS:  And the notebooks are ready.  I will

20  give them to Mr. Palus.

21       THE COURT:  Yes, he can hand them out.  Now, I will

22  tell the jury, I don't want them leafing through it while the

23  trial is going on, I don't want them to get distracted from

24  the testimony.  So I will say something to them.  And I let

25  them take those things home.  If they lose one, I will give

156

1  them another one tomorrow, I don't have any problem with them

2  taking it home at all and reading it on the bus on the way

3  home.

4       (Recess taken).

5       (Back on record in open court).

6       MR. NIRO:  Thank you, Your Honor.

7  BY MR. NIRO:

8    Q.  Mr. Harrington, we had covered BIDCOMP, I want to

9  quickly go to PARITY.  I am going to ask you a series of

10  questions about PARITY, what it did or did not have.

11       Can you tell me whether or not the PARITY system

12  used the Internet?

13   A.  It did not.

14   Q.  Can you tell us whether or not it used a web browser?

15   A.  It did not.

16   Q.  Could you tell us whether or not it required special

17  software to be loaded on the user's computer?

18   A.  It did.

19   Q.  Did it or did it not calculate the true interest cost

20  for multiple bidders at the same time?

21       MR. QUARLES:  Objection, Your Honor.  There is

22  no -- I am sorry.  There is no foundation for this.  No

23    suggestion he has even looked at the PARITY software that's in

24    evidence here.

25         THE COURT:  How do you know that these answers you

157

1    are giving are correct?

2         THE WITNESS:  From the materials and information

3    that had been sent to me by the company.

4         THE COURT:  They answered these type of questions?

5         THE WITNESS:  They do.

6         THE COURT:  Objection overruled.

7    BY MR. NIRO:

8    Q.  Can you answer the question?  Do you have it in mind?

9    A.  I am sorry, did they --

10    Q.  Could they calculate a true interest cost for multiple

11    bidders at the same time?

12    A.  No.

13    Q.  There were multiple bidders coming in, could it

14    calculate the --

15    A.  No, it couldn't.

16    Q.  Did it have a centralized clock?

17    A.  No, it didn't.

18    Q.  Did it allow an observer to see what was going on?

19    A.  Not without special software.

20    Q.  Now, I'd like to show you again the chart that

21    illustrates -- I will back it up -- illustrates features of

22    your invention.  Can you contrast what's shown in this chart

23    with your understanding of what PARITY had as it was submitted

24    to you by the people that provided you with information about

25    it?

### 158

1        MR. QUARLES:  Objection, Your Honor, on the grounds

2    that he is now comparing product to product as opposed to

3    comparing what he should be required to do, the product to the

4    patent.

5        MR. NIRO:  We are going to have our expert --

6        MR. QUARLES:  This is expert testimony.

7        MR. NIRO:  The expert will do the latter part,

8    Your Honor, he can only compare the product.

9        THE COURT:  Well, I will tell you what, why don't

10    we then hold off on this until the expert comes in.

11        MR. NIRO:  All right, we will do that.

12  BY MR. NIRO:

13    Q.  By the way, you are familiar with the existing Thomson

14  new version of their PARITY BIDCOMP, correct?

15    A.  Generally familiar, yes.

16    Q.  That's a product that competes with the stuff that

17  you're doing?

18    A.  It is.

19    Q.  Now, who controls the software as you understand it for

20  that type of auction?

21    A.  I understand it to be controlled by Thomson on a

22  central server.

23    Q.  How about the hardware?

24    A.  The hardware is also owned by Thomson.

25    Q.  Who supervises the auction?

159

1       MR. QUARLES:  Your Honor, I object unless there's

2  some foundation that he knows this from some source other than

3  a hearsay source.

4       THE COURT:  Well, if your client told him, that is

5  not hearsay.

6        MR. QUARLES:  That's correct, but there is no

7   suggestion that anybody has told him.

8        THE COURT:  How did you find out about this?

9        THE WITNESS:  In fact we did get information from

10   public sources about the product that they had supplied, for

11   example, the State of Texas, they had supplied in detail the

12   description of how the product works.

13        THE COURT:  Who gave it to you?  That's what I am

14   asking.

15        THE WITNESS:  The State of Texas in that case gave

16   it to us.  We also had a description of product, the 16 pages

17   that were submitted as part of the patent application as well.

18        THE COURT:  Let me see counsel up here.

19     (On record at sidebar as follows).

20        THE COURT:  Just give me a heads-up here because,

21   frankly, I am a little confused as to how pointing out how

22   their product differs from your product wins you a patent

23   infringement case.

24        MR. NIRO:  Well, he is --

25        THE COURT:  It seems like you are supposed to be

160

1    saying they are the same.

2         MR. NIRO:  Well, we are talking about the new

3    system, the new system is like his system.  The old system is

4    not.  So I am just covering the new system, what are the

5    similarities.

6         THE COURT:  You are saying before your product came

7    out they were completely different and after your patent came

8    out they conformed to your methods?

9         MR. NIRO:  Yes.

10        MR. QUARLES:  But the question has to be whether --

11   we have heard a lot of testimony about automatically

12   calculating and a central location for the bids.  That is not

13   a claim element.  There has been a lot of talk about the

14   centralized clock going out to the neighborhood time zone.

15   That's not an element of the claims.

16        MR. NIRO:  It most certainly is, Your Honor.

17        MR. QUARLES:  It is not.  It is only that there be

18   a synchronization of the clocks.  So what we have here is --

19   and I am sure this jury thinks they are supposed to find out

20   whether our product is like his product.  That's just totally

21   the wrong place to be.

22          THE COURT:  Well, they have to find out if your

23  product infringes on the claims they are asserting.  I

24  understood that.

25          MR. QUARLES:  Yes.

                                161


1          MR. NIRO:  We are not saying that that's not an

2  inquiry we are going to go into with our expert.  We will not

3  do it with him, our expert is going to do that.  He is going

4  to take the claims elements and go through them.

5          THE COURT:  I really don't mind you telling them

6  how your product works and how it compares and contrasts to

7  their product because they should know that.  But I could

8  certainly tell them that you are permitted to make a product

9  that's outside of your own patent.

10          MR. NIRO:  Sure.

11          THE COURT:  That's somewhat commercially different

12  than your patent, but you still have a right to enforce your

13  patent.  I can tell them that.

14          MR. NIRO:  It might be easier, Your Honor, for us

15  to move right past this.  We have an expert who is going to

16  come on.  I don't think we have to do it here.

17          THE COURT:  Okay, I am going to tell them something

18  because it has gone on long enough.

19          MR. QUARLES:  Yes.

20          THE COURT:  If you have your expert come in and

21  talk about the patent itself and why their product infringes,

22  that will cover it.

23          MR. NIRO:  Right.

24          THE COURT:  That will cut down on some of this.

25  But I will tell them that anyhow.

162

1          (Back on record in open court).

2          THE COURT:  Members of the jury, you heard some

3  testimony about comparing and contrasting the two products

4  that are at issue here.  Let me tell you this just so you

5  know:  We are not comparing product to product.  What we are

6  comparing is the Defendant's product to their patent and the

7  claims in their patent.

8          Now, the Plaintiffs are allowed to make a product

9  that's different from their patent and still enforce their

10  patent.  So it is the patent you are trying to discover, does

11  the Defendant's product infringe on the patent, not

12  necessarily does it work the same as their product does.  It's

13  the patent you are construing, not the product.  Keep that in

14  mind.

15      You will hear some expert testimony on both sides

16  on whether the product that the Defendants are using infringes

17  or does not infringe on their patent.  Again, it's not product

18  to product you are comparing, it's their product to their

19  patent.

20      MR. QUARLES:  Your Honor, might I ask that you also

21  discuss whether that is also true with respect to the prior

22  art, whether the prior art is to be compared against the

23  patent or the product.

24      THE COURT:  Okay.  Again, it is the claims in the

25  patent that you have to be constantly worried about, not

163

1  necessarily how their product works.  Same thing is true with

2  the prior art.  Was their patent predicted by a prior art,

3  thus making it obvious?  So that is what you are going to look

4  at.  Prior art that you will see -- and don't roll your eyes

5  just yet, you will get it, you will get it, don't worry,

6   ma'am.  You will get it.  You will get it eventually.  You

7   will understand what these terms mean, you will understand how

8   to construe them, and you will know what the factual basis is

9   on which to make the decision.  I guarantee it.  So don't

10   worry about it.  Just like I guaranteed the Pittsburgh victory

11   yesterday.  Don't worry about a thing, you will be fine.

12   BY MR. NIRO:

13     Q.   Mr. Harrington, when the examiner that we talked about

14   was doing this examination process for your patent and had

15   before him the PARITY BIDCOMP system, then talked about the

16   reasons for allowance, was the examiner talking about what's

17   claimed in your patent or some product?

18     A.   Just what's claimed in the patent.

19     Q.   So he was comparing what was claimed in your patent

20   against the old PARITY, old BIDCOMP system?

21     A.   That's correct.

22     Q.   I would like to show you --

23         MR. QUARLES:  Objection, Your Honor.

24         THE COURT:  Objection overruled.  Let's go.

25   BY MR. NIRO:

164

1   Q.   Okay.  Let me show you Plaintiff's Exhibit 206, which

2   is a March 4, 1998, article from something called Bond Buyer.

3   I hope this is zeroed in enough.  When Internet bidding on

4   municipal bonds first appeared on the market's radar screen,

5   it was greeted with skepticism, dissent, and was really

6   referred to -- was readily referred to as the Pittsburgh

7   experiment.  Myles Harrington, the creator of the MuniAuction

8   website that made Internet bidding a reality, was vilified and

9   attacked.

10         Now, let me see, without going back and forth on

11   this Elmo, if I can read it again.

12         When Internet bidding on municipal bonds first

13   appeared on the market's radar screen, it was greeted with

14   skepticism, dissent, and was readily referred to as the

15   Pittsburgh experiment.  Myles Harrington, the creator of the

16   MuniAuction website that made Internet bidding a reality, was

17   vilified and attacked.

18         Is that statement consistent with what you

19   understood was going on at the time that you introduced this

20   Pittsburgh experiment, the first Internet municipal bond --

21         MR. QUARLES:  Your Honor, note my objection.

22    THE COURT:  Sure.

23    THE WITNESS:  Can I answer?

24    THE COURT:  Yes.

25    THE WITNESS:  Yes.

                        165

1  BY MR. NIRO:

2   Q.  Were you in fact vilified like the article said?

3       MR. QUARLES:  Your Honor, note my objection.

4       THE WITNESS:  I don't think so.

5       THE COURT:  Well, I don't know if that's -- that

6  was not the reason you want to discuss.  You know the reasons

7  I want you to discuss.

8  BY MR. NIRO:

9   Q.  Let's go to the first where it was greeted with

10  skepticism, dissent and readily referred to as the Pittsburgh

11  experiment.

12       Was there in the trades some recognition of what

13  you were doing and, if so, what was it?

14   A.  Well, there was quite a bit of resistance I think not

15  just to the methodology, but to the technology by participants

16  in the industry at the time who, frankly, felt somewhat

17  threatened, I think, by the innovation itself.

18   Q.  All right.  Further down it says:  Dalcomp is planning

19  to launch its own Internet bidding platform based on the

20  PARITY system sometime in the second quarter.  And although

21  the move was characterized as extremely positive by the

22  existing client base, no deals are lined up at this point,

23  said Allen Williams, president of Thomson Municipal Group,

24  which owns and operates Dalcomp.

25       Is Dalcomp owned by Thomson?

166

1   A.  No, Thomson runs Dalcomp.

2   Q.  I am sorry, I thought that's what I asked.  Thomson

3  owns Dalcomp?

4   A.  Yes.

5   Q.  Allen Williams is the gentleman sitting in the back?

6   A.  The president, yes, of Dalcomp.

7   Q.  Did Dalcomp launch its own Internet bidding platform

8  based on PARITY?

9   A.  It did, in September of 1998.

10   Q.  Was that before or after you had done it?

11    A.  It was almost a year after us.

12    Q.  The article goes on to say:  The time is right for this

13    type of feature, that's why we're doing it, Williams said.

14    What we're trying to do is provide the marketplace with a more

15    complete product.  We're working on moving with the way the

16    market is moving, towards more Internet based products and

17    being in that arena.

18          Was the market moving in the direction of Internet

19    based municipal bond auctions at this time?

20          MR. QUARLES:  Objection, Your Honor, calls for an

21    expert opinion.

22          THE COURT:  I will let him answer that.

23          THE WITNESS:  At the time we conceived our

24    invention, I would say most in the industry knew little or

25    nothing about either the Internet or web browsers or any of

167

1    those things.  And at the time this statement was made, yes, I

2    do believe more in the industry realized the advantages of

3    using the technology.

4    BY MR. NIRO:

5     Q.  All right.  Now, I would like to go to a different

6     article, and this one is from Wednesday, July 8th, 1998.  Let

7     me see if I can zoom in on this.  It reads, and this is part

8     of Plaintiff's Exhibit 70R:  One of the biggest steps the

9     municipal market has recently taken into cyberspace was the

10    selling of debt through the Internet.  Although first met with

11    skepticism, the concept caught on in a series of successful

12    MuniAuction deals.

13          What was the reaction of the marketplace to, and

14    people in this industry, to the introduction of your product

15    in September -- I am sorry, November of 1997 in Pittsburgh?

16          MR. QUARLES:  Objection, Your Honor.

17          THE COURT:  Overruled.

18          THE WITNESS:  Well, it was a mixed reaction.  There

19    were some who were delighted about the innovation and there

20    were some who spoke about it in rather unflattering terms.

21    BY MR. NIRO:

22     Q.  The article continues:  With the focus trained on a

23    target date within the next few weeks, Dalcomp expects to

24    become the third venue for electronic municipal bond sales.

25          Dalcomp again is Thomson?

168

1   A.   Yes.

2   Q.   It says:  And while it has been a long time coming,

3   many in the market are looking forward to that day because

4   they currently use Dalcomp.  Market anticipation aside,

5   Flaschen said he is not pleased by the delay.

6        Who is Flaschen, by the way?

7   A.   He was the CEO of Thomson.

8   Q.   In the information service business, as soon as you

9   invent an idea, you want it implemented yesterday.  By

10  definition, I'll never be satisfied with any time frame gap

11  between inventing the idea and delivering the service,

12  Flaschen said.

13       What invention has to do with the introduction of

14  municipal bonds -- I am sorry, the sale of municipal bonds

15  using the Internet and a web browser?

16       MR. QUARLES:  Objection, Your Honor.

17       THE COURT:  Okay.  Overruled.

18       THE WITNESS:  The invention was our invention.  I

19  am not sure whether he is claiming to have invented it or not.

20  BY MR. NIRO:

21    Q.  All right.  I want to go to a different subject for a

22    minute and specifically your website.  Does MuniAuction have a

23    website in which it describes its product and how it works and

24    what's going on there?

25    A.  Yes.

169

1    Q.  Do you keep track and can you keep track of instances

2    in which people visit that website?

3    A.  We can.

4    Q.  Have you done that?

5    A.  Yes.

6    Q.  I am going to show you Plaintiff's Exhibit 177.  It is

7    in your book.  Maybe you can get it from your book as well.  I

8    will just put it up here so you can look at some of these.

9        Did you keep track of instances in which somebody

10    from TFN -- you see a whole list of hits from TFN -- did you

11    keep track of instances in which people from TFN accessed your

12    website?

13    A.  We did, as well as Dalcomp.

14    Q.  What did you find?

15    A.  We found thousands of hits on the website from May of

16  1997 through and including February of 1998.

17    Q.  If you go on the Internet and punch in TFN, what does

18  that take you to?

19    A.  Thomson's -- Thomson Financial's home page.

20    Q.  Now, some of these things are identified as

21  zuul.tfn.com.  Were you able to identify people with these

22  various hits on your website?

23    A.  Well, names like zuul, Z-U-U-L, is either an individual

24  or a group of individuals at Thomson Financial.  The access by

25  specific individuals can be identified by taking registration

                                170


1  information and tracking it to these hits.  So, for example,

2  Allen Williams, the president of the company, hit the site a

3  number of times as well as several other people at Thomson.

4    Q.  Do you know and can you tell what they were accessing

5  when they were hitting the website?

6    A.  They were accessing, among other things, the bid page

7  and the verification page, observation page, information about

8  the issues, that type of thing.

9    Q.  Now, was this occurring before or after Thomson

10    introduced this product?

11    A.  Well before.

12    Q.  Were you able to plot this in a graph?

13    A.  Yes, we have.

14    Q.  I would like to show you Plaintiff's Exhibit 276.  Tell

15    us what that is.

16        MR. QUARLES:  Again, Your Honor, my objection to

17    this document as I raised earlier.

18        THE COURT:  Listen, you don't have to repeat these.

19        MR. QUARLES:  There is an additional one which is,

20    if you notice, this suggests this happened in --

21        THE COURT:  Hold on, hold on, sir.  The reason we

22    have pretrial conferences is to get this out of the way.  Your

23    exception is noted for the record by virtue of your objections

24    in conference.  You don't have to do it again later.

25        MR. QUARLES:  Thank you.


171


1    Q.  What does this graph show?

2    A.  This is a graph showing from the time we went public with

3    our invention, which was basically I think May 30th, 1997.

4  Q.  That's down here?

5  A.  Yes.

6  Q.  Through the time that Thomson did their first auction in

7  September of 1998?  That's at the top?

8  A.  Yes.

9  Q.  What are you plotting here, the number of hits, cumulative

10  or what?

11  A.  This is a conservative presentation of the number of times

12  that Thomson employees accessed our website.  It doesn't

13  include everything they accessed, it's actually unique pay

14  views, that's what hits means, in this case, so 1,069 pages of

15  our website were pulled up and examined by employees of

16  Thomson during that period of time.

17  Q.  Now, in the middle was the auction in Pittsburgh, that was

18  in November of '97, the first auction?

19  A.  Yes.

20  Q.  And then at the top is Thomson's introduction?

21  A.  Yes.

22  Q.  Did this concern you in any way?

23  A.  It did.  We didn't know it was going on, frankly, until

24  shortly before I went to see Thomson in March of 1998.

25  Q.  Let's back up.  Tell us about that visit, why you went

1  there, who you met with?

2  A.  Well, we discovered that Thomson was -- had acquired

3  PARITY, I believe through a press release or through rumor,

4  one of the two, and when we heard that, we became a little bit

5  concerned and decided to take a look and see whether or not

6  any Thomson employee had been hitting our website.  What we

7  found at that point were thousands of hits, including images

8  as well as unique pay views, and I was -- I think we were all

9  somewhat alarmed by it in that it appeared to us to be an

10  indication that it was more than just a casual interest in

11  what we were doing.  So, I made an appointment to go visit two

12  people, Allen Williams and Renata Morgenstern, two senior

13  people.

14  Q.  Where did you go?

15  A.  To New York.

16  Q.  Who are those people?

17  A.  Renata Morgenstern was executive vice president in charge

18  of new property and Allen Williams was the president of

19  Dalcomp.

20  Q.  Did you meet with them and what did they say back to you?

21  A.  I suggested to them that perhaps they would be interested

22  in taking a license from us to use our product, and they

23  dismissed that as something that they wouldn't have any

24  interest in.  And then I put in front of them 30 or 40

25  pages -- I don't remember how many -- of hits on our website

173

1  by their employees and showed them that Dalcomp employees,

2  Thomson employees had not only just been hitting the brochures

3  of our website, but also going into the website and looking at

4  our bid pages, our error pages, our verification pages and the

5  rest of it, and that it was a concern to us.  And, actually,

6  it was the basis on which I thought they might actually be

7  interested in licensing.

8  Q.  What did they say when you brought this to their

9  attention?

10  A.  They didn't say much.  They were defensive and the meeting

11  came to an abrupt end, and they made it clear to me they

12  didn't have any interest in talking to me.

13  Q.  Now, was this before or after your patent had issued?

14  A.  This was before the patent had issued.

15 Q.  After the patent issued, did you visit them again?

16 A.  No.  I sent them a letter.

17 Q.  What was the purpose of that letter?

18 A.  Once the patent had issued, I assumed at that point they

19 would be very seriously interested in licensing.

20 Q.  I'm sorry.  Go ahead.

21 A.  So, in the letter, I suggested to them that we would be

22 willing to talk to them about taking a license.

23 Q.  Let me show you Plaintiff's Exhibit 6.  It's a letter from

24 you dated January 4, 2001, to Mr. Patrick Tierney, President

25 and CEO Thomson Financial.

174

1       Is this the letter to which you just referred?

2 A.  It is.

3 Q.  What did you say in the second paragraph of that letter?

4 A.  If you are interested, we are available to discuss the

5 terms of a license at your convenience.

6 Q.  What about the paragraph above that?

7 A.  Since you do business in a manner described and claimed in

8 this patent, we believe you may be interested in a license

9  under our patent.

10  Q.  Did you copy Mr. Williams?

11  A.  I did.

12  Q.  Did you get a response to this?

13  A.  I don't remember whether I got a formal response or not,

14  frankly, but it was clear to me that they had no interest.

15  Q.  By the way, did you attach a copy of your patent to this?

16  A.  I did.

17  Q.  You don't recall getting any response?

18  A.  I don't.

19  Q.  When, again, did Thomson introduce its new version, what

20  I'll call the new BIDCOM/PARITY system?

21  A.  They did their first sale in September of 1998.

22  Q.  What was it called?

23  A.  The modified BIDCOM/PARITY system.

24  Q.  Did they charge for their service?

25  A.  No.  In fact, they made a number of public statements that

175

1  their service was free.

2  Q.  Did that concern you?

3  A.  To say the least.

4 Q. Why?

5 A. Well, it was a death certificate for us in that if we had

6 a competitor who wasn't going to charge, we didn't have much

7 chance of selling the product, especially to government

8 entities if we had competition that was free because when you

9 try to do business with government and nonprofits, it's --

10 free is everything. It's hard to argue that you have a better

11 product when they can get the service for free.

12 Q. What kind of volume were you doing, let's say, in the

13 first year after you started this, after the Pittsburgh

14 experiment?

15 A. We did about a billion dollars from the time -- it was

16 roughly a billion dollars from the time of our first sale and

17 the time that Thomson did their first sale.

18 Q. What about Thomson, what kind of volume have they done

19 since they introduced to the present, do you know?

20 A. It's roughly $350 billion.

21 Q. That's the par value of the bonds?

22 A. Of the bonds.

23 Q. Is that kind of information publicly available?

24 A. It is from The Bond Buyer.

25  Q.  So if I want to find out what their volume is, I can look

176

1  at a publicly available source and find out what their volume

2  is?

3  A.  Yes.

4  Q.  How many transactions have they done, how many options?

5  A.  Over 13,000 using our methodology.

6  Q.  How many have you done?

7         MR. QUARLES:  I object to that, Your Honor, and ask

8  that it be stricken, using our methodology.  Obviously, talk

9  about how many sales we've done --

10  BY MR. NIRO:

11  Q.  Let's try and limit it to the new BIDCOM/PARITY system.

12  The new BIDCOM/PARITY system, what is their volume on that?

13  A.  350 billion.

14  Q.  And how many auctions have they done using that new

15  BIDCOM/PARITY system?

16  A.  Roughly, 13,500 I believe.

17  Q.  What have you done, that is, you, MuniAuction in the same

18  period of time.  Actually, you have been doing it since '97.

19  What is your volume?

20  A.  I think it's roughly 2,500.

21  Q.  2,500 auctions.  What is the total par value of the bonds

22  auctioned by MuniAuction?

23  A.  It's about 35 billion.

24  Q.  What has happened to your business, that is, the business

25  of MuniAuction since the new PARITY/BIDCOM system entered the

177

1  marketplace in September of '98?

2  A.  Well, we went through a period of rapid consolidation

3  between the time that Thomson introduced their free product

4  and the point in time at which we had no more money and had to

5  lay off people.

6  Q.  Let's go to where you were before and where you went to

7  after.  How many employees did you have?

8  A.  We started with 12.

9       MR. QUARLES:  Objection, Your Honor, the relevance

10  of this.

11       MR. NIRO:  It's relevant to damage, Your Honor.

12       MR. QUARLES:  Damages are reasonable royalty or

13  some other measure, has nothing to do with how many employees

14 they had.

15        THE COURT:  Aren't you going to have a damage

16 expert come in here?

17        MR. NIRO:  Yes, we are.

18        THE COURT:  Let him tell them.

19 BY MR. NIRO:

20 Q.  After you approached Thomson and they didn't come back to

21 you, respond to your letter, what did you do next in terms of

22 addressing these issues with Thomson?

23        THE COURT:  Let me see counsel, please.

24  (Discussion at side-bar.)

25        THE COURT:  I'm just want to make sure he doesn't

178

1 blurt out anything about any offers of settlement or anything

2 like that.

3        MR. NIRO:  He's not going to.

4        THE COURT:  That's what I was concerned about.  I

5 don't want any offers of settlement, we tried to work it out,

6 they refuted me.

7        MR. QUARLES:  Your Honor, I have to make an

8 objection for the record.  What we're hearing now is just a

9  sob story about my company was small and then I got smaller.

10  This is a patent case and the issue is do we infringe their

11  claims and is their patent valid?  Having him go on and on

12  about how he had this number employees and I lost the

13  employees.

14        THE COURT:  His expert is going to testify

15  tomorrow, I think.

16        MS. WIGGINS:  Wednesday.

17        THE COURT:  After the Daubert hearing, if the

18  Daubert challenge is not successful.  That's when you're going

19  to get into the damages.

20        What else do you want to bring out with this

21  fellow?

22        MR. NIRO:  I have very little left, Your Honor.

23  One of the things, the reason this is important is Mr. Landes,

24  we're calling him as an adverse witness, he's going to reveal

25  the strategy that evolved here, specifically, that they went

179

1  out, decided to price it at zero so they could dominate the

2  marketplace and then raise the price later.  That's evidence

3 of intent to copy and run them out of business, that's

4 relevant.

5          MR. McELWAIN:  That's an antitrust claim.

6          MR. NIRO:  It's not the antitrust claim.

7          MR. McELWAIN:  That's been dismissed.

8          THE COURT:  We'll deal with that at 9:00 a.m.

9          What else?

10          MR. NIRO:  The award.

11          THE COURT:  Put in the award.  Your cross, I guess,

12 will be pretty extensive, too.  Let's get started today on the

13 cross and then we'll pick it up again tomorrow.

14     (End of discussion at side-bar.)

15 BY MR. NIRO:

16 Q.  Mr. Harrington, did the City of Pittsburgh receive any

17 awards as a result of this first electronic Internet auction?

18 A.  Yes, it did.

19 Q.  What award did they receive?

20 A.  Well, I think they might have gotten more than one, but

21 the most significant one was granted by Harvard Kennedy

22 School, Kennedy School of Government at Harvard University and

23 the Ford Foundation for innovations in American government.

24 Q.  When did that happen?

25  A.  It was -- they got it in '99, but it took over a year of

180

1  filing the application and they went through several phases.

2  There were semi-finalists and finalists and then a winner, so

3  it started with over 1,600 governments around the country

4  applying for the award, and then it was reduced finally to

5  ten.  And each of the winners received an award of $80,000 to

6  promote whatever their innovation was.

7  Q.  Is this --

8        MR. NIRO:  Your Honor, may I approach?

9  BY MR. NIRO:

10  Q.  Is this the award, certificate concerning the award

11  Pittsburgh got as a result of the first Internet-based

12  municipal bond auction?

13  A.  It is.

14  Q.  By the way, where did this come from?

15  A.  The award?

16  Q.  No, the plaque.

17  A.  The city gave it to us as a gift.

18  Q.  That hangs in your office?

19  A.  Yes.  The city got the money, not us.

20  Q.  The award, the cash component of the award was $80,000?

21  A.  Yes.

22  Q.  And that was given to the city?

23  A.  Yes, it was.

24  Q.  That's Plaintiff's Exhibit 146.

25      Now, in the award it says -- let me go into it if I

181

1  can.  It says:  Conceived in 1996 and ready for use in 1997,

2  MuniAuction allows the City of Pittsburgh to take competitive

3  bids -- why don't you read?

4  A.  Conceived in 1996, ready for use in 1997, MuniAuction

5  allows the City of Pittsburgh to take competitive bids on

6  bonds over the Internet using both maturity by maturity, MBM,

7  and all or nothing, AON, bids.  Bids are taken by a web page

8  template for the bidders which assures accurate and timely

9  submissions.  The MuniAuction website displays the best bid

10  and invites more aggressive bids.  The system has numerous

11  security features and maintains logs of all interactions so

12  that a full chronology can be recalled in any dispute.

13  Q.  Now, does that describe the system, the MuniAuction system

14 that you used for the City of Pittsburgh in November?

15 A. It does.

16        MR. QUARLES:  Objection.

17        THE COURT:  Tomorrow morning at 9:00 a.m.

18 BY MR. NIRO:

19 Q. Now, were there any savings that the City of Pittsburgh

20 realized as a consequence of doing the auction in the manner

21 in which you indicated, namely, an Internet-based, web browser

22 based auction municipal bonds over the Internet?

23        MR. QUARLES:  Objection, Your Honor.

24        THE COURT:  You put your proffer on the record

25 tomorrow morning.

                                182


1        THE WITNESS:  Yes.  In fact, the city did its own

2 analysis, and we did an analysis as well, and the mayor

3 assigned a figure of $300,000 to the savings that the city

4 realized from using the process.  Other analyses show the

5 savings exceeding $1 million.

6 BY MR. NIRO:

7 Q. What were you charging for per transaction per auction for

8 this before the market, before PARITY/BIDCOM/Thomson entered

9 the marketplace?

10 A. We were getting as much as $15,000 an auction down to as

11 little as $2,500 an auction, depending upon the size of the

12 issue. So the larger the issue, the more money we could

13 charge; the smaller the issue, the less money we could charge.

14 Q. What was your profit margin on that?

15 A. At that time, I don't know what it was, but we did a

16 margin analysis later in the process and our margins were --

17 well, our most recent analysis is the one I recall, our

18 margins were as high as 90 percent on these types of auctions.

19 Q. What is the average over the time period that you've

20 looked at it?

21 A. Well, it's well over 50 percent. I don't know what the

22 average has been, but if I were going to speculate, I would

23 say at least 65, 75 percent measured from 1997 to the present.

24 Q. Now, after Thomson came on the marketplace, were you able

25 to maintain that 10,000 to 15,000 per transaction price, or

183

1 no?

2 A. No. In fact, our -- the price we were able to charge

3  immediately dropped from a high of 15,000 down to about

4  $1,800.

5  Q.  I have one last thing I want to ask you about, if I can

6  find it.

7      THE COURT:  Before you go on, ladies and gentlemen,

8  you've heard about the award the plaintiff received, the city

9  received based on its product.  I introduced this because

10  there are some articles that were read into the record about

11  what other people said about it.  You're entitled to consider

12  what we call secondary sources, that is, what people who are

13  knowledgeable in the industry thought about the product at the

14  time in terms of whether or not this is, in fact, a real,

15  unique and innovative invention, or is it simply something

16  which the defendants contend was based on all the prior art

17  and was obvious.  So you can take what other people say about

18  it in making that determination when it comes time for you to

19  decide the case.  For that basis, I allowed it in.

20  BY MR. NIRO:

21  Q.  Now, have you been able to make an item by item, point by

22  point comparison to features of your system, MuniAuction's

23  system with the system that's used by Thomson?

24  A.  I have.

25  Q.  How many similarities are there?

184

1  A.  At least 15.

2       MR. QUARLES:  Objection.

3       THE COURT:  I ruled on this already.  Again, we're

4  not comparing his product to yours, we're comparing his

5  product to your patent, and I thought that's what you said

6  your expert was going to talk about, so let's save that.

7  BY MR. NIRO:

8  Q.  Now, one last thing.  We have a lot of testimony about

9  your invention, how you went about getting it and doing it.

10  Are you proud of your invention?

11  A.  We are.

12       THE COURT:  Did you expect another answer?

13       MR. NIRO:  I would be shocked if he said no to

14  that.

15  BY MR. NIRO:

16  Q.  Have you been paid anything by Thomson, a penny, a nickel,

17  a dime, a dollar?

18  A.  No.

19  Q.  For any use of your invention?

20  A.  No.

21       MR. NIRO:  We have nothing further.

22       Thank you, Your Honor.

23       MR. QUARLES:  Good afternoon, Your Honor.

24       I'm going to examine Mr. Harrington on a number of

25  issues to see whether we can identify those areas where we

185

1  agree and where we disagree.  I intend to discuss with him

2  when he, Mr. Veres and Dr. Panoff came up with a complete idea

3  for the invention they claim in their patent.  I will also

4  discuss with Mr. Harrington what he knew about PARITY,

5  Mr. Landes' system, which Mr. Harrington was seeking to obtain

6  his patent and how he distinguished his system from PARITY

7  both in the patent and in his discussions with the examiner.

8       I will examine Mr. Harrington about what he and his

9  co-inventors knew about the state of electronic auctions,

10  including PARITY, at the time they say they made the

11  invention, and I'll also examine Mr. Harrington as to why he

12  did not disclose to the Patent and Trademark Office two

13  patents that he had in his possession that explicitly

14  disclosed using web browsers in electronic auction.

15  BY MR. QUARLES:

16  Q.  Good afternoon, Mr. Harrington.  Before 1995 you were

17  employed at Wheat, First, Butcher & Singer as a financial

18  advisor, correct?

19  A.  Correct.

20  Q.  You formed Grant Street Advisors in 1995, correct?

21  A.  Correct.

22  Q.  So the original business of Grant Street Advisors was to

23  serve as a financial advisor to municipalities, right?

24  A.  It was, yes.

25  Q.  And it was at Grant Street that you say that you, Mr.

186

1  Veres and Dr. Panoff came up with the idea that led to your

2  patent, correct?

3  A.  Correct.  Except Dr. Panoff wasn't with MuniAuction.

4  Q.  You testified this morning that you first came to a full,

5  fixed conception of your -- withdrawn.

6       You testified this morning about a meeting in April

7  of 1996.  Do you recall that?

8  A.  Yes.

9  Q.  You said you were present and Mr. Veres were present?

10  A.  Yes.

11  Q.  Two of your employees were present, correct?

12  A.  I don't remember the exact number, two or three.

13  Q.  There was another person present, right?

14  A.  Correct.

15  Q.  Who was that person?

16  A.  His name was Kevin O'Neill.

17  Q.  Kevin O'Neill is employed where?

18  A.  Currently he's with a consulting firm in New York.

19  Q.  You described him as a financial advisor, right?

20  A.  No.  He wasn't a financial advisor.  I'm not sure exactly

21  what his title was, but he worked in some department of

22  chemical back in New York.

23  Q.  You've known Mr. O'Neill for a while, correct?

24  A.  Since graduate school at Carnegie Mellon.

25  Q.  In fact, his father is your expert in this case, isn't he?

187

1  A.  Yes.

2  Q.  So Mr. O'Neill was present.  Now, did he participate in

3  this brainstorming discussion?

4  A.  Kevin O'Neill, yes, yes, he did.

5  Q.  What ideas did he contribute?

6  A.  I don't remember any particular ideas that he had.  He

7  wasn't familiar with municipal bond industry and he happened

8  to be in town visiting his wife's parents, so since he was a

9  friend of mine, I invited him to join us since he was in town

10  for a day or two.

11  Q.  He heard the entire back and forth between you and

12  Mr. Veres and the people on your staff?

13  A.  I believe he did, yes.  During the brainstorming session,

14  he heard that whole discussion, yes.

15  Q.  Mr. O'Neill signed a confidentiality agreement?

16  A.  Kevin O'Neill?

17  Q.  Yes.

18  A.  No, he did not.

19  Q.  It was just a person who was a friend of yours who was

20  present and heard everything that was discussed?

21  A.  That's correct, during the brainstorming session, yes.

22  Q.  Now, we can agree, can't we, sir, that after -- withdrawn.

23       Do you have any notes or documents about this

24  meeting in April of 1996?

25  A.  I don't.

                                188


1  Q.  We didn't see any today.

2  A.  I don't have my original handwritten notes, but you do

3  have the notes that were transcribed into type.

4  Q.  We haven't seen those here today, have we?

5  A.  I don't think they have been presented, but they were part

6  of the discovery that we produced.

7  Q.  Now, we can agree, can't we, sir, that Dr. Panoff, you had

8  never discussed this invention with him until November of

9  1996, correct?

10  A.  That's correct.

11  Q.  And Dr. Panoff was the person who was going to write the

12  software to make this system operate, correct?

13  A.  That's what he wound up doing.  I didn't approach him with

14  the idea of writing the software, but he wound up writing it

15  for tran and then Bob O'Neill turned it into pearl.

16  Q.  In fact, you said it was written by a college student?

17  A.  Bob O'Neill I believe he was an undergraduate student in

18  physics at North Carolina State University.

19  Q.  He's the person who actually wrote it an undergraduate?

20  A.  He's actually -- the way Bob Panoff, Dr. Panoff describes

21  it is he would write it in for tran and Bob O'Neill would then

22  effectively transcribe it into pearl.

23  Q.  And from the time that you described how you wanted this

24  to work to Dr. Panoff in November of '96 until you had a

25  prototype took less than a month, right?

189

1  A.  I wouldn't say it was a full prototype.  The full

2  prototype was available probably in mid May.  What we had were

3  certain elements of the invention in practice.  In fact, my

4  recollection is it might have been a bit more than a month.

5  It might have been closer to three months before we had a

6  number of the elements all combined into a web page or a

7  series of web pages.

8  Q.  Did you say in your deposition -- do you recall being

9  asked the following question in your deposition about how long

10  it took for a prototype to be made?  You were asked how long

11  did it take him to produce a prototype.  I'll put this on.

12  You were asked this question.  How long did it take him to

13 produce a prototype.

14        MR. NIRO:  Could we have a page?

15        MR. QUARLES:  133, Line 22.

16 BY MR. QUARLES:

17 Q.    "QUESTION:  How long did it take him to produce a

18 prototype?

19        "ANSWER:  I don't remember exactly how long it was.

20 Plus or minus a month I am thinking."

21        Is that your testimony then?

22 A.  It appears to be, yes.

23 Q.  Now, at some point in 1996, you were aware of a service

24 called MuniBid that provided some form of assistance to

25 issuers with the sale of municipal bonds in a competitive sale

                                190

1 format, correct?

2 A.  I believe it was in 1996, yes.

3 Q.  And MuniBid was a service provided by 21st Century

4 Municipals, correct?

5 A.  I don't know.  Maybe.  I don't know.  Maybe it was

6 provided by -- I know that Dave Landes had a connection to

7  21st Century Municipals and he also had a connection to

8  MuniBid, but what the connection was between the three of

9  them, I don't think I know the legal arrangement between them,

10  no.

11  Q.  Well, you knew that 21st Century was offering an

12  electronic bid submission before you filed your application

13  for a patent, correct?

14  A.  I knew it as PARITY, I think, yes.

15  Q.  And you said in response to some questions Mr. Niro asked

16  you, you said at that time, people weren't using the Internet

17  very much in municipal bonds.  Do you remember that answer you

18  gave Mr. Niro?

19  A.  Yes.

20  Q.  Do you know what Bonds Online is?

21  A.  It's a service that I believe Mr. Landes was trying to get

22  off the ground in 1996.

23  Q.  So Mr. Landes was, in fact, using the Internet for a

24  service called Bonds Online in 1996, right?

25  A.  Well, I believe it was an information service with

191

1  information about bonds.  That was my understanding of it at

2  the time.

3  Q.  And you could put on the Bonds Online an indication of

4  where the bids were, where the next bid was going to be, and

5  list that it was eligible for PARITY, correct?

6  A.  I didn't access Bonds Online so I'm not -- and I don't

7  believe it was described in that kind of detail in the

8  materials I received, but if it was, it didn't -- it wasn't

9  something that I was particularly familiar with.

10 Q.  Well, was it described in the materials that you received?

11 A.  It may have been.  I know it was an information -- I knew

12 it as an information service where he would post information

13 about municipal bond issues, but it's not something I ever

14 knew much more about than that.

15 Q.  Well, let's take a look, if we can, at the August 16th,

16 1996 letter, which is DX AP.

17 Q.  You've seen DX AP before.  That's the letter that

18 Mr. Veres got from Mr. Landes in August of 1996, correct?

19 A.  Yes.

20 Q.  And this would have been at the time you say you were

21 talking to Mr. Veres and Mr. O'Neill and others in your office

22 about the idea of an electronic bid submission activity,

23  right?

24  A.  Actually, no.  We had that meeting several months earlier.

25  Q.  Right.  So according to you, a couple months earlier you

192

1  had this brainstorming session and then in August of 1996, you

2  get a letter from someone who is talking about PARITY, an

3  electronic bid submission program, right?

4  A.  Yes.

5  Q.  Made an impression on you.  You read that letter, didn't

6  you?

7  A.  I did, yes.

8  Q.  And if you look at the second page, right here, and

9  perhaps if you could highlight it where it says, prior to a

10  sale, it says prior to a sale, we will add the issue to our

11  calendar, which will provide dealers with issue data and a

12  contact for more information; two, post the issue in the

13  appropriate state on the municipal bond map in Bonds Online,

14  www.bondsonline.com, right?

15  A.  That's what it says.

16  Q.  The bond -- notify the The Bond Buyer of the issue so that

17  they can designate it as PARITY eligible on their calendar and

18  worksheets; and, four, enter the issue into our data system.

19          Now, that told you in August of 1996, didn't it,

20  that at least Mr. Landes was familiar with the World Wide Web

21  and linking the World Wide Web to the sale of bonds, correct?

22  A.  Yes.

23  Q.  We'll come back to this letter a little bit later.  In

24  fact, sir, you described the 21st Century Municipals bid

25  submission system in your patent application, didn't you?

193

1  A.  The PARITY system, yes.

2  Q.  But you criticized that system as lacking features of your

3  invention, correct?

4  A.  That's correct.

5  Q.  Well, we'll call up Defendant's Exhibit ME, which is the

6  patent at Column 3, Lines 1 through 11.  It says:  In addition

7  to fax submissions, 21st Century Municipals, Inc., has

8  developed a modem-based electronic bid submission system using

9  a computer network and sold under the trademark PARITY.  The

10  PARITY bid submission system allows bidders who have

11  previously obtained and installed appropriate software to

12  electronically submit bids in an auction over a computer

13  network.  The PARITY system is designed to be used together

14  with fax and other bid submission methods during an auction.

15  The PARITY system is designed as a sealed bid system such that

16  the bids are not received until after the auction closes and

17  there is no feedback to the bidders during the auction.

18          All right.

19          You reviewed that before it was sent to the patent

20  office, didn't you, sir?

21  A.  Yes.

22  Q.  And you were criticizing PARITY because there were things

23  that it didn't do, correct?  That is, you were criticizing

24  PARITY because it was a modem-based software program, right?

25  A.  That was one of the limitations, yes.

                                194


1  Q.  Well, let me back up.  Isn't it a fact, sir, that the

2  description that we have just read to you is an accurate

3  description of PARITY as it exists today, except for the fact

4  that the issuer can see the winning bid over the Internet?

5  A.  I'm sorry.  Could you break that up into parts?

6  Q.  Yes.  Isn't it a fact, Mr. Harrington, that PARITY as it

7 operates today operates just like it operated in 1995, 1994,

8 1992, except that the issuer instead of dialing in to find out

9 who won uses the web to find out who won?

10 A. No.

11 Q. Well, it's a fact, isn't it, sir, that every bidder has to

12 have special software?

13 A. Using PARITY?

14 Q. Yes.

15 A. At the time that we wrote this, yes.

16 Q. And today?

17 A. I don't know. I don't know it to be shrink-wrapped

18 software of the time that was used at the time, so it would be

19 a material difference, actually.

20 Q. Do you know whether a person who uses PARITY today has to

21 have access to special software?

22 A. It's my understanding that the PARITY software is resident

23 on a central server now, much like our own.

24 Q. But let's see if we can get into this. The bidder never

25 uses the Internet in today's PARITY, right?

195

1 A.  No.  That's not correct, as I understand it.  They do,

2 bidders do use the Internet.

3 Q.  A bidder submits his bid over something other than the

4 Internet, correct?

5 A.  My understanding of it is that Internet protocols, in

6 fact, are indeed used to submit those bids.

7 Q.  Are you telling this jury that a bidder using PARITY uses

8 the Internet?

9 A.  I don't know exactly which medium every one of the PARITY

10 clients use today, because I haven't had access to that kind

11 of information.  It's all been designated as highly

12 confidential and I haven't been able to see that, but what I

13 have been able to see, Internet protocols are used to submit

14 those bids.

15 Q.  Well, let's ask it this way.  Who do you think would know

16 better whether the Internet is being used by a bidder,

17 Ms. Horowitz or Mr. Williams or you?

18 A.  Well, I don't have any idea what their background is in

19 the Internet, frankly.

20 Q.  Well, you know Mr. Williams is the president of i-Deal?

21 A.  Yes.

22 Q.  You know Ms. Horowitz, don't you?

23  A.  I'm acquainted with her.

24  Q.  Ms. Horowitz has been in this business for about 18 years,

25  correct?

                                    196

1  A.  As I said, I don't know much about their backgrounds.

2  Q.  And you don't know whether they would be a better person

3  to ask whether bids are transmitted over the Internet than

4  you?

5  A.  Again, I don't know what their background are in that

6  field.

7  Q.  Well, let's wait until they testify.  But let's ask you

8  the following question.  You were criticizing, weren't you,

9  the fact that PARITY was modem-based and required special

10  software?

11  A.  Those were some of the limitations, yes, in PARITY.  I'm

12  told -- I'm looking for the word modem in the paragraph you

13  just read.

14  Q.  Let's call up Column 30, Lines 40 to 46 and see what you

15  said about it back then.

16          You told the patent office here it is a drawback of

17 the PARITY bid submission system that to use electronic bid

18 submissions the bidders must previously obtain and install the

19 appropriate software resulting in essentially a

20 closed-computer network.

21        That's what you said back then, right?

22 A.  Correct.

23 Q.  You weren't suggesting that that was a good thing about

24 PARITY, you said that was something that PARITY had that was a

25 drawback?

197

1 A.  Yes.

2 Q.  Resulting in essentially a closed-computer network.  Do

3 you know whether PARITY today on the bidder side is

4 essentially a closed-computer network?

5 A.  I don't believe it is, no.

6 Q.  Well, who would know better, you or Mr. Williams or

7 Ms. Horowitz?

8 A.  Well, again, I don't know what they do on a day-to-day

9 basis, so I really couldn't say what their expertise is in the

10 field.

11 Q.  Now, you said an additional drawback of the PARITY system

12  is that no feedback is provided to the bidders.

13        Do you see that there?

14  A.  Yes.

15  Q.  Do you agree with me that the PARITY system as it exists

16  today, no feedback is provided to the bidders?

17  A.  No.  I wouldn't agree with that.

18  Q.  Well, you would agree that the bidders are not provided

19  the ability to see other people's bids?

20  A.  Oh, they most certainly are.

21  Q.  Not until the auction is closed; isn't that correct?

22  A.  After the bidding period ends, right.

23  Q.  So there is no feedback provided to the bidders during the

24  period, correct?

25  A.  Well, I don't believe that's correct, no.  For example,

                                    198


1  they do know that bids have been submitted and the time that

2  they were submitted.  That's in the PARITY marketing

3  literature.

4  Q.  And that information was available before your patent was

5  applied for, correct, that information was available in old

6  PARITY as well, correct?

7  A.  Not to my knowledge.

8        THE COURT:  Counsel, this is a good place for us to

9  stop today.

10        Members of the jury, we're going to break for the

11  day.  There's a couple of things I'm going to advise you of

12  before you leave and I'm going to say these a number of times

13  throughout the trial.

14        First of all, when you get home, first thing that

15  has happened is your family and friends are going to meet you

16  at the door, they're going to ask you, did you get picked?

17  What is the case about?  Is Judge Lancaster really as good

18  looking as everyone says he is?  You're going to get this.

19  You obviously tell them that you were picked.  You can

20  obviously tell them what the case is about.  You can tell them

21  the dates and times I've given you this morning in case you

22  have to make arrangements for rides, make arrangements for

23  baby-sittersand caregivers.  Obviously, though, don't allow

24  yourselves to get drawn into conversations about the case and

25  what you've heard so far.  It's very easy when you start

199

1 talking and thinking about this with other people, you get

2 ideas set in your mind and so on. It is much too early for

3 that. I want you to keep an open mind. Don't draw anything

4 on what you've heard so far. Wait until you hear all the

5 evidence, the arguments of counsel and my instructions on what

6 the law is. Please doesn't allow yourselves to get drawn into

7 a conversation about the case.

8       Secondly, if there have been any articles in the

9 paper or anything like that, please don't read them. Set them

10 aside and after the trial is over, you can read them until

11 your heart is content.

12       Do not discuss the case among yourselves, do not

13 allow anyone to discuss the case with you, including fellow

14 jurors. If anyone should try to discuss the case with you,

15 even a fellow juror, bring it to my attention promptly.

16       I'm going to ask you to retain an open mind until

17 you've heard all the testimony before you begin thinking about

18 the case.

19       Please be assembled tomorrow morning by 9:20.

20 We'll try to get started promptly at 9:30.

21       I'll see counsel in my chambers at 9:00 a.m.

22    (Court adjourned.)

23            -----

24

25

                            200


1

2            C E R T I F I C A T E

3

            I, Juliann A. Kienzle, certify that the
4   foregoing is a correct transcript from the record of proceedings
    in the above-titled matter.
5
    s/Juliann A. Kienzle
6   _____
    Juliann A. Kienzle, RMR, CRR
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25